HOLLAND & KNIGHT LLP
Warren E. Gluck, Esq.
Barbra R. Parlin, Esq.
Arthur E. Rosenberg, Esq.
31 West 52nd Street
New York, New York 10019
Telephone:  (212) 513-3200
Facsimile:  (212) 385-9010

*Counsel for the Liquidators of the Funds*

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 15 |
|  | : |  |
| PLATINUM PARTNERS VALUE | : | Case No. 16-_____  (___) |
| ARBITRAGE FUND L.P. (IN | : |  |
| PROVISIONAL LIQUIDATION),[1] *et al.*, | : | (Joint Administration Requested) |
|  | : |  |
| Debtors in | : |  |
| Foreign Proceedings. | : |  |
|  | : |  |

-------------------------------------------------------x

## DECLARATION OF CHRISTOPHER BARNETT KENNEDY
## IN SUPPORT OF CHAPTER 15 PETITIONS FOR
## RECOGNITION AS FOREIGN MAIN PROCEEDINGS

I, **CHRISTOPHER BARNETT KENNEDY**, hereby declare under penalty of perjury under

the laws of the United States as follows:

---

[1] The last four digits of the United States Tax Identification Number, or similar foreign identification number, as applicable, follow in parentheses: Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) (1954) and Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation) (2356). The registered office of the International Fund is c/o The R&H Trust Co. Ltd., Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman KY1-1103, Cayman Islands. The Master Fund's registered address is c/o Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands.

1.      My colleague Matthew James Wright and I are the duly appointed joint provisional liquidators ("**Liquidators**" or " **Petitioners**") of Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) ("**Master Fund**") and the duly appointed joint official liquidators of Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation) ("**International Fund**" and together with Master Fund, the "**Funds**").

2.      Both Funds are in liquidation pursuant to the orders of the Financial Services Division of the Grand Court of the Cayman Islands (the "**Grand Court**") (cause nos. FSD 131 of 2016 (AJJ) (Master Fund) and 118 of 2016 (AJJ) (International Fund)) (the "**Liquidation Orders**").   The Liquidation Orders were issued pursuant to sections 92 and 104 of the Companies Law, of the Cayman Islands (2016 Revision) (the "**Companies Law**") in relation to the International Fund and Master Fund, respectively.   Together, the Master Fund and the International Fund liquidations are referred to herein as the Cayman Liquidations (the "**Cayman Liquidations**").

3.      I respectfully submit this declaration (the "**Declaration**") in support of the Liquidators' petitions dated October 18, 2016 ("**Petitions**") seeking the US Bankruptcy Court's recognition of (i) the Cayman Liquidations as "foreign main proceedings" pursuant to 11 U.S.C. § 1517(b)(1) and (ii) the Petitioners as "foreign representatives" of the Funds, pursuant to 11 U.S.C. § 101(24) chapter 15 (the "**Chapter 15 Petitions**").

4.      I am a qualified insolvency practitioner and a director of RHSW (Cayman) Limited ("**RHSW**").   My colleague and fellow Liquidator, Mr. Wright, also is a qualified insolvency practitioner at RHSW.   We both meet the statutorily proscribed requirements under the Cayman Islands Insolvency Practitioners' Regulations (2008 Revision) to act as Liquidators.   We both work out of the offices of RHSW, which are located at 2nd Floor, Windward 1, Regatta Office Park, Grand Cayman, KY1-1103, Cayman Islands.

5.      I am duly authorized to make this Declaration on behalf of the Liquidators.  I am fully familiar with the facts of this matter as a consequence of my day to day conduct of the Cayman Liquidations.  Unless otherwise indicated, all statements contained herein are true to the best of my knowledge and based upon my personal knowledge of the Funds' operations and financial condition, my review of relevant documents and from my conversations with relevant personnel.  I am over the age of 18 and, if called to testify, would testify competently about the facts set forth herein.

6.      I am familiar with the Model Law on Cross-Border Insolvency, adopted by the United Nations Commission on International Trade Law (UNCITRAL), and approved by a resolution of the United Nations General Assembly on 15 December 1997.  I also understand that the Model Law has been adopted in the United States as Chapter 15 of the Bankruptcy Code 11 U.S.C. § 101, *et seq* ("**Bankruptcy Code**").    Mr. Wright and I have previously been recognized as the foreign representatives of Cayman Islands-incorporated funds pursuant to Chapter 15 of the Bankruptcy Code in the matters of *In re Niton Fund SPC*, 15-13252 (SMB) (Bankr. S.D.N.Y.); *In re Madison Niche Assets Fund, Ltd., et. al.*, 16-10043 (KJC) (Bankr. D. Del.); *In re Richcourt Euro Strategies Inc., et. al*, 15-12273 (REG) (Bankr. S.D.N.Y) (Wright only).

7.      I make this Declaration in my statutory capacity as an officer of the Grand Court, and request an extension of comity for the benefit of all of the Funds' creditors and investors, whose interests I represent.

8.      For the reasons discussed below, I submit that: (i) I am a duly appointed "foreign representative" of the Cayman Liquidations and that the Cayman Liquidations constitute "foreign proceedings" within the meaning of sections 101(23) and (24) of the Bankruptcy Code, respectively; (ii) this case was properly commenced in accordance with the requirements of Chapter 15 of the

Bankruptcy Code; and (iii) the Cayman Liquidations satisfy all the requirements to be recognized as "foreign main proceedings" pursuant to sections 1502(4) and 1517(b)(1) of the Bankruptcy Code.

## I.    General Background

9.    On October 25, 2002, the International Fund was incorporated as an exempted limited company under the laws of the Cayman Islands.  The Master Fund operates pursuant to a Second Amended and Restated Limited Partnership Agreement dated July 1, 2008, registered with the Cayman Islands Registrar of Exempted Limited Partnerships.  Prior to the Liquidators' appointment, the Funds were operated by Platinum Management (NY), LLC ("**Platinum Management**") pursuant to a management agreement between the Funds and Platinum Management.

10.    The Master Fund was registered with and regulated by the Cayman Islands Monetary Authority ("**CIMA**") as a master fund. The International Fund was registered with and regulated by CIMA as a mutual fund.  The Liquidators are liaising with CIMA in respect of the Cayman Liquidations.

11.    Following the International Funds' entry into liquidation,  its registered address was changed from c/o Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands to c/o The R&H Trust Co. Ltd., Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman KY1-1103, Cayman Islands.   The Master Fund's registered address is c/o Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands.

12.    Under the terms of its Confidential Private Offering Memorandum (the "**Offering Memorandum**"), the International Fund carries on business as an investment fund; and invests all of its investable capital in Platinum Partners Value Arbitrage Intermediate Fund Ltd., an exempted

4

limited liability company incorporated in the Cayman Islands on April 9, 2010 (the "**Intermediate Fund**").

13.    According to the terms of the Offering Memorandum, the Intermediate Fund invests all of its investable capital in, and is a limited partner of, the Master Fund.  Furthermore, the Master Fund invests and trades in U.S. and non-U.S. financial instruments and other funds as defined in the Offering Memorandum, as wells as in certain other assets and holding companies, as described below.

14.    In addition to the Intermediate Fund, one additional fund acts as a direct feeder fund into, and is a limited partner of, the Master Fund.  This entity is registered in Delaware and is known as Platinum Partners Value Arbitrage Fund (USA) L.P. (the "**Onshore Fund**").

15.    The Liquidators are appointed as the Joint Official Liquidators of the International Fund and the Joint Provisional Liquidators of the Master Fund.

16.    Under the terms of the Offering Memorandum, the International Fund offered participating shares to prospective investors.  The International Fund's investment objective was to achieve superior capital appreciation through its indirect investment in the Master Fund.  The Master Fund is a multi-strategy hedge fund.

17.    The Liquidators understand that the assets of the International Fund consist solely of its share of the Intermediate Fund, and the assets of Intermediate Fund consist solely of its limited partnership interests in the Master Fund. As such, the financial position of the International Fund is dependent upon the performance of the Master Fund and, in turn, the value of the assets in which the

Master Fund holds interests.  The assets of the Master Fund, as valued by Platinum Management as of 30 June 2016, consist of, in part[2]:

(a)    investments in securities, debt and other investment assets with a value of approximately $915,000,000;

(b)    securities purchased under agreements to resell with a value of approximately $46,000,000;

(c)    unrealised appreciation on open derivative contracts with a value of approximately $6,900,000;

(d)    amounts due from brokers with a value of approximately $49,700,000;

(e)    interest receivable in the amount of approximately $23,000,000;

(f)    a potential asset in respect of the purchase of notes under a Put Agreement with a value of $30,000,000;

(g)    notes receivable with a value of approximately $16,000,000;

(h)    participation interest with a value of approximately $3,000,000;

(i)    claims receivable with a value of approximately $2,000,000;

(j)    cash in the approximate amount of $68,500; and

(k)    prepayments of approximately $1,000,000.

18.    According to unaudited information provided to the Liquidators, the Master Fund's liabilities as of May 31, 2016 totaled approximately $382,000,000 and principally comprise:

(a)    a number of structured financial liabilities in the approximate combined

---

[2] Whilst our review of the Master Funds' assets is ongoing, the Liquidators do caveat the asset values described herein in the following principal respect.  The Master Fund holds the majority of its assets via wholly-owned subsidiaries and other vehicles.  In connection with the Liquidators' fundraising efforts, some of these assets, held via wholly-owned subsidiaries of the Master Fund, were considered for sale.  During this process, it has become clear that some of the Master Funds' subsidiaries and those subsidiaries' assets are themselves subject to various loan and encumbrance agreements that may have the effect of diminishing underlying or operational assets' value from the perspective of the Master Fund level.

principal and interest amount of $94,378,544 owed to:

(i)     Heartland Bank, a United States bank based in Arkansas; and

(ii)    the holders of a series of promissory notes issued by the Master Fund, some of whom were former investors in certain of the Master Fund's feeder funds and who hold the promissory notes in settlement of historic redemption requests submitted to such feeder funds and, indirectly, to the Master Fund;

(b)   a potential liability to New Mountain Finance Corporation (**"New Mountain"**) in the amount claimed by New Mountain of approximately $31,800,000 (as at May 18, 2016 and subject to daily accruing interest claimed for the period thereafter) regarding payments which New Mountain claims are due from the Master Fund in respect to a securities purchase and put agreement dated November 7, 2014;

(c)   indirect liabilities to certain of its ultimate redemption creditors in respect of:

(i)     unpaid redemptions and withdrawals in the approximate amount of $66,711,212; and

(ii)    audit holdback amounts in the amount of $9,910,029;

(d)   the following management fee liabilities to the Intermediate Fund and the Onshore Fund:

(i)     $4,716,731 due to the Intermediate Fund; and

(ii)    $2,683,160 due to the Onshore Fund;

(e)   accrued expenses and liabilities in the approximate amount of $6,449,468;

(f)   an amount payable to the general partner of the Master Fund of $4,291,275;

(g)   accrued trader fees of $13,073,209;

(h)   amounts due to the holders of minority interests in the Master Fund's

subsidiary companies of $1,813,251;

(i)    liabilities of approximately $106,824,701 representing the amount the Master Fund expects to be required to cover in respect of short sale contracts entered into by the Master Fund; and

(j)    unrealised depreciation on derivative contracts of approximately $15,742,077.

19.    The investigations by the Liquidators have revealed additional liabilities of the Funds not made known to them upon their appointment. For example, on March 21, 2016, the Master Fund entered into a Master Guaranty Agreement ("**Master Guaranty**") in favour of, among others, BAM Administrative Services LLC, pursuant to which the Master Fund guaranteed the repayment of certain debts owed by each of (i) Golden Gate Oil LLC (a company into which the Master Fund invests); and (ii) Montsant Partners LLC (a wholly-owned subsidiary of the Master Fund). The terms of the Master Guaranty also provide that, if the Master Fund is considered to be 'insolvent' for the purposes of the Master Guarantee, BAM Administrative Services LLC may exercise the option to deem all amounts guaranteed by the Master Guaranty to be due and payable. BAM Administrative Services LLC has filed a proof of debt in connection with the Cayman Liquidations in the amount of $79,146,350.65

20.    The Master Fund, together with its wholly-owned subsidiary DMRJ Group, LLC, entered into a Forbearance and Security Agreement (the "**Forbearance Agreement**") with Epocs Real Estate Partnership, Ltd. ("**Epocs**") and West Loop South LLC ("**West Loop**") dated 5 July 2016, in connection with loans made by Epocs and West Loop to the Master Fund. The terms of the Forbearance Agreement permitted Epocs and West Loop to collect on their claims in the event of an insolvency proceeding against the Master Fund. To that end, Epocs and West Loop have filed claims

against the Master Fund in connection with the Cayman Liquidations in the amount of $2,596,619.91 and $4,955,040.61, respectively.

## II.    Events Leading Up to the Cayman Liquidations

21.    Parris Investments Limited ("**Parris**") is a prior investor and shareholder in the International Fund. In or about August 2015, Parris purchased 556.9018 L-shares in the International Fund ("**Parris Shares**").

22.    On October 21, 2015, an article was published in Bloomberg News raising a number of concerns regarding the Funds, including: (a) a third party broker doing business with the Funds that was sanctioned by regulators for running a scheme to profit from imminent deaths of terminally ill patients; (b) one of the Master Fund's largest investments, an oil company, being charged over the death of three workers killed in an explosion; (c) a former principal of an energy company in which the Funds had a significant stake in, being arrested for tax evasion; and (d) the Master Fund's portfolio being comprised primarily of hard to value, illiquid assets.

23.    On October 27, 2015, Parris submitted a request to the International Fund for the full redemption of the Parris Shares, which was required to be completed by the International Fund by December 31, 2015 ("**Redemption Request**"). The Redemption Request was approved by the International Fund via its administrator, and consequently, under the terms of the Offering Memorandum, 90% of the payment of Parris' redemption proceeds was due on 30 January 2016.

24.    On July 28, 2016, Parris, citing, among other things, the International Fund's failure to honor the Redemption Request, filed a creditor's petition seeking the liquidation of the International Fund by the Grand Court and the appointment of the Liquidators as Joint Official Liquidators of the International Fund pursuant to the Companies Law ("**International Petition**").

25.    Parris placed notice of the filing of the International Petition and its request for appointment of the Liquidators in the *Cayman Compass* and *The Financial Times* which were published on August 15, 2016.

26.    On August 23, 2016, the Master Fund, acting through its general partner, Platinum Management (NY) LLC, presented a petition (the "**Master Petition**", and collectively with the International Petition, the "**Liquidation Petitions**") to the Grand Court under section 92 of the Companies Law, made applicable to the Master Fund by section 36 of the Exempted Limited Partnership Law, 2014 ("**ELP Law**"), seeking, among other orders, orders that provided for: the liquidation of the Master Fund to commence under the authority of the Grand Court; the appointment of Messrs. Wright and Kennedy as the Joint Official Liquidators of the Master Fund; and the granting of certain powers to the Petitioners in their capacities as the Joint Official Liquidators of the Master Fund as described in the Liquidation Petitions and as discussed in greater detail below.  A true and correct copy of the Liquidation Petitions are attached hereto as **Exhibit A**.

27.    Simultaneously with the presentation of the Master Petition, the general partner issued an *ex parte* summons to appoint the Liquidators as Joint Provisional Liquidators of the Master Fund in accordance with section 104 of the Companies Law, pending adjudication of the Master Petition (the "**Provisional Summons**"). A true and correct copy of the Provisional Summons is attached hereto as **Exhibit B**.

28.    Also on August 23, 2016, the Grand Court issued a Winding Up Order for the International Fund on the terms requested through the International Petition ("**International Order**").

29.    On August 29, 2016, the Grand Court issued an Order for the Master Fund to be placed into provisional liquidation pending the determination of the Master Petition which is due to

be heard on October, 27 2016 and appointed the Liquidators as Joint Provisional Liquidators of the Master Fund, (the "**Master Order**"). True and correct copies of the Liquidation Orders are attached hereto as **Exhibit C**.

30.    The general partner of the Master Fund reached the conclusion to wind up the Master Fund based upon their analysis of all relevant factors, including the evidence of deteriorating financial conditions discussed below.

(a)    The shift in the concentration of the Master Fund's assets to illiquid private equity style investments, which had caused an imbalance between liquid and illiquid assets. In that regard:

(i)    Historically, the Master Fund's investment portfolio had been balanced between liquid and illiquid asset classes. However, in recent years the Master Fund has built up a large concentration of illiquid, private equity style investments, which are mostly in the oil and gas sectors (which sector comprises approximately 40% of the Master Fund's investments). This has caused an imbalance in the Master Fund between liquid and private equity style investments, which historically were balanced on an approximate 50/50 basis; and

(ii)    The shift in the constitution of the Master Fund's investment portfolio assets to a large holding of illiquid assets, primarily due to the appreciation of assets that caused the private equity style illiquid investments to occupy a larger position in the Master Fund and volatility in the markets, whereby the Master Fund drew down its exposure in the liquid trading strategies and therefore was

unable to restore such liquid trading strategies and delayed monetization events;

(b)   A global decline in oil prices which has negatively affected the Master Fund's assets which operate in the oil and gas sector;

(c)   A delay in the availability of audited financial statements, due to the esoteric nature of many of the investment assets of the Master Fund, the ongoing investigations by United States regulatory agencies, and the fact that the Master Fund's Administrator has not been in a position to assist due to its remaining a creditor of the Master Fund in respect of unpaid professional services fees;

(d)   Delayed monetization events in relation to the Master Fund's investment assets, which delayed a rebalancing of the Master Fund's liquidity position;

(e)   A large amount of investor redemptions remaining unpaid past their due date, such as Parris;

(f)   The necessary borrowing of funds by the Master Fund to fund certain of its investment assets; and

(g)   The filing by Parris of a petition with the Grand Court seeking the winding up of the International Fund.

## III.   Qualifications for recognition and jurisdiction in the United States

31.   Matthew Wright and I have acted as joint liquidators in respect to more than 100 Cayman Islands companies. We have been recognized as foreign representatives pursuant to Chapter 15 in the past and are familiar with most of the offshore jurisdiction Chapter 15 cases that have been filed in the United States. In view of the foregoing, I submit that the case for Chapter 15 recognition of the Cayman Liquidations of the Funds in this instance is strong, that the need for recognition is

urgent, and that any denial of recognition would result in severe disorder and devaluation of the Funds' assets.

32.    Mr. Wright and I have been directly involved in or have supervised the Liquidators' activities in all facets of these ongoing Liquidations. Based upon this experience, I am confident that the Funds' "nerve center" has been established in the Cayman Islands with the Liquidators. All relevant parties of which I am aware have looked to and are participating in, the Cayman Islands Liquidations and the Liquidators for resolution, objection or instruction. These parties include, but are not limited to, the United States government, the Securities and Exchange Commission, former management entities, direct counterparties, management of the Funds' wholly owned subsidiaries, and the Funds' numerous creditors and investors. In addition to phone and email correspondence, the Liquidators have personally met with a majority of the Funds' major creditors and investors either directly or by their United States and Cayman Islands counsel.

33.    I further note that the subject liquidations are unusual in three main respects as compared to the numerous Cayman Liquidations in which I have participated or am aware have received recognition pursuant to Chapter 15.

34.    First, there is an unusual level of ongoing business activity in respect of the Funds and their directly-owned subsidiaries. Control and direction of this substantial business has been assumed by the Liquidators. The Funds' subsidiaries, Platinum Management, and all of the Funds' counterparties have dealt directly with the Liquidators across myriad business, financial and legal issues that have arisen in the short time since our appointment.

35.    Second, the Funds are experiencing severe and substantial liquidity problems that threaten to result in devaluation of the Funds' assets and/or assets held by wholly owned subsidiaries of the Funds. In order to stabilize and protect these assets, the Liquidators have engaged in near-daily

negotiations with (i) third party funds and investors; and (ii) insider shareholders and creditors, with the goals of obtaining financing or facilitating short-term asset sales as a means of raising additional capital. All of these entities and persons have looked to the Liquidators as the sole persons with authority to deal and conduct business on behalf of the Funds.

36.    To provide context to the scope of the work associated with the issues outlined above, and described in some further detail below, in just the eight weeks since our appointment, the Liquidators and their staff at RHSW have spent more than 1,780 hours working on critical operational and liquidity issues, as well as to the normal requirements of liquidation, such as the formation of liquidation committees and holding extensive meetings, calls and correspondence with investors, stakeholders and creditors.

37.    There is a great deal of work still to do on this matter to ensure that the Funds' investors, creditors and counterparties are protected, and the Liquidators are committed to working to provide this protection. To date, much of the Liquidators work has consisted of either (a) emergency "triage" in respect of ongoing threats to the value of the Funds' assets; (b) meeting with the Funds' most significant creditors, investors, counterparties and stakeholders; (c) defending against litigation; and (d) reporting to and seeking the sanction of the Grand Court and Liquidation Committees (defined below).

38.    <u>Third</u>, the liquidations of the Funds are atypical due to the ongoing investigations into the actions of the Funds' prior management by the United States Department of Justice and the United States Securities and Exchange Commission. In this regard, since the outset of the Liquidations, the Liquidators have been in direct contact with the Securities and Exchange Commission and the United States Attorneys' Office for the Eastern District of New York in respect of current and contemplated actions by the Liquidators. While the urgent "triage" work associated

with protecting the Funds' assets from devaluation and otherwise engaging with the Funds' investors, creditors and potential lenders has consumed most of the Liquidators' time to date, the Liquidators have already begun examining the allegations of asset overvaluation and will execute a detailed investigation in respect of the causes of the Funds' insolvency, the value of the Funds' assets, and any claims that the Funds' may have in respect of the same.

39.     Turning to the statutory requirements and the Liquidation Committee formations, the Liquidators have engaged in the following:

(a)     Upon the entry of the Liquidation Orders, the Liquidators took the various steps required under the Companies Law and the Companies Winding Up Rules 2008 (as revised) ("**CWR**"), including the publication of statutory notices and the convening of meetings of creditors of the Funds.

(b)     In respect of the International Fund, a meeting of stakeholders was held on September 23, 2016. The meeting was chaired from the Cayman Islands, and stakeholders (i.e. investors and creditors) were afforded the opportunity to participate in the meeting in the Cayman Islands, in person in New York, or telephonically. A total of 124 investors and creditors were represented at the September 23 International Fund stakeholders meeting. A total of $153,324,561 in creditor claims and 229,928.16 investment units (68.0% of total issued shares) were admitted for the purposes of voting for the International Fund liquidation committee ("**International Fund Liquidation Committee**"). Voting was executed on a "one vote per share"/ "one vote per dollar" basis. Investor votes were cast in respect of 206,120.7063 shares and creditor votes were cast in respect of $142,701,209 of creditor claims.

(c)    In respect of the Master Fund, a meeting of stakeholders was held on September 28, 2016. The meeting was chaired from the Cayman Islands, and stakeholders (i.e. investors and creditors) were afforded the opportunity to participate in the meeting in the Cayman Islands, in person in New York, or telephonically. All of the Master Funds' limited partners participated in the meeting and voted in respect of the provisional liquidation committee. A total of $177,123,616 in creditor claims were admitted for the purposes of voting for the Master Fund liquidation committee (**"Master Fund Provisional Liquidation Committee"** and, collectively with the International Fund Liquidation Committee, the **"Liquidation Committees"**). Like the International Fund, the voting was executed on a "one vote per dollar" basis and votes were cast in respect of $164,791,480 of creditor claims.

40.    The Liquidation Committees are now fully constituted, and meetings of both Liquidation Committees have been held and chaired by the Liquidators from the Cayman Islands.

41.    Both Liquidation Committees are aware of this Chapter 15 Petition.

42.    I have been advised that in order to qualify for recognition under Chapter 15, the Petitions must meet certain requirements. In particular, each of them must be brought by a "foreign representative" in respect of a "foreign proceeding" that is pending before a "foreign court," all as defined in the Bankruptcy Code.

43.    I am aware of the definition of "foreign representative," as referred to in 11 U.S.C. § 101(24), and I believe that the Liquidators qualify as such. The Liquidators were appointed by the Grand Court pursuant to the Companies Law and the CWR to act as the joint Liquidators of the Funds. Among other things, the Liquidators are charged with administering protecting and liquidating the business and assets of the Funds and acting on behalf of the Funds. The Liquidators

also are authorized to bring or defend any action or legal proceeding in the name or on behalf of the Funds, or for the benefit of their estates. As such, the Liquidators are the persons responsible for representing the Funds in the Cayman Liquidations and in all related matters, including this matter, and are therefore "foreign representatives" of each of the Funds within the meaning of section 101(24) of the Bankruptcy Code.

44.     I also have been advised that a "foreign court" is defined in section 1502 of the Bankruptcy Code as "a judicial or other authority competent to control or supervise a foreign proceeding." I respectfully submit that the Grand Court qualifies as a foreign court for purposes of section 1502.

45.     I understand that a "foreign proceeding" is defined as "a collective judicial . . . proceeding in a foreign country . . . under a law relating to insolvency or the adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23). The Cayman Liquidations qualify as such, since by definition they are liquidation proceedings pursuant to and governed by the Companies Law under the collective judicial supervision of the Grand Court for the benefit of all of the Funds' creditors, investors and parties in interest.

46.     I am also aware that section 1517(b)(1) of the Bankruptcy Code provides that a foreign proceeding shall be recognized as a "foreign main proceeding" if the foreign proceeding is pending in the country where the debtor has "the center of its main interests" ("**COMI**"). I understand that section 1516(c) of the Bankruptcy Code provides that a debtor's "registered office" is presumed to be the debtor's COMI in the absence of evidence to the contrary. Both the Master Fund and the International Fund were formed under the laws of the Cayman Islands and maintain their registered offices there. I believe that there is no basis for rebutting this statutory presumption that is

afforded, and that, in any case, the facts clearly indicate that the Funds' COMI is the Cayman Islands. As demonstrated by the facts included herein, I further believe that the Funds are engaged in non-transient economic activity in the Cayman Islands.

47.     A considerable amount of the Funds' books, records, contracts operating agreements and other critical documentation have been transferred to the Cayman Islands.

48.     To the best of the Liquidators' knowledge, no action in respect of the Funds, whether transactional-related or litigation-related, is taken without the express approval and consent of the Liquidators.

49.     Save for a small balance of cash located in New York, all of the International Fund's assets are now and always have been located in the Cayman Islands.  In particular, the International Funds' assets consist almost entirely of shares in the Intermediate Fund, another Cayman Islands company.  The situs of shares of a Cayman Islands company is the Cayman Islands.

50.     The vast majority of the Master Fund's assets take the form of illiquid debt (owed to the Fund by third parties) and ownership interests in the Funds' subsidiaries and affiliates.  All of these interests are under the sole and exclusive control of the Liquidators in the Cayman Islands.

51.     I have reviewed voluminous documentation issued by and to both Funds.  In all such documentation, each of the Funds is referred to and addressed as a Cayman Islands company.  Based upon the meetings of equity holders, and statutory demands and resolutions to wind up the Funds, all of which focused on the Cayman Islands, I believe that all relevant creditors, stakeholders, and shareholders regard the Funds to be Cayman Islands companies and the Liquidators to be the Funds' current "nerve center."

52.     As Liquidators, we have displaced the prior boards of directors of the International Fund and the prior general partner of the Master Fund, and the Funds are in liquidation before a

Cayman Islands court (the Grand Court). All creditors of the Funds may submit their claims in the Cayman Liquidations, and all claimants have the right to access the Grand Court and appeal decisions of the Liquidators. Moreover, the liquidation of the Funds and their remaining affairs are being conducted from the Cayman Islands.

53.    Substantially all of the work to date relating to the Cayman Liquidations has been conducted in the Cayman Islands and by the RHSW staff, and all of the work has been and will continue to be supervised by me and my fellow Liquidator, and, ultimately, subject to the supervision and orders of the Grand Court. In order to properly meet and confer with the Funds' stakeholders, operating companies, and potential lenders, Mr. Wright and I have travelled to New York and Texas.

54.    At the outset of the liquidation process, my colleagues in the Cayman Islands and I caused the requisite notices and filings to be filed, published and served, and in regards to the International Fund, arranged for the resignation of the Funds' principals and for the transfer of the Funds' books and records to RHSW, as the Funds' new registered office.

55.    As noted above, the Liquidators likewise have engaged in substantial formal and informal correspondence with the Funds' former principals and all relevant stakeholders, including meetings with creditors, including the Liquidation Committees, from the Cayman Islands, toward arriving at liquidation strategy consensus and handling the day-to-operations of the Funds' operating assets.

56.    The Liquidators, their staff at RHSW, and the United States and Cayman counsel of the Liquidators have worked in the interest of the Funds' creditors and stakeholders on an almost non-stop basis since the commencement of the Liquidations. I highlighted some of the major endeavors undertaken above principally for the purpose of demonstrating the clear establishment of the Funds' "nerve center" in the Cayman Islands.

57.    At the outset of the Liquidation process, a meeting was held in the Cayman Islands that was attended by Mr. Bart Schwartz of Guidepost Solutions LLC ("**Guidepost**"), engaged as an independent oversight advisor to the Funds at the time of their liquidation, two senior staff from Platinum Management, the Liquidators, and the Liquidators' United States and Cayman counsel, for the purpose of transferring control of the Funds, their books and records, and assets to the control of the Liquidators, and to generally apprise the Liquidators of the status of the ongoing government investigations and ongoing situations that threatened the Funds' assets.

58.    After the Liquidators were appointed, they were notified of ongoing investigations with respect to the Funds' former management by the U.S. Securities and Exchange Commission ("**SEC**") and the U.S. Department of Justice ("**DOJ**").  Shortly thereafter, the Liquidators contacted (a) the Funds' former counsel in relation to the ongoing investigations, (b) the SEC, and (c) the DOJ.

59.    The Liquidators, both personally and via their United States legal counsel, Holland & Knight LLP, have engaged in telephone and email correspondence with the SEC and DOJ since their appointment and are fully cooperating with these U.S. federal agencies.

60.    In particular, the Liquidators have communicated with the SEC and DOJ concerning (i) the potential sale of the Implant Sciences Corporation ("**Implant Sciences**") notes to Platinum "insiders" and (ii) the potential investment to be made by the Master Fund in Northstar Offshore Group LLC ("**Northstar**") so as to avoid the continuation of its involuntary bankruptcy (discussed below).

61.    The SEC has requested various materials concerning these topics, which have been furnished to the SEC by the Liquidators.  The most recent discussions with the SEC occurred on October 7, 2016, shortly after the Northstar status hearing held on October 5, 2016, and on October 13, 2016, shortly after the Implant Sciences bankruptcy was filed.

62.    In addition to the ongoing government investigations, two items were flagged as critical because of their urgency or the potential for serious asset devaluation.

63.    One item that the Liquidators and their counsel immediately began to address was the status of certain swap transactions with a value of more than $80 million. The Funds' counterparties in respect of these swap transactions are major U.S. financial institutions, and the circumstances surrounding these swap transactions were urgent from the outset of the Liquidators' appointment. The Liquidators and their counsel have spent dozens of hours working with these financial institutions toward unwinding these swaps.

64.    From the perspective of asset devaluation, perhaps the most significant and immediate threat concerned the Funds' lack of liquidity that is necessary to support the Funds' investments. One of these investments is Northstar. A substantial amount of Northstar's equity and a substantial amount of Northstar's debt is held by a subsidiary of the Master Fund and the Master Fund itself, respectively. It has been estimated that the Funds' Northstar holdings comprise approximately 22% of the Funds' total assets.

65.    Northstar was, at the time of the Liquidators' appointment, as well as currently, the subject of a contested involuntary bankruptcy proceedings in the Southern District of Texas, Case No. 16-34028 ("**Northstar Bankruptcy**")

66.    The Liquidators have formed the initial view that that a Northstar Bankruptcy would likely result in both a significant devaluation of the Master Funds' assets and may result in a significant creditor claim against the Master Fund because the Master Fund has guaranteed the "plugging and abandonment" liabilities associated with Northstar's oil and gas wells.

67.    Under the circumstances, the Liquidators have been in continuous negotiations with Northstar's management, creditors, relevant parties, and have been in contact with potential lenders,

asset purchasers and other capital sources in an attempt to arrange additional financing for Northstar, in the form of a loan or an equity investment.

68.     The Liquidators further made an application for directions to the Cayman Court on September 27, 2016 concerning the urgent Northstar situation. At a September 30, 2016 hearing, the Cayman Court suggested that the JPLs should consider whether it would be appropriate for one of them to personally appear at the hearing before this Court scheduled for October 5, 2016. The Cayman Court further suggested that the JPLs should consider requesting an adjournment of the status hearing in order to allow Northstar to provide the JPLs and the Cayman Court with a reorganization plan, in order for it to properly determine whether or not Northstar could continue as a going concern. The Cayman Court was not prepared to sanction the JPLs' further investment in Northstar without first considering that reorganization plan and granted the JPLs leave to reapply on short notice for sanction of the investment as soon as they were in position to place the appropriate evidence before the Cayman Court. True and correct copies of the Declaration of Matthew J. Wright dated September 29, 2016 and the Declaration of Christopher Barnett Kennedy dated October 4, 2016, submitted in the Northstar Bankruptcy, are attached hereto as **Exhibit D**.

69.     In my role as Liquidator, I appeared at the October 5, 2016 hearing in the Northstar Bankruptcy in support of Northstar's motion for abstention pursuant to 11 U.S.C. § 305(a). The Court in the Northstar Bankruptcy has set a November 30, 2016 hearing on the involuntary petition which initiated the Northstar bankruptcy.

70.     In addition to that stated above, the Liquidators have engaged and overseen the following specific and general matters on their own and through and with the assistance of Cayman and United States counsel, which actions commenced within days of the Liquidation Orders:

(a)    Overseeing the administrative and investment management operations of the Master
Fund and the International Fund;

(b)    Gaining access to and control over all electronic files of the Funds;

(c)    Meeting and communicating with Bart Schwartz of Guidepost.    Since their
appointment, the Liquidators have opened and maintained an ongoing dialogue with
Guidepost and continue to share information and cooperate in their respective roles as
far as possible.    Upon the appointment of the Liquidators, Guidepost's role with
respect to the Master Fund has been limited to it acting as a representative of the
Onshore Fund and maintaining a dialogue with respect to the wider Platinum group of
companies which are currently not in liquidation in the Cayman Islands or bankruptcy
proceedings in the United States, making or overseeing various decisions involving the
Funds spending money, selling assets and implementing litigation strategy;

(d)    Engaging in significant and substantial negotiations and meetings with Beechwood in
respect of a collateral account held by Master Fund wholly owned subsidiary,
approximately $11 million in proceeds due to the Master Fund from Beechwood in
relation to the Agera transaction, and the nature and substance of other transactions
between Beechwood and the Funds;

(e)    Working with the Master Fund's counterparties – major financial institutions – toward
unwinding of $80 million in swap contracts;

(f)    Litigating against Twosons Corporation, which has filed a lawsuit in the Supreme
Court of the State of New York styled Twosons Corp. v. Platinum Partners Value
Arbitrage Fund, L.P., Index No. 654865-2015.    In this litigation, Twosons alleges
breach of an 18 September 2014 promissory note with a current face value of

approximately $6 Million, that contains a security provision. In connection with this litigation, Twosons has sought the issuance of a temporary restraining order freezing the Master Fund's assets;

(g) Monitoring litigation involving a wholly-owned subsidiary of the Master Fund, Meserole, LLC, which is engaged in offensive litigation in relation to the dilution of its interest in a fund that owns debt and equity in respect of the company Airdye, LLC. The Master Fund is a nominal party to the various claims in arbitration that are currently pending before the American Arbitration Association and JAMS;

(h) Negotiating with New Mountain, a significant participant in the Cayman Liquidations, in respect of litigation in which New Mountain is plaintiff and the Master Fund is the defendant, which case is pending in the New York State Supreme Court for New York County, Index No. 651186/2016, which plaintiff has agreed to participate in the Cayman Liquidations and is serving on the Master Fund Liquidation Committee;

(i) Supervising and coordinating the Funds' substantial creditor and equity interests, held via a wholly owned subsidiary, in respect of the just-filed Implant Sciences bankruptcy petition, including participating as a creditor in the IMX Acquisition Bankruptcy. The Master Fund, via its wholly owned subsidiaries including but not limited to DMRJ Group, LLC ("**DMRJ**"), holds equity and debt of positions in Implant Sciences Corporation. The notes associated with the Implant Sciences Corporation debt were the subject of an application for directions. Implant Sciences Corporation has filed a Chapter 11 petition styled In re IMX Acquisition Corp., et al., 16-12238 (D.Del) and DMRJ has appeared in that proceeding as a party in interest;

(j)    Holding ongoing discussions with all of the major creditors of and equity holders in the Funds;

(k)    Forming and working with the Liquidation Committees, under the authority and upon the instructions of the Grand Court of the Cayman Islands. The Liquidators have met with the Liquidation Committees on two occasions subsequent to formation (30 September 30, 2016 and October 7, 2016) and met with the Master Fund Committee on October 14, 2016 to discuss urgent funding matters and to provide updates in relation to several of the Master Fund's assets. The Liquidators have had, and continue to have, an active and open dialogue with the Liquidation Committees and will continue to use them as a sounding board as the liquidation progresses;

(l)    Holding the official meetings of the Creditors and Investors of the International Fund (September 23, 2016) and the Master Fund (September 28, 2016) from the Cayman Islands and New York, with one Liquidator in each location and with telephone access to all creditors and investors of the applicable Fund;

(m)    Working with prior Funds' counsel and opposing counsel in connection with two pending arbitrations being held in the United States;

(n)    Working to sell promissory notes owned by a subsidiary of the Master Fund and issued by Implant Sciences;

(o)    Holding discussions and coordinating with the Funds' prior counsel regarding the ongoing investigations of the Funds by the SEC;

(p)    Engaging in correspondence and conferences with the SEC concerning the status of the Liquidations, the Liquidators, and the Northstar situation and other matters;

(q)   Meeting, holding discussions and coordinating with the Funds' prior counsel regarding the ongoing investigations of the Funds by the U.S. Attorney for the Southern and Eastern Districts of New York; and

(r)   Issuing the first comprehensive report by the Joint Provisional Liquidators of the Master Fund on October 13, 2016, which report details the activities of the Liquidators and the assets and liabilities of the Master Fund as well its wholly owned subsidiaries in substantially greater detail that this petition.  A copy of this report can be furnished to the Court *in camera* upon request.

71.   As the Liquidators' investigation continues, the relationships of the Funds, their operations, and potential claims against third parties are becoming clearer.  Potential claims will be overseen, managed and resolved (by litigation or negotiation) by the Liquidators from the Cayman Islands.

72.   I believe it is clear that the Funds' "nerve center" has been the Cayman Islands since the commencement of the Cayman Liquidations, and similarly that the Cayman Islands is the Funds' center of main interests.  I further believe it is clear that since the Commencement of the Cayman Liquidations, the Funds are engaged in non-transitory economic activity in the Cayman Islands.

73.   In accordance with 11 U.S.C. § 1515(c), I am aware of no other pending foreign insolvency proceedings, except the Cayman Liquidations, in which the Funds are the subjects of the proceedings.

74.   In accordance with Rule 1007-1(a)(4) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), a schedule of known and pending action in the United States in which either the Master Fund or the International Fund is named as a party is attached to the respective chapter 15 petitions for the Funds (the "**Litigation**"). The Liquidators are authorized under Cayman

Islands law to act on behalf of the Funds in defending against the Litigation. The disclosures required under Bankruptcy Rule 7007.1 are attached hereto as **Exhibit E**.

75.    For all of these reasons, I respectfully request that this Court enter an Order: (i) recognizing my colleague, Matthew James Wright, and myself as duly authorized foreign representatives of Master Fund and International Fund and the Cayman Liquidations as foreign main proceedings under chapter 15 of the Bankruptcy Code: and (ii) granting such other and further relief as this Court may deem just and proper.

Pursuant to Section 1746 of Title 28 of the United States Code, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: Grand Cayman, Cayman Islands

18 OCTOBER, 2016

**CHRISTOPHER BARNETT KENNEDY**

*Joint Provisional Liquidator of Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) and Joint Official Liquidator of Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation)*