# Exhibit 1

EX-10.1 2 v419204_ex10-1.htm EXHIBIT 10.1

**Exhibit 10.1**

## SECURITIES EXCHANGE AGREEMENT

This SECURITIES EXCHANGE AGREEMENT dated as of August 20, 2015 (this "Agreement") is made by and between Navidea Biopharmaceuticals, Inc., a Delaware corporation (the "Company"), and Montsant Partners LLC, a Delaware limited liability company ("Montsant"), and Platinum Partners Value Arbitrage Fund, L.P. ("Platinum" and, together with Montsant, the "Investors").

### Recitals

A.        The Investors hold an aggregate of 4,519 shares of the Company's Series B Convertible Preferred Stock, par value $0.001 per share (the "Series B Shares"), that are currently convertible into an aggregate of 14,777,130 shares of the Company's Common Stock, par value $0.001 per share (the "Common Stock").

B.        The Company has requested that the Investors exchange their respective Series B Shares for Warrants to acquire an aggregate of 14,777,130 shares of Common Stock at an exercise price per share of $0.01 per share.

C.        The Investors are willing to so exchange their Series B Shares on the terms and conditions set forth herein.

### Statement of Agreement

In consideration of the foregoing, and of their mutual agreements set forth herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

Section 1.        Defined Terms.

Capitalized terms used in this Agreement and not otherwise defined shall have the meanings stated as follows:

"Affiliate" shall mean, with respect to any Person, any other Person that directly or indirectly controls or is controlled by or under common control with such Person. For the purposes of this definition, "control," when used with respect to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise; and the terms of "affiliated," "controlling" and "controlled" have meanings correlative to the foregoing.

"By-laws" shall mean, unless the context in which such term is used otherwise requires, the By-laws of the Company or any of its Subsidiaries as in effect on a Closing Date.

"Certificate of Incorporation" shall mean, unless the context in which it is used shall otherwise require, the Certificate of Incorporation of the Company or any of its Subsidiaries as in effect on the Closing Date require.

"Commission" shall mean the Securities and Exchange Commission or any similar agency then having jurisdiction to enforce the Securities Act.

"Contractual Obligations" shall mean as to the Company, any provision of any security issued by the Company or of any agreement, undertaking, contract, indenture, mortgage, deed of trust or other instrument or arrangement (whether in writing or otherwise) to which such Person is a party or by which it or any of the Company's property is bound.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder

"Governmental Authority" shall mean the government of any nation, state, city, locality or other political subdivision of any thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, regulation or compliance, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"Lien" shall mean any mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, lien (statutory or other), charge, claim, restriction or preference, priority, right or other security interest or preferential arrangement of any kind or nature whatsoever (excluding preferred stock and equity related preferences) including, without limitation, those created by, arising under or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease obligation, or any financing lease having substantially the same economic effect as any of the foregoing..

"Material Adverse Effect" shall mean a material adverse effect on, or a material adverse change in, or a group of such effects on or changes in (i) the assets, business, properties, prospects, operations, or financial condition of the Company and its Subsidiaries, taken as a whole, or (ii) the ability of the Company to perform its obligations under this Agreement.

"Person" shall mean any individual, firm, corporation, limited liability company, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, Governmental Authority or other entity of any kind, and shall include any successor (by merger or otherwise) of such entity.

"Securities" means the Warrants and the Common Stock issuable upon exercise thereof.

"Securities Act" shall mean the Securities Act of 1933, as amended, or any similar federal statute, and the rules and regulations thereunder as the same shall be in effect at the time.
"Securities Act" shall mean the Securities Act of 1933, as amended, or any similar federal statute, and the rules and regulations thereunder as the same shall be in effect at the time.

"Subsidiary" shall mean, with respect to any Person, a corporation or other entity of which 50% or more of the voting power of the voting equity securities or equity interest is owned, directly or indirectly, by such Person. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Company or of a Subsidiary of the Company.

2

"Transaction Documents" shall mean collectively, this Agreement and the Warrants.

Section 2.    Exchange of Securities.

(a)    Subject to the terms and conditions herein set forth, at the Closing (as defined below) each Investor agrees to deliver to the Company the Series B Stock set forth on Exhibit A hereto set forth opposite its name under the heading "Preferred Stock" (collectively, the "Original Securities") in exchange for a 20 year Common Stock Purchase Warrant in the form attached hereto as Exhibit B (collectively, the "Warrants") to acquire an a number of shares of Common Stock set forth opposite its name on Exhibit A hereto under the heading "Warrant Shares" at an exercise price per share of $0.01 per share. In consideration of and in express reliance upon the representations, warranties, covenants, terms and conditions of this Agreement, the Company agrees to issue and deliver the Warrants in exchange for the Original Securities.

(b)    The closing of the transactions contemplated by this Agreement ( the "Closing") shall occur simultaneously with the execution and delivery of this Agreement or on such later date and time as the Parties may agree (the "Closing Date") at the offices of Investors, 250 West 55th Street, 14th Floor, New York, NY 10019.

(c)    At the Closing, the Investors shall deliver to the Company for cancellation the certificates evidencing all Series B Stock held by the Investors. At the Closing, the Company shall issue to Investors the duly executed and delivered Warrants.

Section 3.    Representations and Warranties of the Company.

(a)    The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has the corporate power and authority to execute, deliver and perform its obligations under this Agreement.

(b)    The execution, delivery and performance by the Company of this Agreement, the issuance of the Warrants, the exercise of the same in accordance with its terms, and the consummation of the transactions contemplated hereby and thereby (a) has been duly authorized by all necessary corporate action; (b) do not and will not contravene the terms of the Certificate of Incorporation or By-laws of the Company or any amendment thereof or any federal, state, local or foreign statute, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries are bound or affected, or any requirement of any securities exchange on which the Common Stock is listed; (c) do not and will not (i) conflict with, contravene, result in any material violation or breach of or material default under (with or without the giving of notice or the lapse of time or both), (ii) create in any other Person a right or claim of termination or amendment, or (iii) require any material modification or acceleration or cancellation of, any Contractual Obligation of the Company or any of its Subsidiaries; and (d) do not and will not result in the creation of any Lien (or obligation to create a Lien) against any material property or asset of the Company or any of its, except, in all cases, for such conflicts, defaults, terminations, amendments, acceleration, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect.

3

(c)        This Agreement has been duly executed and delivered by the Company, and this Agreement constitutes the legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, reorganization, moratorium, liquidation, conservatorship, receivership or similar laws relating to, or affecting generally the enforcement of, creditor's rights and remedies or by other equitable principles of general application.

(d)        Neither the Company nor any of its Subsidiaries is required under federal, state, foreign or local law, rule or regulation to obtain any consent, authorization or order of, or make any filing or registration with, any court or Governmental Authority in order for it to execute, deliver or perform any of its obligations under this Agreement or issue the Warrants in accordance with the terms hereof (other than any filings, consents and approvals which may be required to be made by the Company under applicable state and federal securities laws, or rules).

(e)        The Warrants to be issued at the Closing has been duly authorized by all necessary corporate action and, when issued in accordance with the terms hereof, shall be validly issued and outstanding, free and clear of all liens, encumbrances and rights of refusal of any kind, and shall be fully paid and non-assessable.

(f)        The Company has authorized and reserved, and covenants to continue to reserve, free of preemptive rights and other similar contractual rights of stockholders, shares of Common Stock sufficient to effect the exercise of the Warrants. All shares of Common Stock receivable upon exercise of the Warrants have been accepted for listing by the NYSE MKT.

(g)        The Company covenants and agrees that, promptly following the Closing Date, all Series B Shares exchanged by the Investors pursuant to this Agreement will be cancelled and retired by the Company.

(g)        The Warrants shall be deemed to be a "Warrant" for all purposes under the Transaction Documents and, without limiting the generality of the foregoing, shall be entitled to the benefits of the covenants set forth in this Agreement.

(h)        The Company has received no consideration (other than the Series B Shares) in connection with the transactions contemplated hereby. As between the parties, the acquisition and payment of the full purchase price of the Warrants, for purposes of Rule 144 under the Securities Act, shall be deemed to have occurred prior to June 1, 2013 (it being understood that any cash exercise of the Warrants shall constitute additional consideration that may affect the availability of Rule 144 for purposes of disposition of sales of Common Stock received upon exercise of the Warrants). The transactions contemplated herein are exempt from the registration requirements of the Securities Act pursuant to Section 3(a)(9) thereof.

Section 4.        <u>Representations and Warranties of Investors</u>.

(a)        Montsant is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware. Platinum is a limited partnership duly organized, validly existing and in good standing under the laws of Delaware.

(b)        The Investors have the requisite power and authority to enter into and perform this Agreement and to acquire the Warrants being issued to them hereunder. The execution, delivery and performance of this Agreement by the Investors and the consummation by it of the transactions contemplated hereby (i) have been duly authorized by all necessary limited liability company action, and (ii) do not contravene the terms of the organizational or governing documents of the Investors. No further consent or authorization of the Investors, their board of directors or other governing body, or of their members or partners, as applicable, is required for the execution, delivery or performance of this Agreement by the Investors. When executed and delivered by the Investors, this Agreement shall constitute the valid and binding obligation of the Investors enforceable against the Investors in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, conservatorship, receivership or similar laws relating to, or affecting generally the enforcement of, creditor's rights and remedies or by other equitable principles of general application.

(c)        Each Investor owns and holds, beneficially and of record, the entire right, title, and interest in and to the Original Securities set forth opposite its name on <u>Exhibit A</u> hereto, free and clear of any claim, restriction or Lien other than restrictions on transfer under the Securities Act and applicable state securities laws.

(d)        Each Investor is acquiring the Warrants for its own account and not with a view to or for sale in connection with a distribution thereof. The Investors do not have a present intention to sell any of the Warrants, nor a present arrangement (whether or not legally binding) or intention to effect any distribution of any of the Securities to or through any Person or entity; <u>provided</u>, <u>however</u>, that by making the representations herein, the Investors do not agree to hold the Warrants (or securities issued upon exercise of the Warrants) for any minimum or other specific term and reserves the right to dispose of such securities at any time in accordance with federal and state securities laws applicable to such disposition and the terms of the Warrants. Each Investor acknowledges and agrees that the Warrants shall bear a legend to the following effect:

THIS WARRANT AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR NAVIDEA BIOPHARMACEUTICALS, INC. SHALL HAVE RECEIVED AN OPINION OF COUNSEL THAT REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

(e)        Each Investor is an "accredited investor" as defined in Rule 501(a) under the Securities Act. Each Investor has such experience in business and financial matters that it is capable of evaluating the merits and risks of an investment in the Series B Shares. The Investors are not required to be registered as a broker-dealer under Section 15 of the Exchange Act and no Investor is a broker-dealer. The Investors acknowledges that an investment in the Securities is speculative and involves a high degree of risk.

(f)        The Investors understand that the Warrants and the Common Stock receivable upon exercise of the same have not been registered under the Securities Act and must be held indefinitely unless registered under the Securities Act or an exemption from registration is available. The Investors acknowledge that they are familiar with Rule 144, and that the Investors have been advised that Rule 144 permits resales of unregistered securities only under certain circumstances. The Investors understand that to the extent that Rule 144 is not available, the Investors will be unable to sell the Warrants or any shares of Common Stock received upon exercise of the same without either registration under the Securities Act or the existence of another exemption from such registration requirement.

(g)        Each Investor has independently evaluated the merits of its decision to exchange the Series B Stock for the Warrants pursuant to the Transaction Documents. The Investors have not relied on the business or legal advice of the Company or any of its agents, counsel or Affiliates in making its investment decision hereunder, and confirms that none of such Persons has made any representations or warranties to the Investors in connection with the transactions contemplated by the Transaction Documents other than as contained therein

(h)        The Investors understand that the Warrants are being issued in reliance on an exemption from the registration requirements of federal and state securities laws and the Company is relying upon the truth and accuracy of the representations, warranties, agreements, acknowledgments and understandings of the Investors set forth herein in order to determine the applicability of such exemptions. The Investors understand that no Governmental Authority has passed upon or made any recommendation or endorsement of the Warrants or Common Stock.

(i)        The Investors have not employed any broker or finder or incurred any liability for any brokerage or investment banking fees, commissions, finders' structuring fees, financial advisory fees or other similar fees in connection with the transactions contemplated by this Agreement.

(j)        Other than the other Investor and the Reporting Persons named in the Schedule 13G filed on or about February 20, 2015 by Platinum and the other Reporting Persons named therein, no Investor has agreed to act with any other Person for the purpose of acquiring, holding, voting or disposing of the Warrants acquired hereunder or the Common Stock receivable upon exercise of the same for purposes of Section 13(d) of the Exchange Act, and each Investor is acting independently with respect to its investment in the Securities.

Section 5.        <u>Conditions Precedent to the Company's Obligations</u>. The obligation hereunder of the Company to issue and deliver the Warrants to the Investors in exchange for the Original Securities is subject to the satisfaction or waiver, at or before the Closing Date, of each of the conditions set forth below. These conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion.

(a)        The Investors shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Investors at or prior to the Closing Date.

(b)        The representations and warranties of the Investors shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time, except for representations and warranties that are expressly made as of a particular date, which shall be true and correct in all material respects as of such date.

(c)        The Investors shall have delivered to the Company the Original Securities.

Section 6.        <u>Conditions Precedent to the Investors' Obligations</u>. The obligation hereunder of the Investors to accept the Warrants in exchange for the Original Securities is subject to the satisfaction or waiver, at or before the Closing Date, of each of the conditions set forth below. These conditions are for each Investor's sole benefit and may be waived by an Investor at any time in its sole discretion.

(a)        The Company shall have duly executed and delivered the Warrants.

(b)        The Company shall have delivered to the Investors evidence of the receipt of any necessary stockholder, securities exchange (including NYSE MKT) or lender consent and approval, together with evidence of the qualification for listing of any Warrant Shares on the NYSE MKT.

(c)        The Company shall have performed, satisfied and complied in all material respects with all covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date.

(d)        Each of the representations and warranties of the Company shall be true and correct in all material respects as of the date when made and as of the Closing Date as though made at that time, except for representations and warranties that speak as of a particular date, which shall be true and correct in all material respects as of such date.

(e)        The Investors shall have received an opinion of counsel to the Company, substantially in the form of Exhibit B, with such exceptions and limitations as shall be reasonably acceptable to counsel to Investors.

7

Section 7.        <u>Covenants of the Company</u>. The Company covenants and agrees with the Investors as follows:

(a)        The Company shall not enter into any agreement in which the terms of such agreement would materially restrict or impair the right or ability to perform of the Company or any Subsidiary under any Transaction Document.

(b)        So long as the Investors beneficially owns any of the Warrants, the Company shall timely file all reports required to be filed with the Commission pursuant to the Exchange Act, and the Company shall not terminate its status as an issuer required to file reports under the Exchange Act even if the Exchange Act or the rules and regulations thereunder would permit such termination.

(c)        The Company will provide, at the Company's expense, such legal opinions in the future as are reasonably necessary for the issuance and resale of the Common Stock issuable upon exercise of the Warrants pursuant to an effective registration statement, Rule 144 under the Securities Act or an exemption from registration, to the extent applicable. In the event that Common Stock is sold in a manner that complies with an exemption from registration, the Company will promptly instruct its counsel (at its expense) to issue to the transfer agent an opinion permitting removal of the legend (indefinitely, if under Rule 144, such shares of Common Stock may be sold without regards to volume limitations or the availability of current public information concerning the Company, or to otherwise permit sale of the shares if pursuant to the other provisions of Rule 144).

(d)        The Company covenants and agrees that neither it nor any other person acting on its behalf will provide the Investors or their agents or counsel with any information that the Company believes constitutes material non-public information, unless prior thereto the Investors shall have executed a written agreement regarding the confidentiality and use of such information. The Company understands and confirms that the Investors shall be relying on the foregoing representations in effecting transactions in securities of the Company. In the event of a breach of the foregoing covenant by the Company, or any of its Subsidiaries, or any of its or their respective officers, directors, employees and agents, in addition to any other remedy provided herein or in the Transaction Documents, the Company shall publicly disclose any material, non-public information in a Form 8-K within five (5) Business Days of the date that it discloses such information to an Investor. In the event that the Company discloses any material, non-public information to any Investor and fails to publicly file a Form 8-K in accordance with the above, such Investor shall have the right to make a public disclosure, in the form of a press release, public advertisement or otherwise, of such material, nonpublic information without the prior approval by the Company, its Subsidiaries, or any of its or their respective officers, directors, employees or agents. The Investors shall have no liability to the Company, its Subsidiaries, or any of its or their respective officers, directors, employees, stockholders or agents, for any such disclosure.

8

(e)    During the term of the Warrants, so long as at least 25% of the Warrants (on an aggregate basis) remains unexercised, the Company shall not, without the written consent of the Investors: (i) repurchase, redeem or pay dividends on (whether in cash, in kind, or otherwise), shares of the Common Stock; (ii) effect any distribution with respect to the Common Stock, or (iii) issue any Common Stock or Common Stock equivalent for a per Common Stock share effective price less than $1.35, other than (1) issuances of securities upon the exercise or exchange of or conversion of any securities exercisable or exchangeable for or convertible into shares of Common Stock issued and outstanding on the date hereof, provided that such securities have not been amended since the date hereof to increase the number of such securities or to decrease the exercise, exchange or conversion price of any such securities; (2) securities issued pursuant to acquisitions or strategic transactions approved by a majority of the disinterested directors, but not including, or a transaction the primary purpose of which is to raise capital; or (3) issuances, pursuant to equity compensation plans approved by the Company's shareholders, of options, restricted stock or other forms of equity compensation to employees, consultants, officers or directors of the Company, approved by a majority of the non-employee members of the Board of Directors of the Company or a majority of the members of a committee of nonemployee directors established for such purpose. For purposes of clause (iii) above, the "per Common Stock share effective price" in the case of any Common Stock equivalent shall be determined by dividing (X) the total amount received or receivable by the Company as consideration for the issue or sale of such Common Stock equivalents, plus the minimum aggregate amount of additional consideration, if any, payable to the Company upon the conversion or exercise thereof, by (Y) the total maximum number of shares of Common Stock issuable upon the conversion or exercise of all such Common Stock equivalents.

Section 8.    <u>Miscellaneous</u>.

(a)    Each party shall pay the fees and expenses of its advisors, counsel, accountants and other experts, if any, and all other expenses, incurred by such party incident to the negotiation, preparation, execution, delivery and performance of this Agreement.

(b)    Electronic transmissions or retransmissions of images of any executed original document shall be deemed to be the same as the delivery of an executed original. At the request of any party hereto, the other parties hereto shall confirm such electronic transmissions by executing duplicate original documents and delivering the same to the requesting party or parties. This Agreement may be executed in any number of counterparts and by the parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement, it being understood that all parties need not sign the same counterpart.

(c)    This Agreement and the Warrants contain the entire understanding and agreement of the parties with respect to the matters covered hereby and, except as specifically set forth herein or therein, neither the Company nor the Investors make any representation, warranty, covenant or undertaking with respect to such matters, and they supersede all prior understandings and agreements with respect to said subject matter, all of which are merged herein. No provision of this Agreement may be waived or amended other than by a written instrument signed by the Company and the Investors. Any amendment or waiver effected in accordance with this Section 7(c) shall be binding upon the Investors (and their permitted assigns) and the Company.

(d)       Any notice, demand, request, waiver or other communication required or permitted to be given hereunder shall be in writing and shall be effective (a) upon hand delivery by telecopy or facsimile at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Company:                     Navidea Biopharmaceuticals, Inc.
                                       5600 Blazer Parkway, Suite 200
                                       Dublin, Ohio 43017-1367
                                       Facsimile No.: (614) 793-7550
                                       Attention: Ricardo J. Gonzalez, Chief Executive Officer and President

with copies (which copies             Dickinson Wright PLLC
shall not constitute notice           150 East Gay Street, Suite 2400
to the Company) to:                   Columbus, Ohio 43215
                                       Facsimile No.: (248) 443-7274
                                       Attention: William J. Kelly, Esq.

If to the Investors:                   c/o Montsant Partners LLC
                                       250 West 55th Street, 14th Floor
                                       New York, NY 10019
                                       Attention: David Steinberg

with copies (which copies             Burak Anderson & Melloni, PLC
shall not constitute notice           30 Main Street, PO Box 787
to the Investors) to:                 Burlington, Vermont 05402-0787
                                       Facsimile No.: (802) 862-8176
                                       Attention: Shane W. McCormack

(e)       The article, section and subsection headings in this Agreement are for convenience only and shall not constitute a part of this Agreement for any other purpose and shall not be deemed to limit or affect any of the provisions hereof.

(f)       This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to any of the conflicts of law principles which would result in the application of the substantive law of another jurisdiction, except to the extent that the General Corporation Law of the State of Delaware shall apply.

(g)       This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the parties hereto. Subject to applicable securities laws and any restrictions contained herein, an Investor may assign any of its rights under any of the Transaction Documents to any Person, and any holder of a Warrant, may assign, in whole or in part such Warrant to any Person. The Company may not assign any of its rights, or delegate any of its obligations, under this Agreement without the prior written consent of the Investors, and any such purported assignment by the Company without the written consent of the Investors shall be void and of no effect.

10

(h)        This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

(i)        The provisions of this Agreement are severable and, in the event that any court of competent jurisdiction shall determine that any one or more of the provisions or part of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision or part of a provision of this Agreement and this Agreement shall be reformed and construed as if such invalid or illegal or unenforceable provision, or part of such provision, had never been contained herein, so that such provisions would be valid, legal and enforceable to the maximum extent possible.

[Signature Page Follows]

11

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized persons as of the date first indicated above.

**NAVIDEA BIOPHARMACEUTICALS, INC.**

By: /s/ Ricardo J. Gonzalez
    Name: Ricardo J. Gonzalez
    Title: President and CEO

**MONTSANT PARTNERS LLC**

By: /s/ David Steinberg
    Name: David Steinberg
    Title: Authorized Signatory

**PLATINUM PARTNERS VALUE ARBITRAGE FUND, L.P.**

By: /s/ David Steinberg
    Name: David Steinberg
    Title: Authorized Signatory

Exhibit A

| Investor | Preferred Stock | Warrant Shares |
|---|---|---|
| Montsant Partners LLC | 2,864 | 9,365,280 |
| Platinum Partners Value Arbitrage Fund, L.P. | 1,655 | 5,411,850 |

13

Exhibit B

(A)        Navidea is a corporation validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to execute, deliver and perform its obligations under each Transaction Document to which it is a party.

(B)        The execution and delivery of the Transaction Documents by Navidea and the performance by Navidea of its obligations under the Transaction Documents do not violate its Certificate of Incorporation or By-Laws.

(C)        Navidea has duly authorized by all necessary corporate action the execution and delivery by it of each of the Transaction Documents and the performance by it of its obligations under each of the Transaction Documents. The Transaction Documents required by the Agreement to be executed and delivered at the Closing have been duly executed and delivered by Navidea, and such Transaction Documents constitute legal, valid and binding obligations of Navidea, enforceable against Navidea in accordance with their respective terms.

(D)        The execution and delivery by Navidea of the Transaction Documents and the performance by Navidea of its obligations under such Transaction Documents do not (a) violate any existing law or regulation of general applicability of the State of New York, the United States of America or the General Corporation Law of the State of Delaware; or (b) violate any order, decree or decision of any court or governmental authority to our knowledge binding upon Navidea.

(E)        No consent, approval, authorization or order of, or registration or filing with, any court or governmental authority is required for the execution, delivery and performance by Navidea of the Transaction Documents.

(F)        The shares of Common Stock to be issued upon exercise of the Warrants are duly authorized, and assuming that Warrants are exercised immediately following the Closing in accordance with its terms, the shares of Common Stock so issuable would be validly issued, fully paid, and nonassessable.

14

# Exhibit 2

8-K 1 v419204_8-k.htm FORM 8-K

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of The Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported)                    August 20, 2015

NAVIDEA BIOPHARMACEUTICALS, INC.
(Exact name of registrant as specified in its charter)

| Delaware | 001-35076 | 31-1080091 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| 5600 Blazer Parkway, Suite 200, Dublin, Ohio | 43017 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code          (614) 793-7500

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐  Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 1.01          Entry Into a Material Definitive Agreement.**

On August 20, 2015, Navidea Biopharmaceuticals, Inc. (the "Company") entered into a Securities Exchange Agreement (the "Exchange Agreement") with two investment funds managed by Platinum Management (NY) LLC to exchange the 4,519 shares of Series B Convertible Preferred Stock ("Preferred Stock") held by them for twenty year warrants to purchase common stock of the Company ("Warrants"). The Preferred Stock was convertible into common stock at a conversion rate of 3,270 shares of common stock per share of Preferred Stock resulting in an aggregate number of shares of common stock into which the Preferred Stock was convertible of 14,777,130 shares. The exercise price of the Warrants is $0.01 per share, and the total number of shares of common stock for which the Warrants are exercisable is 14,777,130 shares. The Warrants contain cashless exercise provisions, and the other economic terms are comparable to those of the Preferred Stock, except that there is no liquidation preference associated with the Warrants or shares issuable on the exercise thereof. There was no other consideration paid or received for the exchange. Following the exchange, the Company has no shares of preferred stock outstanding.

The exchange transaction was entered into in connection with the filing of an application to list the Company's common stock on the Tel Aviv Stock Exchange ("TASE") (see Item 8.01 below), in order to comply with a listing requirement of the TASE requiring that listed companies have only one class of equity securities issued and outstanding.

The foregoing description of the terms of the Exchange Agreement and Warrants, is qualified in its entirety by reference to the text of the Exchange Agreement and form of Warrant, copies of which are attached hereto as exhibits 10.1 and 10.2, respectively, and incorporated herein by reference.

**Item 8.01          Other Events.**

On August 24, 2015, the Company issued a press release entitled "Navidea Biopharmaceuticals to Register Shares for Dual Listing on Tel-Aviv Stock Exchange." A copy of the Company's August 24, 2015, press release is filed as Exhibit 99.1 to this Current Report on Form 8-K and is incorporated herein by reference.

The information contained in Item 8.01 of this Current Report on Form 8-K, including Exhibit 99.1 attached hereto, shall not be treated as "filed" for purposes of the Securities Exchange Act of 1934, as amended.

**Item 9.01          Financial Statements and Exhibits.**

(d)          Exhibits.

| Exhibit Number | Exhibit Description |
|---|---|
| 10.1 | Securities Exchange Agreement, dated as of August 20, 2015, among the Company, Montsant Partners LLC and Platinum Partners Value Arbitrage Fund, L.P. |
| 10.2 | Form of Warrant issued to Montsant Partners LLC and Platinum Partners Value Arbitrage Fund, L.P. |
| 99.1 | Press Release, dated August 24, 2015, entitled "Navidea Biopharmaceuticals to Register Shares for Dual Listing on Tel-Aviv Stock Exchange." |

Statements contained or incorporated by reference in this Current Report on Form 8-K which relate to other than strictly historical facts, such as statements about the Company's plans and strategies, expectations for future financial performance, new and existing products and technologies, and markets for the Company's products, are forward-looking statements. The words "believe," "expect," "anticipate," "estimate," "project," and similar expressions identify forward-looking statements that speak only as of the date hereof. Investors are cautioned that such statements involve risks and uncertainties that could cause actual results to differ materially from historical or anticipated results due to many factors including, but not limited to, the Company's continuing operating losses, uncertainty of market acceptance, reliance on third party manufacturers, accumulated deficit, future capital needs, uncertainty of capital funding, dependence on limited product line and distribution channels, competition, limited marketing and manufacturing experience, and other risks detailed in the Company's most recent Annual Report on Form 10-K and other filings with the United States Securities and Exchange Commission. The Company undertakes no obligation to publicly update or revise any forward-looking statements.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Navidea Biopharmaceuticals, Inc.

Date: August 26, 2015

By: /s/ Brent L. Larson_____

Brent L. Larson, Executive Vice President and
Chief Financial Officer

# Exhibit 3

WLL15-002

**THIS WARRANT AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR NAVIDEA BIOPHARMACEUTICALS, INC. SHALL HAVE RECEIVED AN OPINION OF COUNSEL THAT REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.**

WARRANT TO PURCHASE

SHARES OF COMMON STOCK

OF

**NAVIDEA BIOPHARMACEUTICALS, INC.**

Expires August 20, 2035

No.: WLL15-002                                                      Number of Shares: 5,411,850
Date of Issuance: August 20, 2015

FOR VALUE RECEIVED, subject to the provisions hereinafter set forth, the undersigned, Navidea Biopharmaceuticals, Inc., a Delaware corporation (together with its successors and assigns, the "Issuer"), hereby certifies that Platinum Partners Value Arbitrage Fund, L.P. or its registered assigns is entitled to subscribe for and purchase, during the period specified in this Warrant, up to five million four hundred eleven thousand eight hundred fifty (5,411,850) shares (subject to adjustment as hereinafter provided) of the duly authorized, validly issued, fully paid and non-assessable Common Stock of the Issuer, at an exercise price per share equal to the Warrant Price then in effect, subject, however, to the provisions and upon the terms and conditions hereinafter set forth. Capitalized terms used in this Warrant and not otherwise defined herein shall have the respective meanings specified in Section 8 hereof.

1.    Term. The right to subscribe for and purchase shares of Warrant Stock represented hereby shall commence on the date hereof and shall expire at 5:00 p.m., Eastern Time, on August 20, 2035 (such period being the "Term").

2.    Method of Exercise Payment; Issuance of New Warrant; Transfer and Exchange.

(a)    Time of Exercise. The purchase rights represented by this Warrant may be exercised in whole or in part at any time and from time to time during the Term.

(b)    Method of Exercise. The Holder hereof may exercise this Warrant, in whole or in part, by the surrender of this Warrant (with the exercise form attached hereto duly executed) at the principal office of the Issuer, and by the payment to the Issuer of an amount of consideration therefor equal to the Warrant Price in effect on the date of such exercise multiplied by the number of shares of Warrant Stock with respect to which this Warrant is then being exercised, payable at such Holder's election (i) by certified or official bank check or by wire transfer to an account designated by the Issuer, (ii) by "cashless exercise" in accordance with the provisions of subsection (c) of this Section 2, or (iii) by a combination of the foregoing methods of payment selected by the Holder of this Warrant.

(c)    Cashless Exercise. Notwithstanding any provisions herein to the contrary, if the Per Share Market Value of one share of Common Stock is greater than the Warrant Price (at the date of calculation as set forth below) in lieu of exercising this Warrant by payment of cash, the Holder may exercise this Warrant by a cashless exercise and shall receive the number of shares of Common Stock equal to an amount (as determined below) by surrender of this Warrant at the principal office of the Issuer together with the properly endorsed Notice of Exercise in which event the Issuer shall issue to the Holder a number of shares of Common Stock computed using the following formula:

$$X = Y - \frac{(A)(Y)}{B}$$

Where X =    the number of shares of Common Stock to be issued to the Holder.

Y =    the number of shares of Common Stock purchasable upon exercise of all of the Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being exercised.

A =    the Warrant Price.

B =    the Per Share Market Value of one share of Common Stock.

(d)  Deemed Exercise on Certain Events.

(i)  This Warrant shall be deemed to have been exercised in full upon the earlier to occur of either of the following (each, an "Automatic Exercise Event"): (i) the closing of a firm commitment underwritten public offering of Common Stock of the Issuer pursuant to an effective registration statement under Section 5 of the Securities Act in which the gross cash proceeds to the Issuer (before underwriting discounts, commissions and fees) from such public offering are at least $10,000,000, or (ii) one hundred eighty (180) days following the first Trading Date upon which the Trigger Price per share of the Common Stock equals or exceeds $7.00 per share, but excluding from such 180 day period any Trading Day on which the Trigger Price is less than $5.00 per share. The number of shares of Common Stock which the Holder shall receive upon an Automatic Exercise Event shall be determined by applying the cashless exercise formula contained in Section 2(c), assuming the exercise in full of this Warrant.

(ii)  Upon the occurrence of an Automatic Exercise Event, the Warrant shall be deemed to have been exercised automatically by the holder without any further action by the holder and whether or not the Warrant is surrendered to the Company; provided, however, that the Company shall not be obligated to issue certificates evidencing the Warrant Stock issuable upon such exercise unless the Warrant are either delivered to the Company as provided in Section 2(b), or the holder certifies to the Company that the Warrant has been lost, stolen or destroyed and executes an agreement satisfactory to the Company to indemnify the Company from any loss incurred by it in connection with the Warrant. Upon surrender by the holder of the Warrant to the Company or the transfer agent, there shall be issued and delivered to such holder promptly in its name as shown on such surrendered Warrant, a certificate or certificates for the number of shares of Warrant Stock into which the Warrant surrendered were exercised on the date on which such automatic exercise occurred, and the Company shall promptly pay in cash (at the fair market value per share of Common Stock determined by the Board of Directors as of the date of exercise) the value of any fractional share of Warrant Stock otherwise issuable to the holder the Warrant being exercised. Until surrendered as provided above, the Warrant shall be deemed for all corporate purposes to represent the number of shares of Common Stock resulting from such automatic exercise.

(iii)  Notwithstanding the provisions of Section 2(d)(i) if, upon the occurrence of an Automatic Exercise Event, the Issuer cannot issue shares of Common Stock to fully effect the deemed exercise for any reason, including, without limitation, because the Issuer (i) does not have a sufficient number of shares of Common Stock authorized and available, (ii) is otherwise prohibited by applicable law or by the rules or regulations of any stock exchange, interdealer quotation system or other self-regulatory organization with jurisdiction over the Issuer or its securities from issuing all of the Common Stock which is to be issued to a holder of this Warrant, or (iii) the exercise would be prohibited by the provisions of Section 7 hereof and such prohibition has not been waived by the Holder, then the Issuer shall issue as many shares of Common Stock as it is able to issue, and with respect to the unexercised Warrant (the "Unexercised Warrant Stock"), deliver to the Holder an amended and restated Warrant in substantially the form hereof.  In the event that the Issuer is thereafter able to effect the exercise of the Unexercised Warrant Stock, it shall so notify the holder in writing, and such notice shall be deemed to be an Automatic Conversion Event for purposes of this Section 2(d).

(e)  Issuance of Stock Certificates. In the event of any exercise or deemed exercise of the rights represented by this Warrant in accordance with and subject to the terms and conditions hereof, (i) certificates for the shares of Warrant Stock so purchased shall be dated the date of such exercise and delivered to the Holder hereof within

a reasonable time, not exceeding three (3) Trading Days after such exercise (the "Delivery Date") or, at the request of the Holder, issued and delivered to the Depository Trust Company ("DTC") account on the Holder's behalf via the Deposit Withdrawal Agent Commission System ("DWAC") within a reasonable time, not exceeding three (3) Trading Days after such exercise, and the Holder hereof shall be deemed for all purposes to be the Holder of the shares of Warrant Stock so purchased as of the date of such exercise, and (ii) unless this Warrant has expired, a new Warrant representing the number of shares of Warrant Stock, if any, with respect to which this Warrant shall not then have been exercised (less any amount thereof which shall have been canceled in payment or partial payment of the Warrant Price as hereinabove provided) shall also be issued to the Holder hereof at the Issuer's expense within such time. Notwithstanding the foregoing to the contrary, the Issuer or its transfer agent shall only be obligated to issue and deliver the shares to the DTC on the Holder's behalf via DWAC (or certificates free of restrictive legends) if such exercise is in connection with a sale by the Holder and the Holder has complied with the applicable prospectus delivery requirements or an exemption from such registration requirements (each as evidenced by documentation furnished to and reasonably satisfactory to the Issuer).

(f)    Transferability of Warrant. Subject to Section 2(h), this Warrant may be transferred by a Holder without the consent of the Issuer. If transferred pursuant to this paragraph, this Warrant may be transferred on the books of the Issuer by the Holder hereof in person or by the Holder's duly authorized attorney, upon surrender of this Warrant at the principal office of the Issuer, properly endorsed (by the Holder executing an assignment in the form attached hereto) and upon payment of any necessary transfer tax or other governmental charge imposed upon such transfer. This Warrant is exchangeable at the principal office of the Issuer for Warrants for the purchase of the same aggregate number of shares of Warrant Stock, each new Warrant to represent the right to purchase such number of shares of Warrant Stock as the Holder hereof shall designate at the time of such exchange. All Warrants issued on transfers or exchanges shall be dated the Original Issue Date and shall be identical with this Warrant except as to the number of shares of Warrant Stock issuable pursuant hereto.

(g)    Continuing Rights of Holder. The Issuer will, at the time of or at any time after each exercise of this Warrant, upon the request of the Holder hereof, acknowledge in writing the extent, if any, of its continuing obligation to afford to such Holder all rights to which such Holder shall continue to be entitled after such exercise in accordance with the terms of this Warrant, provided, however, that if any such Holder shall fail to make any such request, the failure shall not affect the continuing obligation of the Issuer to afford such rights to such Holder.

(h)    Compliance with Securities Laws.

(i)    The Holder of this Warrant, by acceptance hereof, acknowledges that this Warrant and the shares of Warrant Stock to be issued upon exercise hereof are being acquired solely for the Holder's own account and not as a nominee for any other party, and, for investment, and that the Holder will not offer, sell or otherwise dispose of this Warrant or any shares of Warrant Stock to be issued upon exercise hereof except pursuant to an effective registration statement, or an exemption from registration, under the Securities Act and any applicable state securities laws.

(ii)    Except as provided in paragraph (iii) below, this Warrant and all certificates representing shares of Warrant Stock issued upon exercise hereof shall be stamped or imprinted with a legend in substantially the following form:

THIS WARRANT AND THE SHARES OF COMMON STOCK ISSUABLE UPON EXERCISE HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, TRANSFERRED OR OTHERWISE DISPOSED OF UNLESS REGISTERED UNDER THE SECURITIES ACT AND UNDER APPLICABLE STATE SECURITIES LAWS OR NAVIDEA BIOPHARMACEUTICALS, INC. SHALL HAVE RECEIVED AN OPINION OF COUNSEL THAT REGISTRATION OF SUCH SECURITIES UNDER THE SECURITIES ACT AND UNDER THE PROVISIONS OF APPLICABLE STATE SECURITIES LAWS IS NOT REQUIRED.

(iii) The restrictions imposed by this subsection (h) upon the transfer of this Warrant or the shares of Warrant Stock to be purchased upon exercise hereof shall terminate (A) when such securities shall have been resold pursuant to an effective registration statement under the Securities Act, (B) upon the Issuer's receipt of an opinion of counsel, in form and substance reasonably satisfactory to the Issuer, addressed to the Issuer to the effect that such restrictions are no longer required to ensure compliance with the Securities Act and state

securities laws or (C) upon the Issuer's receipt of other evidence reasonably satisfactory to the Issuer that such registration and qualification under the Securities Act and state securities laws are not required. Whenever such restrictions shall cease and terminate as to any such securities, the Holder thereof shall be entitled to receive from the Issuer (or its transfer agent and registrar), without expense (other than applicable transfer taxes, if any), new Warrants (or, in the case of shares of Warrant Stock, new stock certificates) of like tenor not bearing the applicable legend required by paragraph (ii) above relating to the Securities Act and state securities laws.

(i) <u>Buy In</u>. In addition to any other rights available to the Holder, if the Issuer fails to cause its transfer agent to transmit to the Holder a certificate or certificates representing the Warrant Stock pursuant to an exercise or deemed exercise on or before the Delivery Date, and if after such date the Holder is required by its broker to purchase (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of the Warrant Stock which the Holder anticipated receiving upon such exercise (a "<u>Buy-In</u>"), then the Issuer shall (1) pay in cash to the Holder the amount by which (x) the Holder's total purchase price (including brokerage commissions, if any) for the shares of Common Stock so purchased exceeds (y) the amount obtained by multiplying (A) the number of shares of Warrant Stock that the Issuer was required to deliver to the Holder in connection with the exercise at issue times, (B) the price at which the sell order giving rise to such purchase obligation was executed, and (2) at the option of the Holder, either reinstate the portion of the Warrant and equivalent number of shares of Warrant Stock for which such exercise was not honored or deliver to the Holder the number of shares of Common Stock that would have been issued had the Issuer timely complied with its exercise and delivery obligations hereunder. For example, if the Holder purchases Common Stock having a total purchase price of $11,000 to cover a Buy-In with respect to an attempted exercise of shares of Common Stock with an aggregate sale price giving rise to such purchase obligation of $10,000, under clause (1) of the immediately preceding sentence the Issuer shall be required to pay the Holder $1,000. The Holder shall provide the Issuer written notice indicating the amounts payable to the Holder in respect of the Buy-In, together with applicable confirmations and other evidence reasonably requested by the Issuer. Nothing herein shall limit a Holder's right to pursue any other remedies available to it hereunder, at law or in equity including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Issuer's failure to timely deliver certificates representing shares of Common Stock upon exercise of this Warrant as required pursuant to the terms hereof.

3.    <u>Stock Fully Paid; Reservation and Listing of Shares; Covenants</u>.

(a)    <u>Stock Fully Paid</u>. The Issuer represents, warrants, covenants and agrees that all shares of Warrant Stock which may be issued upon the exercise of this Warrant or otherwise hereunder will, upon issuance, be duly authorized, validly issued, fully paid and non-assessable and free from all taxes, liens and charges created by or through Issuer. The Issuer further covenants and agrees that during the period within which this Warrant may be exercised, the Issuer will at all times have authorized and reserved for the purpose of the issue upon exercise of this Warrant a number of shares of Common Stock equal to the aggregate number of shares of Common Stock exercisable hereunder to provide for the exercise of this Warrant (without regard to limitations on exercisability set forth in Section 7).

(b)    <u>Reservation</u>. If any shares of Common Stock required to be reserved for issuance upon exercise of this Warrant or as otherwise provided hereunder require registration or qualification with any governmental authority under any federal or state law before such shares may be so issued, the Issuer will in good faith use its best efforts as expeditiously as possible at its expense to cause such shares to be duly registered or qualified. If the Issuer shall list any shares of Common Stock on any securities exchange or market it will, at its expense, list thereon, maintain and increase when necessary such listing, of, all shares of Warrant Stock from time to time issued upon exercise of this Warrant or as otherwise provided hereunder, and, to the extent permissible under the applicable securities exchange's rules, all unissued shares of Warrant Stock which are at any time issuable hereunder, so long as any shares of Common Stock shall be so listed. The Issuer will also so list on each securities exchange or market, and will maintain such listing of, any other securities which the Holder of this Warrant shall be entitled to receive upon the exercise of this Warrant if at the time any securities of the same class shall be listed on such securities exchange or market by the Issuer.

(c)    <u>Covenants</u>. Until the sooner to occur of the full exercise of this Warrant or the end of the Term, except and to the extent as waived or consented to by the Holder, the Issuer shall not by any action, including, without limitation, amending its Certificate of Incorporation or By-Laws or through any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate to protect the rights of Holder as set forth in this Warrant against impairment or dilution. Without limiting the generality of the foregoing, the Issuer will (a) not increase the par value of any Warrant Stock above the amount payable therefor upon such exercise

immediately prior to such increase in par value, (b) take all such action as may be necessary or appropriate in order that the Issuer may validly and legally issue fully paid and nonassessable Warrant Stock upon the exercise of this Warrant, and (c) use commercially reasonable efforts to obtain all such authorizations, exemptions or consents from any public regulatory body having jurisdiction thereof as may be necessary to enable the Issuer to perform its obligations under this Warrant.

(d) <u>Loss, Theft, Destruction of Warrants</u>. Upon receipt of evidence satisfactory to the Issuer of the ownership of and the loss, theft, destruction or mutilation of any Warrant and, in the case of any such loss, theft or destruction, upon receipt of indemnity or security satisfactory to the Issuer or, in the case of any such mutilation, upon surrender and cancellation of such Warrant, the Issuer will make and deliver, in lieu of such lost, stolen, destroyed or mutilated Warrant, a new Warrant of like tenor and representing the right to purchase the same number of shares of Common Stock.

4.    <u>Adjustment of Warrant Price and Warrant Share Number</u>. The number of shares of Common Stock for which this Warrant is exercisable, and the price at which such shares may be purchased upon exercise of this Warrant, shall be subject to adjustment from time to time as set forth in this Section 4. The Issuer shall give the Holder notice of any event described below which requires an adjustment pursuant to this Section 4 in accordance with Section 5. Notwithstanding any adjustment hereunder, at no time shall the Warrant Price be greater than $0.01 per share, except if it is adjusted pursuant to Section 4(b)(iii).

(a)    <u>Recapitalization, Reorganization, Reclassification, Consolidation, Merger or Sale</u>.

(i)    In case the Issuer after the Original Issue Date shall do any of the following (each, a "<u>Triggering Event</u>"): (a) consolidate with or merge into any other Person and the Issuer shall not be the continuing or surviving corporation of such consolidation or merger, or (b) permit any other Person to consolidate with or merge into the Issuer and the Issuer shall be the continuing or surviving Person but, in connection with such consolidation or merger, any Capital Stock of the Issuer shall be changed into or exchanged for Securities of any other Person or cash or any other property, or (c) transfer all or substantially all of its properties or assets to any other Person, or (d) effect a capital reorganization or reclassification of its Capital Stock, then, and in the case of each such Triggering Event, proper provision shall be made so that, upon the basis and the terms and in the manner provided in this Warrant, the Holder of this Warrant shall be entitled upon the exercise hereof at any time after the consummation of such Triggering Event, to the extent this Warrant is not exercised prior to such Triggering Event, to receive at the Warrant Price in effect at the time immediately prior to the consummation of such Triggering Event in lieu of the Common Stock issuable upon such exercise of this Warrant prior to such Triggering Event, the Securities, cash and property to which such Holder would have been entitled upon the consummation of such Triggering Event if such Holder had exercised the rights represented by this Warrant (without giving effect to the limitations on exercise set forth in Section 7 hereof) immediately prior thereto (including the right to elect the type of consideration, if applicable), subject to adjustments (subsequent to such corporate action) as nearly equivalent as possible to the adjustments provided for elsewhere in this Section 4.

(ii)    Notwithstanding anything contained in this Warrant to the contrary and so long as the surviving entity is a Qualifying Entity, the Issuer will not be deemed to have effected any Triggering Event if, prior to the consummation thereof, each Person (other than the Issuer) which may be required to deliver any Securities, cash or property upon the exercise of this Warrant as provided herein shall assume, by written instrument delivered to the Holder of this Warrant and reasonably satisfactory to the Holder, (A) the obligations of the Issuer under this Warrant (and if the Issuer shall survive the consummation of such Triggering Event, such assumption shall be in addition to, and shall not release the Issuer from, any continuing obligations of the Issuer under this Warrant) and (B) the obligation to deliver to such Holder such shares of Securities, cash or property as, in accordance with the foregoing provisions of this subsection (a), such Holder shall be entitled to receive, and such Person shall have similarly delivered to such Holder, an opinion of counsel for such Person, which shall be reasonably satisfactory to the Holder, stating that this Warrant shall thereafter continue in full force and effect and the terms hereof (including, without limitation, all of the provisions of this subsection (a)) shall be applicable to the Securities, cash or property which such Person may be required to deliver upon any exercise of this Warrant or the exercise of any rights pursuant hereto.

(b)    <u>Stock Dividends, Subdivisions and Combinations</u>. If at any time the Issuer shall:

(i)    set a record date or take a record of the holders of its Common Stock for the purpose of entitling them to receive a dividend payable in, or other distribution of, shares of Common Stock,

(ii)  subdivide its outstanding shares of Common Stock into a larger number of shares of Common Stock, or

(iii) combine its outstanding shares of Common Stock into a smaller number of shares of Common Stock,

then (1) the number of shares of Common Stock for which this Warrant is exercisable immediately after the occurrence of any such event shall be adjusted to equal the number of shares of Common Stock which a record holder of the same number of shares of Common Stock for which this Warrant is exercisable immediately prior to the occurrence of such event (without giving effect to the limitations on exercise set forth in Section 7 hereof) would own or be entitled to receive after the happening of such event, and (2) the Warrant Price then in effect shall be adjusted to equal (A) the Warrant Price then in effect multiplied by the number of shares of Common Stock for which this Warrant is exercisable immediately prior to the adjustment (without giving effect to the limitations on exercise set forth in Section 7 hereof) divided by (B) the number of shares of Common Stock for which this Warrant is exercisable immediately after such adjustment (without giving effect to the limitations on exercise set forth in Section 7 hereof).

(c)  Certain Other Distributions. If at any time the Issuer shall set a record date or take a record of the holders of its Common Stock for the purpose of entitling them to receive any dividend or other distribution of:

(i)  cash (other than a cash dividend payable out of earnings or earned surplus legally available for the payment of dividends under the laws of the jurisdiction of incorporation of the Issuer),

(ii)  any evidences of its indebtedness, any shares of stock of any class or any other securities or property of any nature whatsoever, or

(iii) any warrants or other rights to subscribe for or purchase any evidences of its indebtedness, any shares of stock of any class or any other securities or property of any nature whatsoever,

then (1) the number of shares of Common Stock for which this Warrant is exercisable shall be adjusted to equal the product of the number of shares of Common Stock for which this Warrant is exercisable immediately prior to such adjustment (without giving effect to the limitations on exercise set forth in Section 7 hereof) multiplied by a fraction (A) the numerator of which shall be the Per Share Market Value of Common Stock at the date of taking such record and (B) the denominator of which shall be such Per Share Market Value minus the amount allocable to one share of Common Stock of any such cash so distributable and of the fair value (as determined in good faith by the Board of Directors of the Issuer and supported by an opinion from an investment banking firm reasonably acceptable to the Holder) of any and all such evidences of indebtedness, shares of stock, other securities or property or warrants or other subscription or purchase rights so distributable, and (2) the Warrant Price then in effect shall be adjusted to equal (A) the Warrant Price then in effect multiplied by the number of shares of Common Stock for which this Warrant is exercisable immediately prior to the adjustment (without giving effect to the limitations on exercise set forth in Section 7 hereof) divided by (B) the number of shares of Common Stock for which this Warrant is exercisable immediately after such adjustment (without giving effect to the limitations on exercise set forth in Section 7 hereof). A reclassification of the Common Stock (other than a change in par value, or from par value to no par value or from no par value to par value) into shares of Common Stock and shares of any other class of stock shall be deemed a distribution by the Issuer to the holders of its Common Stock of such shares of such other class of stock within the meaning of this Section 4(c) and, if the outstanding shares of Common Stock shall be changed into a larger or smaller number of shares of Common Stock as a part of such reclassification, such change shall be deemed a subdivision or combination, as the case may be, of the outstanding shares of Common Stock within the meaning of Section 4(b).

(d)  [reserved]

(e)  [reserved]

(f)  [reserved]

(g)  [reserved]

(h)  [reserved]

(i)  Other Provisions Applicable to Adjustments under this Section. The following provisions shall be applicable to the making of adjustments of the number of shares of Common Stock for which this Warrant is exercisable and the Warrant Price then in effect provided for in this Section 4:

(i) [Reserved]

(ii) [Reserved]

(iii) *Fractional Interests*. In computing adjustments under this Section 4, fractional interests in Common Stock shall be taken into account to the nearest one one-hundredth ($1/100^{th}$) of a share.

(iv) <u>*When Adjustment Not Required*</u>. If the Issuer shall take a record of the holders of its Common Stock for the purpose of entitling them to receive a dividend or distribution or subscription or purchase rights and shall, thereafter and before the distribution to stockholders thereof, legally abandon its plan to pay or deliver such dividend, distribution, subscription or purchase rights, then thereafter no adjustment shall be required by reason of the taking of such record and any such adjustment previously made in respect thereof shall be rescinded and annulled.

(j)    <u>Form of Warrant after Adjustments</u>. The form of this Warrant need not be changed because of any adjustments in the Warrant Price or the number and kind of securities purchasable upon exercise of this Warrant.

(k)    <u>Escrow of Property</u>. If after any property becomes distributable pursuant to this Section 4 by reason of the taking of any record of the holders of Common Stock, but prior to the occurrence of the event for which such record is taken, and the Holder exercises this Warrant, such property shall be held in escrow for the Holder by the Issuer to be distributed to the Holder upon and to the extent that the event actually takes place, upon payment of the then current Warrant Price. Notwithstanding any other provision to the contrary herein, if the event for which such record was taken fails to occur or is rescinded, then such escrowed property shall be returned to the Issuer.

5.    <u>Notice of Adjustments</u>. Whenever the Warrant Price or Warrant Share Number shall be adjusted pursuant to Section 4 hereof (for purposes of this Section 5, each an "adjustment"), the Issuer shall cause its Chief Financial Officer to prepare and execute a certificate setting forth, in reasonable detail, the event requiring the adjustment, the amount of the adjustment, the method by which such adjustment was calculated (including a description of the basis on which the Board made any determination hereunder), and the Warrant Price and Warrant Share Number after giving effect to such adjustment, and shall cause copies of such certificate to be delivered to the Holder of this Warrant promptly after each adjustment. Any dispute between the Issuer and the Holder of this Warrant with respect to the matters set forth in such certificate may at the option of the Holder of this Warrant be submitted to one of the national accounting firms currently known as the "big four" selected by the Holder, *provided, however,* that the Issuer shall have ten (10) days after receipt of notice from such Holder of its selection of such firm to object thereto, in which case such Holder shall select another such firm and the Issuer shall have no such right of objection. The firm selected by the Holder of this Warrant as provided in the preceding sentence shall be instructed to deliver a written opinion as to such matters to the Issuer and such Holder within thirty (30) days after submission to it of such dispute. Such opinion shall be final and binding on the parties hereto.

6.    <u>Fractional Shares</u>. No fractional shares of Warrant Stock will be issued in connection with any exercise hereof, but in lieu of such fractional shares, the Issuer shall at its option either (a) make a cash payment therefor equal in amount to the product of the applicable fraction multiplied by the Per Share Market Value then in effect or (b) issue one whole share in lieu of such fractional share.

7.    <u>Certain Exercise Restrictions.</u>

(a)    Notwithstanding anything to the contrary set forth in this Warrant, at no time may a holder of this Warrant exercise this Warrant if the number of shares of Common Stock to be issued pursuant to such exercise would exceed, when aggregated with all other shares of Common Stock owned by such holder at such time, the number of shares of Common Stock which would result in such holder beneficially owning (as determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules thereunder) in excess of 4.99% of all of the Common Stock outstanding at such time; *provided, however*, that upon a holder of this Warrant providing the Issuer with sixty-one (61) days notice (pursuant to Section 13 hereof) (the "<u>Waiver Notice</u>") that such holder would like to waive this Section 7(a) with regard to any or all shares of Common Stock issuable upon exercise of this Warrant, this Section 7(a) will be of no force or effect with regard to all or a portion of the Warrant referenced in the Waiver Notice; provided, further, that this Section 7(a) shall be of no further force or effect during the sixty-one (61) days immediately preceding the expiration of the term of this Warrant.

(b) Notwithstanding anything to the contrary set forth in this Warrant, at no time may a holder of this Warrant exercise this Warrant if the number of shares of Common Stock to be issued pursuant to such exercise would exceed, when aggregated with all other shares of Common Stock owned by such holder at such time, the number of shares of Common Stock which would result in such holder beneficially owning (as determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules thereunder) in excess of 9.99% of all of the Common Stock outstanding at such time; provided, however, that upon a holder of this Warrant providing the Issuer with sixty-one (61) days notice (pursuant to Section 13 hereof) (the "Waiver Notice") that such holder would like to waive this Section 7 with regard to any or all shares of Common Stock issuable upon exercise of this Warrant, this Section 7 will be of no force or effect with regard to all or a portion of the Warrant referenced in the Waiver Notice; provided, further, that this Section 7(b) shall be of no further force or effect during the sixty-one (61) days immediately preceding the expiration of the term of this Warrant.

8.    Definitions. For the purposes of this Warrant, the following terms have the following meanings:

"Board" shall mean the Board of Directors of the Issuer.

"Capital Stock" means and includes (i) any and all shares, interests, participations or other equivalents of or interests in (however designated) corporate stock, including, without limitation, shares of preferred or preference stock, (ii) all partnership interests (whether general or limited) in any Person which is a partnership, (iii) all membership interests or limited liability company interests in any limited liability company, and (iv) all equity or ownership interests in any Person of any other type.

"Certificate of Incorporation" means the Certificate of Incorporation of the Issuer as in effect on the Original Issue Date, and as hereafter from time to time amended, modified, supplemented or restated in accordance with the terms hereof and thereof and pursuant to applicable law.

"Closing Price" shall mean (i) the last trading price per share of the Common Stock on such date on the NYSE MKT or other registered national stock exchange on which the Common Stock is then listed, or if there is no such price on such date, then the last trading price on such exchange or quotation system on the date nearest preceding such date, or (ii) if the price of the Common Stock is not then reported on a national securities exchange, the last trading price per share of the Common Stock as reported by the OTC Bulletin Board, or (iii) if the Common Stock is not listed on a national securities exchange or quoted on the OTC Bulletin Board, then the average of the "Pink Sheet" quotes for the relevant date, as reported by the National Quotation Bureau, Inc., or (iv) if the Common Stock is not then publicly traded the fair market value of a share of Common Stock as mutually determined by the Issuer and the Majority Holders.

"Common Stock" means the Common Stock, par value $.001 per share, of the Issuer and any other Capital Stock into which such stock may hereafter be changed.

"Common Stock Equivalent" means any Convertible Security or warrant, option or other right to subscribe for or purchase any Additional Shares of Common Stock or any Convertible Security.

"Exchange Agreement" means the Securities Exchange Agreement dated as of __, 2015 between the Issuer and the Holder.

"Governmental Authority" means any governmental, regulatory or self-regulatory entity, department, body, official, authority, commission, board, agency or instrumentality, whether federal, state or local, and whether domestic or foreign.

"Holders" mean the Persons who shall from time to time own any Warrant. The term "Holder" means one of the Holders.

"Independent Appraiser" means a nationally recognized or major regional investment banking firm or firm of independent certified public accountants of recognized standing (which may be the firm that regularly examines the financial statements of the Issuer) that is regularly engaged in the business of appraising the Capital Stock or assets of corporations or other entities as going concerns, and which is not affiliated with either the Issuer or the Holder of any Warrant.

"Issuer" means Navidea Biopharmaceuticals, Inc., a Delaware corporation, and its successors.

"Majority Holders" means at any time the Holders of Warrants, substantially in the form of this Warrant, exercisable for a majority of the shares of Warrant Stock issuable under the Warrants at the time outstanding.

"Original Issue Date" means the date hereof.

"OTC Bulletin Board" means the over-the-counter electronic bulletin board.

"Person" means an individual, corporation, limited liability company, partnership, joint stock company, trust, unincorporated organization, joint venture, Governmental Authority or other entity of whatever nature.

"Per Share Market Value" means on any particular date (a) the last trading price on any national securities exchange on which the Common Stock is listed, or, if there is no such price, the closing bid price for a share of Common Stock in the over-the-counter market, as reported by the OTC Bulletin Board or in the National Quotation Bureau Incorporated or similar organization or agency succeeding to its functions of reporting prices) at the close of business on such date, or (b) if the Common Stock is not then reported by the OTC Bulletin Board or the National Quotation Bureau Incorporated (or similar organization or agency succeeding to its functions of reporting prices), then the average of the "Pink Sheet" quotes for the Common Stock on such date, or (c) if the Common Stock is not then publicly traded the fair market value of a share of Common Stock on such date as determined by the Board in good faith; provided, however, that the Majority Holders, after receipt of the determination by the Board, shall have the right to select, jointly with the Issuer, an Independent Appraiser, in which case, the fair market value shall be the determination by such Independent Appraiser; and provided, further that all determinations of the Per Share Market Value shall be appropriately adjusted for any stock dividends, stock splits or other similar transactions during the period between the date as of which such market value was required to be determined and the date it is finally determined. The determination of fair market value shall be based upon the fair market value of the Issuer determined on a going concern basis as between a willing buyer and a willing seller and taking into account all relevant factors determinative of value, and shall be final and binding on all parties. In determining the fair market value of any shares of Common Stock, no consideration shall be given to any restrictions on transfer of the Common Stock imposed by agreement or by federal or state securities laws, or to the existence or absence of, or any limitations on, voting rights.

"Qualifying Entity" means an entity which has its common equity securities traded or quoted on a national securities exchange or the OTC Bulletin Board.

"Securities" means any debt or equity securities of the Issuer, whether now or hereafter authorized, any instrument convertible into or exchangeable for Securities or a Security, and any option, warrant or other right to purchase or acquire any Security. "Security" means one of the Securities.

"Securities Act" means the Securities Act of 1933, as amended, or any similar federal statute then in effect.

"Subsidiary" means any corporation at least 50% of whose outstanding Voting Stock, and a limited liability company at least 50% of whose membership interests, shall at the time be owned directly or indirectly by the Issuer or by one or more of its Subsidiaries.

"Term" has the meaning specified in Section 1 hereof.

"Trading Day" means (a) a day on which the Common Stock is traded on the OTC Bulletin Board, or (b) if the Common Stock is not traded on the OTC Bulletin Board, a day on which the Common Stock is quoted in the over-the-counter market as reported by the National Quotation Bureau Incorporated (or any similar organization or agency succeeding its functions of reporting prices); provided, however, that in the event that the Common Stock is not listed or quoted as set forth in (a) or (b) hereof, then Trading Day shall mean any day except Saturday, Sunday and any day which shall be a legal holiday or a day on which banking institutions in the State of New York are authorized or required by law or other government action to close.

"Trigger Price" means the average VWAP for any thirty (30) consecutive Trading Days.

"Voting Stock" means, as applied to the Capital Stock of any corporation, Capital Stock of any class or classes (however designated) having ordinary voting power for the election of a majority of the members of the Board of Directors (or other governing body) of such corporation, other than Capital Stock having such power only by reason of the happening of a contingency.

"VWAP" means, for any date, (i) the daily volume weighted average price of the Common Stock for such date on the NYSE MKT (or other national securities exchange, if applicable) as reported by Bloomberg Financial L.P. (based on a Trading Day from 9:30 a.m. Eastern Time to 4:02 p.m. Eastern Time); or (ii) if the Common Stock is not then listed or quoted on a national securities exchange, and if prices for the Common Stock are then reported on the OTC Bulletin Board (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported.

"Warrants" means the Series W Warrants issued and sold pursuant to the Exchange Agreement, including, without limitation, this Warrant, and any other warrants of like tenor issued in substitution or exchange for any thereof pursuant to the provisions hereof or of any of such other Warrants.

"Warrant Price" initially means U.S. $0.01, as such price may be adjusted from time to time as shall result from the adjustments specified in this Warrant, including Section 4 hereto.

"Warrant Share Number" means at any time the aggregate number of shares of Warrant Stock which may at such time be purchased upon exercise of this Warrant, after giving effect to all prior adjustments and increases to such number made or required to be made under the terms hereof.

"Warrant Stock" means Common Stock issuable upon exercise of any Warrant or Warrants or otherwise issuable pursuant to any Warrant or Warrants.

9.   Other Notices.  In case at any time:

(a)   the Issuer shall make any distributions to the holders of Common Stock; or

(b)   the Issuer shall authorize the granting to all holders of its Common Stock of rights to subscribe for or purchase any shares of Capital Stock of any class or of any Common Stock Equivalents or other rights; or

(c)   there shall be any reclassification of the Capital Stock of the Issuer; or

(d)   there shall be any capital reorganization by the Issuer; or

(e)   there shall be any (i) consolidation or merger involving the Issuer or (ii) sale, transfer or other disposition of all or substantially all of the Issuer's property, assets or business (except a merger or other reorganization in which the Issuer shall be the surviving corporation and its shares of Capital Stock shall continue to be outstanding and unchanged and except a consolidation, merger, sale, transfer or other disposition involving a wholly-owned Subsidiary); or

(f)   there shall be a voluntary or involuntary dissolution, liquidation or winding-up of the Issuer or any partial liquidation of the Issuer or distribution to holders of Common Stock;

then, in each of such cases, the Issuer shall give written notice to the Holder of the date on which (i) the books of the Issuer shall close or a record shall be taken for such dividend, distribution or subscription rights or (ii) such reorganization, reclassification, consolidation, merger, disposition, dissolution, liquidation or winding-up, as the case may be, shall take place. Such notice also shall specify the date as of which the holders of Common Stock of record shall participate in such dividend, distribution or subscription rights, or shall be entitled to exchange their certificates for Common Stock for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, disposition, dissolution, liquidation or winding-up, as the case may be. Such notice shall be given at least twenty (20) days prior to the action in question and not less than twenty (20) days prior to the record date or the date on which the Issuer's transfer books are closed in respect thereto. The Holder shall have the right to send two (2) representatives selected by it to each meeting, who shall be permitted to attend, but not vote, at such meeting and any adjournments thereof. This Warrant entitles the Holder to receive copies of all financial and other information distributed or required to be distributed to the holders of the Common Stock.

10.   Amendment and Waiver. Any term, covenant, agreement or condition in this Warrant may be amended, or compliance therewith may be waived (either generally or in a particular instance and either retroactively or prospectively), by a written instrument or written instruments executed by the Issuer and the Majority Holders; *provided, however,* that no such amendment or waiver shall reduce the Warrant Share Number, increase the Warrant Price, shorten

WLL15-002

the period during which this Warrant may be exercised or modify any provision of this Section 11 without the consent of the Holder of this Warrant.

11. Governing Law. **THIS WARRANT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW, EXCEPT TO THE EXTENT THE GENERAL CORPORATION LAW OF DELAWARE SHALL APPLY.**

12. Notices. Any and all notices or other communications or deliveries required or permitted to be provided hereunder shall be in writing and shall be deemed given and effective on the earlier of (i) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified for notice prior to 5:00 p.m., eastern time, on a Trading Day, (ii) the Trading Day after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified for notice later than 5:00 p.m., eastern time, on any date and earlier than 11:59 p.m., eastern time, on such date, (iii) the Trading Day following the date of mailing, if sent by nationally recognized overnight courier service or (iv) actual receipt by the party to whom such notice is required to be given. The addresses for such communications shall be with respect to the Holder of this Warrant or of Warrant Stock issued pursuant hereto, addressed to such Holder at its last known address or facsimile number appearing on the books of the Issuer maintained for such purposes, or with respect to the Issuer, addressed to:

> Navidea Biopharmaceuticals, Inc.
> 5600 Blazer Parkway, Suite 200
> Dublin, OH 43017
> Tel. No.: (614) 793-7500
> Fax No.: (614) 793-7520
>
> with a copy to:
>
> Dickinson Wright PLLC
> 150 East Gay Street, Suite 2400
> Columbus, OH 43215
> Attn:  William J. Kelly, Jr.
> Fax: (248) 433-7274

Copies of notices to the Holder shall be sent to Burak Anderson & Melloni, PLC, 30 Main Street, Burlington, Vermont 05402,  Tel No.: (802) 862-0500, Fax No.: (802) 862-8176. Any party hereto may from time to time change its address for notices by giving at least ten (10) days written notice of such changed address to the other party hereto.

13. Warrant Agent. The Issuer may, by written notice to each Holder of this Warrant, appoint an agent having an office in New York, New York for the purpose of issuing shares of Warrant Stock on the exercise of this Warrant pursuant to subsection (b) of Section 2 hereof, exchanging this Warrant pursuant to subsection (d) of Section 2 hereof or replacing this Warrant pursuant to subsection (d) of Section 3 hereof, or any of the foregoing, and thereafter any such issuance, exchange or replacement, as the case may be, shall be made at such office by such agent.

14. Remedies. The Issuer stipulates that the remedies at law of the Holder of this Warrant in the event of any default or threatened default by the Issuer in the performance of or compliance with any of the terms of this Warrant are not and will not be adequate and that, to the fullest extent permitted by law, such terms may be specifically enforced by a decree for the specific performance of any agreement contained herein or by an injunction against a violation of any of the terms hereof or otherwise.

15. Successors and Assigns. This Warrant and the rights evidenced hereby shall inure to the benefit of and be binding upon the successors and assigns of the Issuer, the Holder hereof and (to the extent provided herein) the Holders of Warrant Stock issued pursuant hereto, and shall be enforceable by any such Holder or Holder of Warrant Stock.

16. Modification and Severability. If, in any action before any court or agency legally empowered to enforce any provision contained herein, any provision hereof is found to be unenforceable, then such provision shall be deemed modified to the extent necessary to make it enforceable by such court or agency. If any such provision is not enforceable as set forth in the preceding sentence, the unenforceability of such provision shall not affect the other provisions of this Warrant, but this Warrant shall be construed as if such unenforceable provision had never been contained herein.

WLL15-002

17. Headings. The headings of the Sections of this Warrant are for convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant.

18. Voting. This Warrant does not entitle the Holder to any voting rights or other rights as a shareholder of the Issuer prior to the exercise hereof as set forth in Section 2.

[Signature page follows]

WLL15-002

IN WITNESS WHEREOF, the Issuer has executed this Warrant as of August 20, 2015.

**NAVIDEA BIOPHARMACEUTICALS, INC.**

By: _____

Name: Brent L. Larson

Title: Executive Vice President and CFO

WLL15-002

## NAVIDEA BIOPHARMACEUTICALS, INC.

### WARRANT
### EXERCISE FORM

The undersigned _____, pursuant to the provisions of the within Warrant, hereby elects to purchase _____ shares of Common Stock of Navidea Biopharmaceuticals, Inc. covered by the within Warrant.

Dated: _____    Signature    _____

                                          Address    _____

                                                      _____

Number of shares of Common Stock beneficially owned or deemed beneficially owned by the Holder on the date of Exercise: _____

The undersigned is an "accredited investor" as defined in Regulation D under the Securities Act of 1933, as amended.

The undersigned intends that payment of the Warrant Price shall be made as (check one):

                    Cash Exercise _____

                    Cashless Exercise _____

If the Holder has elected a Cash Exercise, the Holder shall pay the sum of $_____ by certified or official bank check (or via wire transfer) to the Issuer in accordance with the terms of the Warrant.

If the Holder has elected a Cashless Exercise, a certificate shall be issued to the Holder for the number of shares equal to the whole number portion of the product of the calculation set forth below, which is _____.

$$X = Y - \frac{(A)(Y)}{B}$$

*Where:*

The number of shares of Common Stock to be issued to the Holder _____("X").

The number of shares of Common Stock purchasable upon exercise of all of the Warrant or, if only a portion of the Warrant is being exercised, the portion of the Warrant being exercised _____ ("Y").

The Warrant Price _____ ("A").

The Per Share Market Value of one share of Common Stock _____ ("B").

## ASSIGNMENT

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto _____ the within Warrant and all rights evidenced thereby and does irrevocably constitute and appoint _____, attorney, to transfer the said Warrant on the books of the within named corporation.

Dated: _____     Signature _____

                                   Address _____

                                           _____

## PARTIAL ASSIGNMENT

FOR VALUE RECEIVED, _____ hereby sells, assigns and transfers unto _____ the right to purchase _____ shares of Warrant Stock evidenced by the within Warrant together with all rights therein, and does irrevocably constitute and appoint _____, attorney, to transfer that part of the said Warrant on the books of the within named corporation.

Dated: _____     Signature _____

                                   Address _____

                                           _____

## FOR USE BY THE ISSUER ONLY:

This Warrant No. W-____ canceled (or transferred or exchanged) this _____ day of _____, _____, shares of Common Stock issued therefor in the name of _____, Warrant No. X-_____ issued for ____ shares of Common Stock in the name of _____.

# Exhibit 4

Report ID ICUS0016

**BNY MELLON**

Platinum

▉ - PLATINUM PARTNERS VAL ARBITRAGE FD LP

Custody Holdings
By Security - Details By Status
11/16/2017

| ISIN | Description | Ccy | Ctry Inc | Status | Loc | Reg | Traded Shares/Par Amortized Face | Settled Shares/Par | Pending Receive Shares / Par | Pending Deliver Shares/Par |
|------|-------------|-----|----------|--------|-----|-----|----------------------------------|--------------------|------------------------------|----------------------------|
| US6399920155 | NAVIDEA WTS 20AUG35 RESTR | USD | US | AVAILABLE | NYV | NAME | 5,411,850.0000 | 5,411,850.0000 | | |

TOTAL BY UNITS - ▉ - PLATINUM PARTNERS VAL ARBITRAGE FD LP

TOTAL BY AMORTIZED FACE - ▉ - PLATINUM PARTNERS VAL ARBITRAGE FD LP

# Exhibit 5

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 131 OF 2016 (AJJ)**

**IN THE MATTER OF THE COMPANIES LAW (2013 REVISION)**

**AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW, 2014**

**AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P.**

**BEFORE THE HONOURABLE MR. JUSTICE ANDREW J. JONES QC**
**IN CHAMBERS**
**25 AUGUST 2016**



<u>**ORDER**</u>

**UPON** the application (this "**Application**") of Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") acting by Platinum Management (NY) LLC (the "**General Partner**") in its capacity as the general partner of the Master Fund pursuant its *ex parte* Summons issued on 23 August 2016 for the appointment of joint provisional liquidators pursuant to section 104(3) of the Companies Law (2013 Revision) (as amended) (the "**Companies Law**") (as applied by and subject to section 36 of the Exempted Limited Partnership Law, 2014);

**AND UPON** reading the winding up petition presented by the Master Fund acting by its General Partner on 23 August 2016 2016 (the "**Petition**"), the First Affidavit of Mark Nordlicht sworn on 23 August 2016, the Second Affidavit of Nordlicht sworn on 23 August 2016, the Third Affidavit of Mark Nordlicht sworn on 24 August 2016, the First Affidavit of Matthew Wright sworn on 19 August 2016, the First Affidavit of Christopher Kennedy sworn on 19 August 2016, the First Affidavit of Patrick McConvey sworn on 24 August 2016 and the respective exhibits thereto;

**AND UPON** hearing counsel for the Master Fund, acting by its General Partner

**IT IS ORDERED THAT**:

1.      Matthew Wright and Christopher Kennedy both of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, West Bay Road, Grand Cayman, KY1-1103,

Cayman Islands, be appointed as joint provisional liquidators (the "**JPLs**") of the Master Fund with the power to act jointly and severally and during the period of their appointment, any act required or authorised to be done by the JPLs may be done by any one or more of the JPLs.

2.      The JPLs shall not be required to give security for their appointment.

3.      The JPLs are hereby authorised jointly and severally to take such steps as, in their discretion, may be necessary or expedient for the purpose of presenting a compromise or arrangement to the creditors of the Master Fund in order to facilitate the maximisation of the value of the assets of the Master Fund upon their realisation.

4.      In addition to the powers prescribed in Part II of the Third Schedule to the Companies Law, the JPLs are hereby authorised jointly and severally to exercise any of the following powers without further sanction of the Court:

  (a)      the power to defend any action or other legal pending against the Master Fund;

  (b)      the power to enter into discussions and negotiations for and on behalf of the Master Fund for the purpose of, but not limited to -

    (i)      restructuring the Master Fund's business and operations;

    (ii)     restructuring or rescheduling the Master Fund's indebtedness; and/or

    (iii)    making any compromise or arrangement with creditors or persons claiming to be creditors or having or alleging themselves to have any claim (present or future, certain or contingent, ascertained or sounding only in damages) against the Master Fund or for which the Master Fund may be rendered liable;

  (c)      the power to sell any of the Master Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels, in each case subject to the prior consent of the liquidation committee constituted pursuant to paragraph 5 of this Order (the "**Liquidation Committee**") or, if such consent is not provided, subject to the prior sanction of the Court;



(d)      the power to raise or borrow money and grant securities therefor over the property of the Master Fund, in each case subject to the prior consent of the Liquidation Committee or, if such consent is not provided, subject to the prior sanction of the Court;

(e)      the power to engage staff (whether or not as employees of the Master Fund) to assist the JPLs in the performance of their functions;

(f)      the power to engage independent attorneys and other professionally qualified persons to assist the JPLs in the performance of their functions, whether in the Cayman Islands or elsewhere provided that the JPLs shall not engage Walkers, Schulte Roth & Zabel LLP or Dechert LLP as attorneys for the JPLs;

(g)      the power to:

(i)       take control of the ownership interests of the Master Fund in its direct subsidiaries and/or joint ventures, investment, associated companies, business or other entities ("**Subsidiaries**") of the Master Fund in which the Master Fund holds an interest, in each case wherever located, as the JPLs shall think fit;

(ii)      call or cause to be called such meetings of such Subsidiaries and/or to sign such resolutions (in each case in accordance with the provisions of any relevant constitutional or related documentation of such companies) and take such other steps, including applications to appropriate courts and/or regulators, as the JPLs shall consider necessary to appoint or remove directors, legal representatives, officers, and/or managers  to or from such Subsidiaries, and in each case take such steps as are necessary to cause the registered agents (or other equivalent corporate administrators) of such Subsidiaries to give effect to the changes to the boards of directors, legal representatives, officers, and/or managers of such Subsidiaries, including (without limitation) effecting changes to the company registers of such Subsidiaries as may be deemed appropriate by the JPLs; and/or

(iii)    to take such other action in relation to all such Subsidiaries as the JPLs shall think fit for the purpose of protecting the assets of the Master Fund and managing the affairs of the Master Fund;

(h)    the power to communicate with and carry out any necessary filings with regulatory bodies as appropriate, including, without limitation, the Cayman Islands Registrar of Exempted Limited Partnerships, the Cayman Islands Monetary Authority and the United States Securities and Exchange Commission in the name and on behalf of the Master Fund;

(i)    subject to the prior sanction of the Court following an application to be made upon not less than five days' notice to the Liquidation Committee, the power to engage either Platinum Management (NY) LLC, or another professional asset manager, to act as investment adviser;

(j)    subject to the prior sanction of the Court following an application to be made upon not less than five days' notice to the Liquidation Committee, the power to engage or re-engage the services of Guidepost Solutions LLC; and

(k)    the power to do all acts and execute, in the name and on behalf of the Master Fund, all deeds, receipts and other documents in connection with the exercise of their powers notwithstanding that the JPLs are not the general partner of the Master Fund and, for that purpose, use the Master Fund's seal (if any) when necessary.

5.    A Liquidation Committee shall be constituted consisting of -

(a)    not more than three creditors of the Master Fund;

(b)    an unredeemed shareholder of Platinum Partners Value Arbitrage Fund (International) Limited (the "**Offshore Feeder Fund**"); and

(c)    a limited partner of Platinum Partners Value Arbitrage Fund (USA) LP ("the **Onshore Feeder Fund**")

6.    To the fullest extent permitted by law, the Liquidation Committee and its members shall have no duty, whether fiduciary or otherwise, to any other creditor, the Master Fund, the

Offshore Feeder Fund, the Onshore Feeder Fund, the JPLs or any other person by reason of, or in connection with, their membership of or participation in the Liquidation Committee.

7.      The Liquidation Committee be authorised to engage Cayman Islands attorneys whose fees and expenses, reasonably and properly incurred on the instructions of the Liquidation Committee, shall be paid out of the assets of the Master Fund as an expense of the provisional liquidation.

8.      The JPLs be authorised, if they think fit, to take any such action as may be necessary or desirable to obtain recognition of the appointment of the JPLs in any other relevant jurisdiction and to make applications to the courts of such jurisdictions for that purpose, including, without limitation as representatives of the Master Fund (as applicable) to seek relief under Chapter 15 of Title 11 of the United States Bankruptcy Code, and to take such steps arising in connection therewith that the JPLs may consider appropriate.

9.      Pursuant to Section 97 of the Companies Law, no suit, action or other proceedings, including criminal proceedings, shall be proceeded with or commenced against the Master Fund except with the leave of the Court and subject to such terms as the Court may impose.

10.     Pursuant to Section 99 of the Companies Law, no disposition of the Master Fund's property by or with the authority of the JPLs in either case in the carrying out of their duties and functions and the exercise of their powers pursuant to this Order shall be avoided and any payments made into or out of the bank accounts(s) of the Master Fund in the ordinary course of business of the Master Fund between the date of the presentation of the Petition herein and the date of the appointments of the JPLs shall not be avoided by virtue of the provisions of section 99 of the Companies Law in the event of an order for the winding up of the Master Fund being made on the Petition.

11.     The costs of and incidental to the Application incurred by the Master Fund shall be agreed and paid by the JPLs out of the assets of the Master Fund.



**AND IT IS FURTHER DIRECTED THAT:**

12.    The hearing of the Petition shall be adjourned to 27 October 2016 at 10.00 am and any creditor of the Master Fund shall have liberty to apply, upon not less than 14 days' notice to the Master Fund and the JPLs, to –

11.1 discharge or vary this order; and/or

11.2 remove the JPLs and appoint alternative provisional liquidators.

13.    Any creditor or shareholder of the Offshore Feeder Fund and any creditor or limited partner of the Onshore Feeder Fund may be heard on the adjourned hearing of the Petition.

14.    The JPLs and/or the General Partner shall cause copies of the Petition and this Order to be served upon –

14.1    all creditors of the Master Fund;

14.2    all redemption creditors and shareholders of the Offshore Feeder Fund; and

14.3    all creditors and limited partners of the Onshore Feeder Fund.

15.    The JPLs shall provide copies of all affidavits and exhibits thereto filed in support of the Petition and the Summons, upon request, to any creditor, shareholder and/or limited partner of the Master Fund, the Offshore Feeder Fund and the Onshore Feeder Fund.

16.    The JPLs shall file a report to the Court detailing the progress of the provisional liquidation and setting out their recommendations for any potential restructuring and shall make such report available to all creditors and limited partners of the Master Fund and all creditors and shareholders of the Offshore Feeder Fund and all creditors and limited partners of the Onshore Feeder Fund by no later than 13 October 2016.



17.    A transcript of the hearing of this Application shall be prepared and approved by the Judge and the JPLs shall provide copies, upon request, all creditors, shareholders and limited partners of the Master Fund, the Offshore Feeder Fund and the Onshore Feeder Fund.

DATED this 25th day of August 2016

FILED this 29th day of August 2016

_____
**The Honourable Mr. Justice Andrew J. Jones QC**

**JUDGE OF THE GRAND COURT**

This Order is filed by Walkers, Attorneys at Law for the Petitioner whose address for service is care of its said Attorneys at Law, Walkers, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9001, Cayman Islands.

# Exhibit 6

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO: FSD 131 of 2016 (AJJ)

The Honourable Mr. Justice Andrew J. Jones QC
In Open Court, 27 October 2016

IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)

AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW, 2014

AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN PROVISIONAL LIQUIDATION)

---

### WINDING UP ORDER

---

**UPON** hearing counsel for Platinum Management (NY) LLC in its capacity as general partner of Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) (the "**Master Fund**") on the adjourned hearing of the winding up petition presented in respect of the Master Fund on 23 August 2016

**AND UPON** reading the First affidavit of Harris D. Kealey sworn on 19 October 2016, the Second Affidavit of Matthew Wright sworn on 24 October 2016, the First Affidavit of Claire Loebell sworn on 10 October 2016, the First Affidavit of Kieran Hutchison sworn on 12 October 2016, the Fourth Affidavit of Mark Nordlicht sworn on 26 October 2016, the Third Affidavit of Matthew Wright sworn on 26 October 2016, the First Affidavit of Richard Bernstein sworn on 26 October 2016 and the respective exhibits thereto

**AND UPON** hearing (a) counsel for Mr. Matthew Wright and Mr. Christopher Kennedy, both of RHSW (Cayman) Limited ("**Messrs. Wright and Kennedy**") in their capacity as joint provisional liquidators of the Master Fund, (b) counsel for New Mountain Finance Company, a creditor of the Master Fund, (c) counsel for BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, Senior Health Insurance Company of Pennsylvania and BBIL ULICO (referred to collectively as "the Beechwood Group"), Jules and Barbara Nordlicht, Parker Family Limited Partnership, Alaska Trust Company, Swedbank for Core Peak Hedge, Adela Kenner de Katz, Shumuel and Serena Fuchs Foundation, Paularene Management Inc. and Rivie Schewebel

Retirement Plan, creditors of the Master Fund and/or shareholders or creditors of Platinum Partners Value Arbitrage Fund (International) Limited (In Liquidation) (the "**Feeder Fund**")

**AND UPON** having determined that the same insolvency practitioners should not serve as official liquidators of both the Master Fund and the Feeder Fund

**AND UPON** Messrs Wright and Kennedy having given notice to the Court of their intention to resign as official liquidators of the Feeder Fund in the event that their interim appointment as official liquidators of the Master Fund is confirmed by the Court at a hearing to be held on 12 December 2016 in respect of both this cause and Cause FSD 118 of 2016 – AJJ) (the "**Combined Hearing**")

**AND UPON** the Court having determined that all matters relating to the appointment of official liquidators of the Master Fund and Feeder Fund should be heard and determined together at the Combined Hearing

**IT IS ORDERED THAT**

1.      The Master Fund be wound up in accordance with the provisions of the Companies Law (2016 Revision) as applied by section 36 of the Exempted Limited Partnership Law 2014.

2.      Messrs. Wright and Kennedy of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, PO Box 897, Grand Cayman, KY1-1103, be appointed as the joint official liquidators of the Master Fund on an interim basis until the end of the Combined Hearing or further order of the Court.

3.      The Official Liquidators shall have the power to act jointly and severally and any act required or authorised to be done by the official liquidators may be done by either or both of them.

4.      The Official Liquidators shall not be required to give security for their appointment.

5.      In addition to the powers prescribed in Part II of the Third Schedule to the Companies Law (2016 revision), the Official Liquidators may also exercise the following powers set

out in Part I of the Third Schedule without further sanction or intervention from the Grand Court:

a.      the power to defend or continue any action or legal proceedings pending against the Master Fund or previously commenced by the Master Fund, including but not limited to those actions and proceedings referred to in paragraphs 3.52 to 3.59 of the Abridged Report;

b.      the power, subject to the unanimous approval of the liquidation committee (failing which, the sanction of the court, to be sought on no less than 5 days' notice),  to sell any of the Master Fund's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels in order to be able to realise any of the Master Funds' assets;

c.      the power to engage Collas Crill as Cayman Islands legal counsel and Holland & Knight as United States legal counsel;  and

d.      power to continue the petition presented to the United States Bankruptcy Court, Southern District of New York (No.16-1295-scc) for recognition under Chapter 15 of the United States Bankruptcy Code.

6.      No suit, action or other proceedings, including criminal proceedings, shall be proceeded or commenced against the Master Fund except with leave of the Grand Court pursuant to section 97 of the Companies Law (2016 Revision).

7.      No disposition of the Master Fund property by or with the authority of the Official Liquidators in the carrying out of their duties and functions and the exercise of their powers shall be avoided by virtue of section 99 of the Companies Law.

## AND IT IS FURTHER DIRECTED THAT

8.      The Official Liquidators shall prepare and file a report to the Court which shall deal with the following matters -

(a) A plan in respect of the work intended to be performed by or on behalf of the Official Liquidators in the six months ended 30 April 2017, including details of the staff who will be engaged;

(b) A budget in respect of the anticipated liquidation expenses for the period ended 30 April 2017;

(c) Details of any law firms other than Collas Crill and Holland & Knight which are proposed to be engaged by the Official Liquidators;

(d) Details of the professional portfolio manager(s) intended to be engaged or re-engaged  by the Official Liquidators, including drafts of the proposed contracts of engagement;

(e) In the event that the Official Liquidators intend to engage Guidepost Solutions LLC, details of the proposed engagement including a draft of the proposed contract of engagement;

(f) Details of the "key professionals" intended to be engaged by the Official liquidators or employed by the Master Fund and/or any of its subsidiaries, including drafts of the proposed contracts engagement or employment; and

(g) Details of any other professional service providers intended to be engaged by the Official Liquidators or engaged or re-engaged to act on behalf of the Master Fund and/or any of its subsidiaries, including drafts of the proposed contracts of engagement

("**the Report**").

9.    The Report shall be filed by Monday 21 November 2016 and shall be served on or sent by e-mail to (a) the members of the Liquidation Committees of both the Master Fund and the Feeder Fund, (b) all known creditors of the Master Fund and (c) the shareholders and all known creditors of the Feeder Fund.

10.    The Liquidation Committee constituted following the meeting convened on 28 September 2016 (pursuant to paragraph 5 of the Order made on 25 August 2016) shall remain in place and retain its authority to act until further order of the Court.

11.    In the event that the Liquidation Committee (or any of its members acting individually) or any creditor of the Master Fund wishes to nominate a qualified insolvency practitioner(s) for appointment as official liquidator of the Master Fund in place of Messrs. Wright and Kennedy, notice of his intention together with supporting affidavits which shall comply

with the requirements of CWR Order 3, rule 4 and address, so far as possible, the matters referred to in the Report, shall be served on the Official Liquidators no later than Monday 5 December 2016

DATED this 27th day of October 2016

FILED this 2nd day of November 2016

The Honourable Mr. Justice Andrew J. Jones QC

# Exhibit 7

(d) The power to take such other action in relation to any of the Subsidiaries as the Official Liquidators think fit for the purpose of protecting their assets and, indirectly, the assets of the Master Fund; and

(e) The power to re-engage, on terms complying with CWR Order 25, all or any of those foreign lawyers currently acting for the Master Fund itself (either alone or jointly with one or more Subsidiaries) in connection with any proceedings or arbitrations to which the Master Fund is a party.

3.    The Official Liquidators are authorised to engage -

(a) GLC Advisors & Co as portfolio managers and advisers on substantially the same terms as the letter agreement contained in Appendix III to the Second Report;

(b) LDM Global as IT consultants on substantially the same terms as those set out in the proposal and terms of engagement contained in Appendix IV to the Second Report;

(c) The Singapore law firm of DLA Piper on terms compliant with CWR Order 25.

4.    The Official Liquidators' costs of this application, including the cost of the Second Report and the hearing on 27 October 2016 shall be paid out of the assets of the Master Fund as an expense of the liquidation (except that the added cost of engaging leading counsel shall be disallowed).

5.    The Liquidation Committee's costs of this hearing (limited to the fees charged by Priestleys) shall be paid out of the assets of the Master Fund as an expense of the liquidation.

DATED this 16th day of December 2016

FILED this 20th day of December 2016

The Honourable Mr. Justice Andrew J. Jones QC

This Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, Floor 2, Willow House, Cricket Square, George Town, PO Box 709, Grand Cayman, KY1-1107, CAYMAN ISLANDS

# Exhibit 8

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO: FSD 131 of 2016 (AJJ)**

**IN CHAMBERS**
**29 SEPTEMBER 2017**

**BEFORE THE HONOURABLE MR. JUSTICE ANDREW J. JONES QC**

**IN THE MATTER OF THE COMPANIES LAW (2016 REVISION)**

**AND IN THE MATTER OF THE EXEMPTED LIMITED PARTNERSHIP LAW (2014 REVISION)**

**AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN OFFICIAL LIQUIDATION)**

---

**ORDER**

---

**UPON** reading the application of Mr. Matthew Wright and Mr. Christopher Kennedy both of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, the joint official liquidators (the "**JOLs**") of Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") made by letter dated 15 September 2017 (the "**Application**")

**AND UPON** reading the Application and its enclosures

**AND UPON** the Liquidation Committee of the Master Fund consenting to the Application

**AND UPON** the JOLs having engaged Rehmann Robson as US tax advisors

**AND UPON** the JOLs having negotiated the terms of a proposed Settlement and Assignment Agreement and General Release (the "**Airdye Settlement**") made by and among the Master Fund; Platinum Partners Credit Opportunities Master Fund LP ("**PPCO**"); and Meserole LLC; Airdye Holdings LLC; Saviva FS I LP; Saviva FS I GP LLP; Fuller Smith Capital Management LLC; Daniel Fuller; Debs Corporation; Hiroshi Hayashi; Soubhi Debs; Hani Debs; and Mystic Bay Holdings Ltd

1

**AND UPON** the Court being satisfied that the resignation of Mr Matthew Wright as a joint official liquidator of the Master Fund should take effect from 30 September 2017 and that Mr Martin Nicholas John Trott should be appointed as successor liquidator

**IT IS ORDERED THAT:**

1.  The JOLs shall have the power to engage Rehmann Robson as tax advisors on the terms pursuant to the engagement letter executed on behalf of the Master Fund on 12 September 2017.

2.  The JOLs shall have the power to enter into the Airdye Settlement on substantially the same terms as the version enclosed with the Application and executed on behalf of PPCO.

3.  Mr Matthew Wright be released from the performance of any further duties as joint official liquidator of the Master Fund with effect from 30 September 2017 without the need to prepare a report and accounts in accordance with Order 10, rule 2 of the Companies Winding Up Rules 2008 (as amended) ("**CWR**").

4.  Mr Martin Nicholas John Trott of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, be hereby appointed as successor liquidator to Matthew Wright with effect from 30 September 2017 pursuant to Order 5, rule 6 of CWR.

5.  The Application and the supporting documents enclosed with it shall be sealed for a period of six months.

6.  The costs of and incidental to this application insofar as they relate to paragraphs 1 and 2 of this Order shall be paid out of the assets under the JOLs' control as an expense of the administration of the PSC Trust (as defined in the Summons dated 22 August 2017) and/or as an expense of the liquidation.

7.  The additional costs of this application insofar as they relate to paragraphs 3 and 4 of this Order are not recoverable as an expense of the administration of the

2

This Draft Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, 2nd Floor , Willow House, Cricket Square, PO Box 709, Grand Cayman, KY1-1107, Cayman Islands

PSC Trust (as defined in the Summons dated 22 August 2017) and/or as an expense of the liquidation.

**DATED** this 29th day of September 2017

**FILED** this 2nd day of October 2017

**The Honourable Mr. Justice Andrew J. Jones QC**
**Judge of the Grand Court**

This Draft Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, 2nd Floor , Willow House, Cricket Square, PO Box 709, Grand Cayman, KY1-1107, Cayman Islands

# Exhibit 9

<u>**IN THE GRAND COURT OF THE CAYMAN ISLANDS**</u>

<u>**FINANCIAL SERVICES DIVISION**</u>

<u>**CAUSE NO: FSD 131 of 2016 (NAS)**</u>

**IN CHAMBERS**

**BEFORE THE HONOURABLE MR. JUSTICE NICHOLAS A. SEGAL**

**IN THE MATTER OF THE COMPANIES LAW (2018 REVISION)**

**AND IN THE MATTER OF PLATINUM PARTNERS VALUE ARBITRAGE FUND L.P. (IN OFFICIAL LIQUIDATION)**

---

**ORDER**

---

**UPON** reading the application of Mr. Martin Trott and Mr Christopher Kennedy both of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, the joint official liquidators (the "**JOLs**") of Platinum Partners Value Arbitrage Fund L.P. (the "**Master Fund**") made by letter from Collas Crill dated 26 June 2018 (the "**Application**")

**AND UPON** reading the Application and its enclosures

**AND UPON** the Court being satisfied that the resignation of Mr. Christopher Kennedy as a joint official liquidator of the Master Fund should take effect from 8 June 2018 and that Mr. Christopher Smith should be appointed as successor liquidator

**AND UPON** the application having been dealt with on the papers

**IT IS ORDERED THAT:**

1.    Mr. Christopher Kennedy be released from the performance of any further duties as joint official liquidator of the Master Fund with effect from 8 June 2018 without the need to prepare a report and accounts in accordance with Order 10, rule 2 of the Companies Winding Up Rules, 2018 ("**CWR**").

1

This Order is filed by Collas Crill, Attorneys-at-Law for and on behalf of the Joint Official Liquidators of Platinum Partners Value Arbitrage Fund L.P. (In Official Liquidation) herein, whose address for service is that of their said Attorneys, 2nd Floor , Willow House, Cricket Square, PO Box 709, Grand Cayman, KY1-1107, Cayman Islands

2.    Mr. Christopher Smith of RHSW (Cayman) Limited, Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman, KY1-1103, Cayman Islands, be hereby appointed as successor liquidator to Mr. Christopher Kennedy with effect from 8 June 2018 pursuant to Order 5, rule 4(6) of the CWR.

3.    The costs of the Application are not recoverable as an expense of the liquidation.

**DATED** this 6th day of July 2018

**FILED** this 9th day of July 2018

_____

**The Honourable  Mr. Nicholas Segal**
Judge of the Grand Court

2

# Exhibit 10

## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
:
In re:                                               :     Chapter 15
:
PLATINUM PARTNERS VALUE                             :     Case No. 16-12925 (SCC)
ARBITRAGE FUND L.P. (IN                             :
PROVISIONAL LIQUIDATION),[1] *et al.*,             :     (Jointly Administered)
:
Debtors in                                   :
Foreign Proceedings.                        :
:
:
:
---------------------------------------------------------x

## ORDER GRANTING RECOGNITION AND RELIEF IN AID OF A FOREIGN MAIN PROCEEDING PURSUANT TO SECTIONS 1504, 1509, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE

Matthew James Wright and Christopher Barnett Kennedy, duly appointed joint official

liquidators ("**Petitioners**" or "**Liquidators**") of Platinum Partners Value Arbitrage Fund L.P. (in

Provisional Liquidation) ("**Master Fund**") and the duly appointed joint official liquidators of

Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation)

("**International Fund**" and together with Master Fund, the "**Funds**"), both Funds in liquidation

by way of the Financial Services Division of the Grand Court of the Cayman Islands (the

"**Grand Court**") (cause nos. FSD 131 of 2016 (AJJ) (Master Fund) and 118 of 2016 (AJJ)

(International Fund)) as a result of the Grand Court's orders (the "**Liquidation Orders**") made

pursuant to petitions for the winding up of the Funds under, as applicable, sections 92 and 104 of

the Companies Law of the Cayman Islands (2016 Revision) (the "**Companies Law**") and section

---

[1] The last four digits of the United States Tax Identification Number, or similar foreign identification number, as applicable, follow in parentheses: Platinum Partners Value Arbitrage Fund L.P. (in Provisional Liquidation) (1954) and Platinum Partners Value Arbitrage Fund (International) Ltd. (in Official Liquidation) (2356). The registered office of the International Fund is c/o The R&H Trust Co. Ltd., Windward 1, Regatta Office Park, P.O. Box 897, Grand Cayman KY1-1103, Cayman Islands. The Master Fund's registered address is c/o Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman, KY1-9005, Cayman Islands.

36 of the Exempted Limited Partnership Law, 2014 ("**ELP Law**") (collectively, the "**Cayman Liquidations**"), by its United States counsel, Holland & Knight LLP, filed Official Form Petitions, the *Verified Petition for Recognition of Foreign Insolvency Proceedings and Application for Additional Relief, Pursuant to Sections 1504, 1509, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* (the "**Verified Petition**,"[2] and, together with the Official Form Petitions, the "**Petition**"), and the accompanying Kennedy Declaration, Leontsinis Declaration, and Gluck Declaration, seeking relief pursuant to chapter 15 of the Bankruptcy Code; and upon due consideration of the Petition, Kennedy Declaration, Leontsinis Declaration and the Gluck Declaration, together with all exhibits thereto, in support of the Petition, and hearing no objections thereto, and a hearing having been held on November 21, 2016 the evidence put on the record at the Hearing; and appropriate and timely notice of the filing of the Petition and the Hearing thereon having been given by the Liquidators, pursuant to section 1514 of the Bankruptcy Code; and such notice having been adequate and sufficient for all purposes; and having been updated pursuant to Section 1518 of the Bankruptcy Code, and no other or further notice being necessary or required; and no objections or other responses having been filed that have not been overruled, withdrawn or otherwise resolved; and all interested parties having had an opportunity to be heard at the Hearing; and after due deliberation and sufficient cause appearing therefore, the Court makes the following findings of fact and conclusions of law:

A.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and 11 U.S.C. §§ 109 and 1501 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated February 1, 2012.

---

[2] Capitalized terms used, but not otherwise defined herein shall have the meanings given to them in the Verified Petition.

2

B.      Venue of this proceeding is proper in this judicial district pursuant to 28 U.S.C. § 1410 (2) because there is an action pending against the Funds within this judicial district, and the Court may enter a final order consistent with Article III of the United States Constitution.

C.      This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

D.      The Liquidators are the "foreign representatives" of the Funds pursuant to 11 U.S.C. § 101(24).

E.      The chapter 15 cases of the Funds were properly commenced pursuant to 11 U.S.C. §§ 1504, 1509 and 1515.

F.      The Liquidators have satisfied the requirements of 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure.

G.      The Cayman Liquidations are "foreign proceedings" pursuant to 11 U.S.C. § 101(23).

H.      The Cayman Liquidations are entitled to recognition by this Court pursuant to 11 U.S.C. § 1517.

I.      The Cayman Liquidations are pending in the Cayman Islands, the country where the Funds' center of main interests is located, and accordingly the Cayman Liquidations are foreign main proceedings pursuant to 11 U.S.C. § 1502(4), and are entitled to recognition as foreign main proceedings pursuant to 11 U.S.C. § 1517(b)(1).

J.      The Liquidators are entitled to all of the relief provided under 11 U.S.C. § 1520 and 1521 without limitation.

K.      The relief granted hereby is necessary and appropriate, in the interests of the public and international comity, consistent with the public policy of the United States, and warranted pursuant to 11 U.S.C. §§ 1507, 1517, 1520 and 1521.

3

**NOW, THEREFORE, IT IS HEREBY**

1.      **ORDERED**, that the Petition is granted as set forth herein;

2.      **ORDERED**, that the Cayman Liquidations are recognized as foreign main proceedings pursuant to 11 U.S.C. §§ 1517(a) and (b)(1);

3.      **ORDERED**, that all persons and entities (other than the Liquidators and their expressly authorized representatives and agents) are hereby enjoined, except as provided in 11 U.S.C. §§ 555 through 557, 559 through 562, 1520 and 1521 or as modified herein, from:

(1)      executing against the Funds' property or assets;

(2)      taking or continuing any act to obtain possession of, or exercise control over, the Liquidators (with respect to the Funds), the Funds, or any of the Funds' property or assets;

(3)      taking or continuing any act to create, perfect or enforce a lien or other security interest, set-off or other claim against the Liquidators (with respect to the Funds), the Funds or any of the Funds' property or assets as of the date of the filing of the Petition, or otherwise seeking the issuance of or issuing any restraining notice or other process or encumbrance with respect to the Funds or any of the Funds' property or assets; and

(4)      transferring, relinquishing or disposing of any property of the Funds to any person or entity other than the Liquidators;

and it is further

4.      **ORDERED**, that 11 U.S.C. § 1520(a) shall be effective with respect to the Cayman Liquidations; and it is further

5.      **ORDERED**, that 11 U.S.C. § 1521(a)(1-3) shall be effective with respect to the Cayman Liquidations and/or the stay, as provided for by Section 97(1) of the Companies Law, shall be effective in the United States of America pursuant to 11 U.S.C. § 1507; and it is further

6.      **ORDERED**, that the Liquidators or any third person acting pursuant to the Liquidators' instructions or agreement may transfer funds or property belonging to the Funds

4

into or out of the United States of America in accordance with their respective obligations to the Funds or under the Cayman Liquidations; and it is further

7.    **ORDERED**, that the Liquidators are hereby authorized to examine witnesses, take evidence, and seek the production of documents within the territorial jurisdiction of the United States concerning the assets, affairs, rights, obligations or liabilities of the Funds, the Funds affiliates and the Funds' subsidiaries by:

    a.  issuing discovery requests to intermediary banks that process U.S. dollar-denominated wire transfers and maintain records of such transfers;

    b.  upon written request, obtaining turnover of any and all documents, records, filings, or other information, however stored, including but not limited to emails that are property of, concern or were made or issued on behalf of the Funds, from any person or entity subject to this Court's jurisdiction; and

    c.  upon service of this order, prohibiting all persons and entities subject to the jurisdiction of this Court from destroying, secreting, altering, deleting or otherwise disposing of any electronic data, documents, records, filings, or other information, however stored, concerning or relating to the assets, affairs, rights, obligations or liabilities of the Funds; and it is further

8.    **ORDERED**, that the Liquidators are authorized to operate the business of the Funds that is the subject of Cayman Liquidations and may exercise the powers of a trustee under and to the extent provided by 11 U.S.C. §§ 1520 and 1521; and it is further

9.    **ORDERED**, that the Liquidators are hereby granted authority to assert claims of the Funds against parties that are subject to jurisdiction in the United States of America; and it is further

10.    **ORDERED**, that the administration or realization of all or part of the assets of the Funds within the territorial jurisdiction of the United States of America is hereby entrusted to the Liquidators and the Liquidators are hereby established as the exclusive representatives of the Funds in the United States of America; and it is further

5

11.     **ORDERED**, that this Court retains jurisdiction with respect to the enforcement,

amendment or modification of this Order, any requests for additional relief or any adversary

proceeding brought in and through these chapter 15 cases, and any request by an entity for relief

from the provisions of this Order, for cause shown, that is properly commenced and within the

jurisdiction of this Court; and it is further

12.     **ORDERED**, that, notwithstanding Bankruptcy Rule 7062, made applicable to

these chapter 15 cases by Bankruptcy Rule 1018, the terms and conditions of this Order shall be

immediately effective and enforceable upon its entry, and upon its entry, this Order shall become

final and appealable.

Dated:

November 22, 2016
New York, New York

                                        /S/ Shelley C. Chapman
                                        Honorable Shelley C. Chapman
                                        United States Bankruptcy Judge

# Exhibit 11

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-Q

(Mark One)

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

### For the quarterly period ended September 30, 2016

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

#### For the transition period from to _____ to

#### Commission File Number: 001-35076

# NAVIDEA BIOPHARMACEUTICALS, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **31-1080091** |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| **5600 Blazer Parkway, Suite 200, Dublin, Ohio** | **43017-7550** |
| (Address of principal executive offices) | (Zip Code) |

#### (614) 793-7500
##### (Registrant's telephone number, including area code)

##### (Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☐ | | Accelerated filer ☒ |
| Non-accelerated filer   ☐ | | Smaller reporting company ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12-b-2 of the Act.) Yes ☐  No ☒

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date: 155,762,729 shares of common stock, par value $.001 per share (as of the close of business on November 1, 2016).

9.    **Notes Payable**

*Platinum*

In July 2012, we entered into an agreement with Platinum to provide us with a credit facility of up to $50 million.  Following the approval of Lymphoseek, Platinum was committed under the terms of the agreement to extend up to $35 million in debt financing to the Company.  During the nine-month period ended September 30, 2016, $814,000 of interest was compounded and added to the balance of the Platinum Note.  In accordance with the terms of a Section 16(b) Settlement Agreement, Platinum agreed to forgive interest owed on the credit facility in an amount equal to 6%, effective July 1, 2016.  As of September 30, 2016, the outstanding principal balance of the Platinum Note was approximately $9.3 million, with $27.3 million currently available under the credit facility.  An additional $15 million is potentially available under the credit facility on terms to be negotiated.  However, based on Platinum's recent filing for Chapter 15 bankruptcy protection, Navidea has substantial doubt about Platinum's ability to fund future draw requests under the credit facility.

The Platinum Note is reflected on the consolidated balance sheets at its estimated fair value, which includes the estimated fair value of the embedded conversion option of $1.3 million.  During the three-month periods ended September 30, 2016 and 2015, changes in the estimated fair value of the Platinum conversion option were increases of $839,000 and $1.6 million, respectively, and were recorded as non-cash changes in the fair value of the conversion option.  During the nine-month periods ended September 30, 2016 and 2015, changes in the estimated fair value of the Platinum conversion option were a decrease of $1.8 million and an increase of $1.7 million, respectively, and were recorded as non-cash changes in the fair value of the conversion option.  The estimated fair value of the Platinum Note was $10.5 million as of September 30, 2016.

The Platinum Loan Agreement includes a covenant that results in an event of default on the Platinum Loan Agreement upon default on the CRG Loan Agreement.  As discussed above, the Company is maintaining its position that CRG's alleged claims do not constitute events of default under the CRG Loan Agreement and believes it has defenses against such claims.  The Company has obtained a waiver from Platinum confirming that we are not in default under the Platinum Loan Agreement as a result of the alleged default on the CRG Loan Agreement and as such, we are currently in compliance with all covenants under the Platinum Loan Agreement.

*Capital Royalty Partners II, L.P.*

In May 2015, Navidea and its subsidiary Macrophage Therapeutics, Inc., as guarantor, executed a Term Loan Agreement with CRG in its capacity as a lender and as control agent for other affiliated lenders party to the CRG Loan Agreement (collectively, the Lenders) in which the Lenders agreed to make a term loan to the Company in the aggregate principal amount of $50 million (the CRG Term Loan), with an additional $10 million in loans to be made available upon the satisfaction of certain conditions stated in the CRG Loan Agreement.  During the nine-month period ended September 30, 2016, $553,000 of interest was compounded and added to the balance of the CRG Term Loan.  Pursuant to a notice of default letter sent to Navidea by CRG, the Company stopped compounding interest in the second quarter of 2016 and began recording accrued interest.  As of September 30, 2016, $4.7 million of accrued interest is included in accrued liabilities and other on the consolidated balance sheets.  As of September 30, 2016, the outstanding principal balance of the CRG Term Loan was $51.7 million.

In connection with the CRG Loan Agreement, the Company recorded a debt discount related to lender fees and other costs directly attributable to the CRG Loan Agreement totaling $2.2 million, including a $1.0 million facility fee which is payable at the end of the term or when the loan is repaid in full.  A long-term liability was recorded for the $1.0 million facility fee.  The debt discount was being amortized as non-cash interest expense using the effective interest method over the term of the CRG Loan Agreement.  As further described below, the facility fee was fully paid off and the debt discount was accelerated and fully amortized in the second quarter of 2016.

The CRG Term Loan is collateralized by a security interest in substantially all of the Company's assets.  In addition, the CRG Loan Agreement requires that the Company adhere to certain affirmative and negative covenants, including financial reporting requirements and a prohibition against the incurrence of indebtedness, or creation of additional liens, other than as specifically permitted by the terms of the CRG Loan Agreement.  The Lenders may accelerate the payment terms of the CRG Loan Agreement upon the occurrence of certain events of default set forth therein, which include the failure of the Company to make timely payments of amounts due under the CRG Loan Agreement, the failure of the Company to adhere to the covenants set forth in the CRG Loan Agreement, and the insolvency of the Company.  The covenants of the CRG Loan Agreement include a covenant that the Company shall have EBITDA of no less than $5 million in each calendar year during the term or revenues from sales of Lymphoseek in each calendar year during the term of at least $22.5 million in 2016, with the target minimum revenue increasing in each year thereafter until reaching $45 million in 2020.  However, if the Company were to fail to meet the applicable minimum EBITDA or revenue target in any calendar year, the CRG Loan Agreement provides the Company a cure right if it raises 2.5 times the EBITDA or revenue shortfall in equity or subordinated debt and deposits such funds in a separate blocked account.  Additionally, the Company must maintain liquidity, defined as the balance of unencumbered cash and permitted cash equivalent

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

NAVIDEA BIOPHARMACEUTICALS, INC.
(the Company)
November 9, 2016

By: /s/ Michael M. Goldberg

Michael M. Goldberg, M.D.
President and Chief Executive Officer
(duly authorized officer; principal executive officer)

By: /s/ Jed A. Latkin

Jed A. Latkin
Interim Chief Operating Officer
(duly authorized officer; principal financial and accounting officer)

50

# Exhibit 12

PRER14A 1 v456830_prer14a.htm PRER14A

## SCHEDULE 14A INFORMATION

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934 (Amendment No. )**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:
☒  Preliminary Proxy Statement
☐  Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
☐  Definitive Proxy Statement
☐  Definitive Additional Materials
☐  Soliciting Material under §240.14a-12

## NAVIDEA BIOPHARMACEUTICALS, INC.
**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):
☐  No fee required.
☒  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11

    (1)    Title of each class of securities to which transaction applies:
        Not applicable

    (2)    Aggregate number of securities to which transaction applies:
        Not applicable

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state  how it was determined):
        Not applicable

    (3)    Proposed maximum aggregate value of transaction:
        $100,100,000

    (4)    Total fee paid:
        $11,601.59

☒  Fee paid previously with preliminary materials.

☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)    Amount Previously Paid:
    (2)    Form, Schedule or Registration Statement No.:
    (3)    Filing Party:
    (4)    Date Filed:

**SPECIAL MEETING OF STOCKHOLDERS**

January _____, 2017

Dear Stockholder:

You are cordially invited to attend a Special Meeting of Stockholders of Navidea Biopharmaceuticals, Inc., which will be held at 9:00 a.m., Eastern Standard Time, on February ___, 2017, at the Hilton Garden Inn, 70 Challenger Road, Ridgefield Park, NJ 07660, 201-641-2024. The matters on the meeting agenda are described in the Notice of Special Meeting of Stockholders and proxy statement which accompany this letter.

We hope you will be able to attend the meeting, but regardless of your plans, we ask that you please complete, sign, and date the enclosed proxy card and return it in the envelope provided, or follow the instructions on the proxy card to vote online or by telephone, so that your shares will be represented at the meeting.

Very truly yours,

/s/ Michael M. Goldberg, M.D.

Michael M. Goldberg, M.D.
President and Chief Executive Officer

**NAVIDEA BIOPHARMACEUTICALS, INC.**
**5600 Blazer Parkway, Suite 200**
**Dublin, Ohio 43017**

**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**

**To the Stockholders of**
**NAVIDEA BIOPHARMACEUTICALS, INC.:**

A Special Meeting of the Stockholders of Navidea Biopharmaceuticals, Inc., a Delaware corporation (the "Company" or "Navidea"), will be held at the Hilton Garden Inn, 70 Challenger Road, Ridgefield Park, NJ 07660, 201-641-2024, on February ____, 2017, at 9:00 a.m., Eastern Standard Time, for the following purposes:

1.  To authorize the sale (the "Asset Sale") by Navidea of its assets used in connection with Navidea's Lymphoseek[®] business in North America, as defined in and pursuant to the Asset Purchase Agreement, dated as of November 23, 2016, by and between Navidea and Cardinal Health 414, LLC, as more fully described in the enclosed proxy statement;

2.  To adjourn the Special Meeting to a later date, if necessary or appropriate, to allow for the solicitation of additional proxies in favor of the proposal to approve the Asset Sale if there are insufficient votes to approve the Asset Sale; and

3.  To transact such other business as may properly come before the meeting or any adjournment thereof.

The Board of Directors has fixed the close of business on January 23, 2017, as the record date for the determination of stockholders entitled to notice of and to vote at the Special Meeting and any adjournment thereof. A list of stockholders will be available for examination by any stockholder at the Special Meeting and for a period of 10 days before the Special Meeting at the executive offices of the Company.

**Important Notice Regarding the Availability of Proxy Materials for the Special Meeting of Stockholders to be Held on February ____, 2017: The proxy statement is available at www.proxyvote.com.**

**Whether or not you plan to attend the Special Meeting, please complete, sign, and date the enclosed proxy card and return it in the envelope provided, or follow the instructions on the proxy card to take advantage of the opportunity to vote your proxy online or by telephone.**

By Order of the Board of Directors

/s/ Michael M. Goldberg, M.D.

Michael M. Goldberg, M.D.
President and Chief Executive Officer

Dublin, Ohio
January _____, 2017

- we agreed to sell all of our assets used, held for use, or intended to be used in operating the Business in the Territory (giving effect to the license-back described below and excluding certain assets specifically retained by the Company), such assets consisting primarily of, without limitation, (i) intellectual property used in or reasonably necessary for the conduct of the Business, (ii) inventory of, and certain customer, distribution, and product manufacturing agreements related to, the Business, (iii) all product registrations related to the Product, including the new drug application approved by the U.S. Food and Drug Administration ("FDA") for the Product and all regulatory submissions in the United States that have been made with respect to the Product and all Health Canada regulatory submissions and, in each case, all files and records related thereto, (iv) all related clinical trials and clinical trial authorizations and all files and records related thereto; and (v) all right, title and interest in and to the Product (collectively, the "Acquired Assets").

- in exchange for the Acquired Assets, Cardinal Health 414 agreed to: (i) make a cash payment to us at closing of $80,000,000 (reduced by an aggregate of approximately $65.0 million of indebtedness to be repaid to Capital Royalty Partners II, L.P. ("CRG") and Platinum-Montaur Life Sciences LLC and its affiliates ("Platinum") on behalf of the Company, the amount by which, if any, transferred Product inventory is less than $6 million, and estimated transaction costs of $600,000); (ii) assume certain liabilities of the Company associated with the Product as specified in the Asset Purchase Agreement; and (iii) make periodic earnout payments (to consist of contingent payments and milestone payments which, if paid, will be treated as additional purchase price) to us based on the "Net Sales" derived from the purchased Product, subject, in each case, to Cardinal Health 414's right to off-set. In no event shall the sum of all earnout payments, as further described below, exceed an aggregate of $230 million. "Net Sales" is defined as gross amounts invoiced to third parties for the Product sold or leased in the Territory for current approved indications by the FDA and similar indications approved by the FDA in the future by Cardinal Health 414, its licensees, sublicensees and affiliates, or in any combination thereof (other than the Company and its sublicensees and affiliates), less the sum of the following actual and customary deductions where applicable and separately listed: cash, trade, or quantity discounts or rebates (as allowed under applicable law); sales tax, use tax, tariff, import/export duties or other excise taxes imposed on particular sales (except for value-added and income taxes imposed on the sales of Product in foreign countries); credits to customers because of rejections or returns, or transfers of Product without charge for charitable, promotional, non-clinical, clinical research or regulatory purposes. For purposes of calculating Net Sales, transfers to Cardinal Health 414's licensees, sublicensees or affiliates (other than the Company and its sublicensees and affiliates) of Product without an invoice for (i) end use (but not resale) by such licensee, sublicensee or affiliate shall be treated as sales by Cardinal Health 414 at Cardinal Health 414's list price for the Product or (ii) resale by such licensee, sublicensee or affiliate shall be treated as sales at the list price of such sublicensee or affiliate.

- during the period commencing on the date of closing of the Asset Sale and ending on the earlier of (i) June 30, 2026 or (ii) such time as $160,000,000 in contingent payments have been earned by the Company (the "Contingent Payment Period"), Cardinal Health 414 will pay to the Company contingent payments in an amount equal to eight percent of the Net Sales for each measuring year, or each fiscal year ending June 30th through and including June 30, 2026; provided that the first measuring year shall be from the closing of the Asset Sale through and including June 30, 2017. In the case of contingent payments to be made with respect to the first three measuring years during the Contingent Payment Period, Cardinal Health 414 will make such payments on a quarterly basis (equal to the greater of (a) eight percent of Net Sales during the applicable fiscal quarter, or (b) $1,675,000) to the Company within 30 days following the end of each fiscal quarter during the applicable measuring year. Notwithstanding the foregoing, with respect to the first measuring year, the minimum contingent payment will be pro rated based on a fraction, the numerator of which equals the number of days elapsed between the closing of the Asset Sale through and including June 30, 2017 and the denominator of which equals 365, and, to the extent such pro ration results in the Company receiving less than the minimum contingent payment for such first measuring period, Cardinal Health 414 will pay the Company a "catch-up contingent payment" in an amount equal to the difference between what the Company received and the minimum contingent payment for such first measuring period within 30 days following the end of the second fiscal quarter of the fourth measuring year. Notwithstanding the foregoing, if the contingent payment in any of the first three measuring years would be less than $6.7 million (as pro rated for the first measuring year) based upon the calculation of Net Sales, then the contingent payment to the Company for the applicable measuring year will be deemed to be $6.7 million (as pro rated for the first measuring year) (each such contingent payment during the first three measuring years and the catch up contingent payment, collectively being the "guaranteed payments"), subject to Cardinal Health 414's right to off-set the difference between $6.7 million and the amount that would have otherwise been payable in the absence of this minimum threshold against any future earnout payments that are not guaranteed. In no event will the sum of all contingent payments exceed $160,000,000 (of which $20,100,000 are guaranteed payments), subject, in each case, to Cardinal Health 414's right to off-set.

**Parties to the Asset Sale (page 19)**

- *Navidea Biopharmaceuticals, Inc.* is a biopharmaceutical company focused on the development and commercialization of precision immunodiagnostic agents and immunotherapeutics. Navidea is developing multiple precision-targeted products based on our Manocept™ platform to help identify the sites and pathways of undetected disease and enable better diagnostic accuracy, clinical decision-making, targeted treatment and, ultimately, patient care. Navidea's Manocept platform is predicated on the ability to specifically target the CD206 mannose receptor expressed on activated macrophages. The Manocept platform serves as the molecular backbone of the Product (technetium Tc 99m tilmanocept), the first product developed and commercialized by Navidea based on the platform. After consummation of the Asset Sale, Navidea intends to distribute the Product in Europe, where the Product received European approval in imaging and intraoperative detection of sentinel lymph nodes in patients with melanoma, breast cancer or localized squamous cell carcinoma of the oral cavity. Navidea also intends to continue developing its remaining candidates using the Manocept platform.

- *Cardinal Health, 414, LLC* is a wholly-owned subsidiary of Cardinal Health, a global integrated healthcare services and products company providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. Cardinal Health 414 is the exclusive distributor of the Product in the United States.

**Reasons for the Asset Sale (page 24)**

- In arriving at its determination that the Asset Sale is advisable to, and in the best interests of, the Company and our stockholders, our Board of Directors considered various factors, including without limitation, the need to pay off or refinance the Company's outstanding debt obligations to CRG, as discussed below. For the material factors considered by our Board of Directors in reaching its decision to adopt and approve the Asset Sale and the Asset Purchase Agreement, see "The Asset Sale —Reasons for the Asset Sale," beginning on page 24.

**Risk Factors (page 15)**

- In evaluating the Asset Sale and Asset Purchase Agreement, you should carefully read this proxy statement and especially consider the factors discussed in the section entitled "Risk Factors" beginning on page 15 of this proxy statement.

**Interests of Our Directors and Executive Officers in the Asset Sale (page 27)**

- In considering the recommendation of our Board of Directors to vote for the proposal to adopt and approve the Asset Sale, you should be aware that some of our directors and executive officers may have personal interests in the Asset Sale that are, or may be, different from, or in addition to, your interests. See "Interests of Our Directors and Executive Officers in the Asset Sale," beginning on page 27.

- Dr. Michael Goldberg, our President and Chief Executive Officer, previously managed a portfolio of funds for Platinum from May 2007 until December 2013. Dr. Goldberg was not a member of the management of any of the Platinum entities; rather he solely had control over the trading activities of a portfolio of health care investments from funds allocated to him from the Platinum funds. Dr. Goldberg was responsible for all investments made by Platinum in the Company and for the trading in the Company's securities up until he joined the Company's Board of Directors in November 2013, at which time he relinquished all control over the trading of the Company's securities held by all of the Platinum entities. On December 13, 2013, Dr. Goldberg formally separated from Platinum and had no further role in managing their health care portfolio. As part of his separation from Platinum, Dr. Goldberg entered into a settlement agreement, dated March 28, 2014, and amended on June 11, 2015, with Platinum Partners Value Arbitrage Fund pursuant to which Dr. Goldberg was entitled to receive a beneficial ownership interest in 15% (1) of all securities held by Platinum at the time of his separation from Platinum which included, without limitation, warrants to purchase the Company's common stock, and (2) of the drawn amounts from the Platinum debt facility. Dr. Goldberg and Platinum are presently in the process of effectuating the transfer of ownership in such securities to Dr. Goldberg. In furtherance of the foregoing, on October 17, 2016, Platinum transferred warrants to acquire an aggregate of 5,411,850 shares of our common stock to Dr. Goldberg. The Company has received notice that Dr. Goldberg intends to exercise such warrants prior to the record date. The Company has been advised that a portion of its outstanding debt to Platinum, as evidenced by a third amended and restated promissory note, is intended to be transferred to Dr. Goldberg upon consummation of the Asset Sale. That part of the Platinum debt not transferred to Dr. Goldberg will be paid-off by us using proceeds of the Asset Sale as the Asset Purchase Agreement requires that, at closing, all indebtedness of the Company be paid in full out of the initial closing cash payment, which includes debts payable to CRG, Platinum and Dr. Goldberg. The

Company discussed obtaining a waiver of such requirement with respect to any Platinum debt transferred to Dr. Goldberg. Cardinal Health 414 has orally agreed to waive such requirement provided there is no security interest in the assets being transferred to Cardinal Health 414. Dr. Goldberg has agreed to not require repayment by the Company of any debt transferred to him and has agreed to release any financial covenants and securitization requirements. As of December 31, 2016, the outstanding portion of Platinum's debt intended to be transferred to Dr. Goldberg was $1,423,173.35, which accrues interest at an annual rate of 14.125%, compounded monthly. In accordance with the terms of a Section 16(b) Settlement Agreement, Platinum agreed to forgive interest owed on the credit facility in an amount equal to 6%, effective July 1, 2016, making the effective annual interest rate 8.125% as of December 31, 2016.

6

- the expectation that a portion of the consideration we will receive in connection with the Asset Sale will be subject to certain U.S. federal, state, and local income and other taxes;

- the risk that unforeseen liabilities and expenses may be incurred that may limit the ultimate amount of net proceeds from the Asset Sale; and

- the significant costs involved in consummating the Asset Sale, including legal and accounting and other costs, which we estimate to be approximately $600,000.

After careful and due consideration, our Board of Directors concluded that overall, the risks, uncertainties, restrictions and potentially negative factors associated with the Asset Sale were outweighed by the potential benefits of the Asset Sale, and that many of these risks could be managed or mitigated prior to the consummation of the Asset Sale or were unlikely to have a material adverse effect on our Company.

The foregoing information and factors considered by our Board of Directors are not intended to be exhaustive. In view of the variety of factors and the amount of information considered, our Board of Directors did not find it practicable to, and did not, quantify, rank or otherwise assign relative weights to the specific factors it considered in approving the Asset Sale and the Asset Purchase Agreement. In addition, individual members of our Board of Directors may have given different weights to different factors. Our Board of Directors considered all of these factors as a whole, and overall considered them to be favorable to support its determination.

**Interests of Our Directors and Executive Officers in the Asset Sale**

In considering the recommendation of our Board of Directors to vote for the proposal to adopt and approve the Asset Sale, you should be aware that some of our directors and executive officers may have personal interests in the Asset Sale that are, or may be, different from, or in addition to, your interests. Dr. Michael Goldberg, our President and Chief Executive Officer, previously managed a portfolio of funds for Platinum from May 2007 until December 2013. Dr. Goldberg was not a member of the management of any of the Platinum entities, rather he solely had control over the trading activities of a portfolio of health care investments from funds allocated to him from the Platinum funds. Dr. Goldberg was responsible for all investments made by Platinum in Navidea and for the trading in Navidea securities up until he joined Navidea's Board of Directors in November 2013, at which time he relinquished all control over the trading of Navidea's securities held by all of the Platinum entities. On December 13, 2013, Dr. Goldberg formally separated from Platinum and had no further role in managing their health care portfolio. As part of his separation from Platinum, Dr. Goldberg entered into a settlement agreement, dated March 28, 2014, and amended on June 11, 2015, with Platinum Partners Value Arbitrage Fund pursuant to which Dr. Goldberg was entitled to receive a beneficial ownership interest in 15% (1) of all securities held by Platinum at the time of his separation from Platinum which included, without limitation, warrants to purchase the Company's common stock, and (2) of the drawn amounts from the Platinum debt facility. Dr. Goldberg and Platinum are presently in the process of effectuating the transfer of ownership in such securities to Dr. Goldberg. In furtherance of the foregoing, on October 17, 2016, Platinum transferred warrants to acquire an aggregate of 5,411,850 shares of our common stock to Dr. Goldberg. The Company has received notice that Dr. Goldberg intends to exercise such warrants prior to the record date. The Company has been advised that a portion of its outstanding debt to Platinum, as evidenced by a third amended and restated promissory note, is intended to be transferred to Dr. Goldberg upon consummation of the Asset Sale. That part of the Platinum debt not transferred to Dr. Goldberg will be paid-off by us using proceeds of the Asset Sale as the Asset Purchase Agreement requires that, at closing, all indebtedness of the Company be paid in full out of the initial closing cash payment, which includes debts payable to CRG, Platinum and Dr. Goldberg. The Company discussed obtaining a waiver of such requirement with respect to any Platinum debt transferred to Dr. Goldberg. Cardinal Health 414 has orally agreed to waive such requirement provided there is no security interest in the assets being transferred to Cardinal Health 414. Dr. Goldberg has agreed to not require repayment by the Company of any debt transferred to him and has agreed to release any financial covenants and securitization requirements. As of December 31, 2016, the outstanding portion of Platinum's debt intended to be transferred to Dr. Goldberg was $1,423,173.35, which accrues interest at an annual rate of 14.125%, compounded monthly. In accordance with the terms of a Section 16(b) Settlement Agreement, Platinum agreed to forgive interest owed on the credit facility in an amount equal to 6%, effective July 1, 2016, making the effective annual interest rate 8.125% as of December 31, 2016.

27

# Exhibit 13

DEFM14A 1 v458707_defm14a.htm DEFM14A

# SCHEDULE 14A INFORMATION

### Proxy Statement Pursuant to Section 14(a) of the
### Securities Exchange Act of 1934 (Amendment No. 2)

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:
- ☐    Preliminary Proxy Statement
- ☐    Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))
- ☒    Definitive Proxy Statement
- ☐    Definitive Additional Materials
- ☐    Soliciting Material under §240.14a-12

### NAVIDEA BIOPHARMACEUTICALS, INC.
### (Name of Registrant as Specified In Its Charter)

### (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):
- ☐    No fee required.
- ☒    Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11

    (1)    Title of each class of securities to which transaction applies:
            Not applicable

    (2)    Aggregate number of securities to which transaction applies:
            Not applicable

    (3)    Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state  how it was determined):
            Not applicable

    (3)    Proposed maximum aggregate value of transaction:
            $100,100,000

    (4)    Total fee paid:
            $11,601.59

☒    Fee paid previously with preliminary materials.

☐    Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

    (1)    Amount Previously Paid:
    (2)    Form, Schedule or Registration Statement No.:
    (3)    Filing Party:
    (4)    Date Filed:

**SPECIAL MEETING OF STOCKHOLDERS**

February 8, 2017

Dear Stockholder:

You are cordially invited to attend a Special Meeting of Stockholders of Navidea Biopharmaceuticals, Inc., which will be held at 9:00 a.m., Eastern Standard Time, on March 2, 2017, at the Hilton Garden Inn, 70 Challenger Road, Ridgefield Park, NJ 07660, 201-641-2024. The matters on the meeting agenda are described in the Notice of Special Meeting of Stockholders and proxy statement which accompany this letter.

We hope you will be able to attend the meeting, but regardless of your plans, we ask that you please complete, sign, and date the enclosed proxy card and return it in the envelope provided, or follow the instructions on the proxy card to vote online or by telephone, so that your shares will be represented at the meeting.

Very truly yours,

/s/ Michael M. Goldberg, M.D.

Michael M. Goldberg, M.D.
President and Chief Executive Officer

**NAVIDEA BIOPHARMACEUTICALS, INC.**
**5600 Blazer Parkway, Suite 200**
**Dublin, Ohio 43017**

**NOTICE OF SPECIAL MEETING OF STOCKHOLDERS**

**To the Stockholders of**
**NAVIDEA BIOPHARMACEUTICALS, INC.:**

A Special Meeting of the Stockholders of Navidea Biopharmaceuticals, Inc., a Delaware corporation (the "Company" or "Navidea"), will be held at the Hilton Garden Inn, 70 Challenger Road, Ridgefield Park, NJ 07660, 201-641-2024, on March 2, 2017, at 9:00 a.m., Eastern Standard Time, for the following purposes:

1.  To authorize the sale (the "Asset Sale") by Navidea of its assets used in connection with Navidea's Lymphoseek® business in North America, as defined in and pursuant to the Asset Purchase Agreement, dated as of November 23, 2016, by and between Navidea and Cardinal Health 414, LLC, as more fully described in the enclosed proxy statement;

2.  To adjourn the Special Meeting to a later date, if necessary or appropriate, to allow for the solicitation of additional proxies in favor of the proposal to approve the Asset Sale if there are insufficient votes to approve the Asset Sale; and

3.  To transact such other business as may properly come before the meeting or any adjournment thereof.

The Board of Directors has fixed the close of business on January 23, 2017, as the record date for the determination of stockholders entitled to notice of and to vote at the Special Meeting and any adjournment thereof. A list of stockholders will be available for examination by any stockholder at the Special Meeting and for a period of 10 days before the Special Meeting at the executive offices of the Company.

**Important Notice Regarding the Availability of Proxy Materials for the Special Meeting of Stockholders to be Held on March 2, 2017: The proxy statement is available at www.proxyvote.com.**

**Whether or not you plan to attend the Special Meeting, please complete, sign, and date the enclosed proxy card and return it in the envelope provided, or follow the instructions on the proxy card to take advantage of the opportunity to vote your proxy online or by telephone.**

By Order of the Board of Directors

/s/ Michael M. Goldberg, M.D.

Michael M. Goldberg, M.D.
President and Chief Executive Officer

Dublin, Ohio
February 8, 2017

**NAVIDEA BIOPHARMACEUTICALS, INC.**
**5600 Blazer Parkway, Suite 200**
**Dublin, Ohio 43017**

**SPECIAL MEETING OF STOCKHOLDERS**

**MARCH 2, 2017**

**PROXY STATEMENT**

**Dated February 8, 2017**

**INTRODUCTION**

This proxy statement is being furnished to the holders of common stock, $0.001 par value per share ("Common Stock"), of Navidea Biopharmaceuticals, Inc., a Delaware corporation, in connection with the solicitation of proxies for use at a Special Meeting of Stockholders to be held at 9:00 a.m., Eastern Standard Time, on March 2, 2017, at the Hilton Garden Inn, 70 Challenger Road, Ridgefield Park, NJ 07660, 201-641-2024, and at any adjournment of that meeting. This proxy statement is first being mailed to stockholders on or about February 8, 2017.

In this proxy statement the terms "Navidea," "Company," "we," "our," "ours," and "us" refer to Navidea Biopharmaceuticals, Inc. and its subsidiaries. The term "Asset Purchase Agreement" refers to the Asset Purchase Agreement, dated as of November 23, 2016, by and between the Company and Cardinal Health 414, LLC, as it may be amended, restated, modified or superseded from time to time in accordance with its terms. The terms "Lymphoseek" and the "Product" refer to the Company's radioactive diagnostic agent marketed under the Lymphoseek® trademark for current approved indications by the FDA and similar indications approved by the FDA in the future. The Company develops, manufactures and commercializes a product used for (1) lymphatic mapping, (2) lymph node biopsy, and (3) the diagnosis of metastatic spread to lymph nodes for the staging of cancer (the "Business"), including the Product. The term "Asset Sale" refers to the proposed sale of the assets of the Company used, held for use or intended to be used in connection with the operation of the Business in Canada, Mexico and the United States (including their respective territories and possessions) (the "Territory"), as contemplated by the Asset Purchase Agreement. The term "Cardinal Health 414" refers to Cardinal Health 414, LLC, a wholly-owned subsidiary of Cardinal Health, Inc. ("Cardinal Health"), an Ohio corporation with common stock listed on the New York Stock Exchange under the symbol "CAH." Each of Navidea and Cardinal Health 414 are sometimes referred to in this proxy statement as a party, or collectively as the parties.

**SUMMARY**

This summary highlights selected information contained in this proxy statement and does not contain all of the information that may be important to you. We urge you to read carefully this proxy statement in its entirety, as well as the appendices. For your convenience, we have included cross references to direct you to a more complete description of the topics described in this summary. Additional, important information is also contained in the documents incorporated by reference into this proxy statement; see the section entitled "Where You Can Find More Information; Incorporation by Reference."

**The Asset Sale (page 19)**

- On November 23, 2016, the members of our Board of Directors adopted and unanimously approved the Asset Sale pursuant to the Asset Purchase Agreement, a copy of which is included as *Appendix A* to this proxy statement. Please read it carefully. Pursuant to the terms of the Asset Purchase Agreement, among other things:

- we agreed to sell all of our assets used, held for use, or intended to be used in operating the Business in the Territory (giving effect to the license-back described below and excluding certain assets specifically retained by the Company), such assets consisting primarily of, without limitation, (i) intellectual property used in or reasonably necessary for the conduct of the Business, (ii) inventory of, and certain customer, distribution, and product manufacturing agreements related to, the Business, (iii) all product registrations related to the Product, including the new drug application approved by the U.S. Food and Drug Administration ("FDA") for the Product and all regulatory submissions in the United States that have been made with respect to the Product and all Health Canada regulatory submissions and, in each case, all files and records related thereto, (iv) all related clinical trials and clinical trial authorizations and all files and records related thereto; and (v) all right, title and interest in and to the Product (collectively, the "Acquired Assets").

- in exchange for the Acquired Assets, Cardinal Health 414 agreed to: (i) make a cash payment to us at closing of $80,000,000 (reduced by an aggregate of approximately $65.5 million of indebtedness to be repaid to Capital Royalty Partners II, L.P. ("CRG") and Platinum-Montaur Life Sciences LLC and its affiliates ("Platinum") on behalf of the Company (less approximately $1.4 million if the transfer of debt to Dr. Goldberg occurs, as discussed under "Interests of Our Directors and Executive Officers in the Asset Sale" beginning on page 27), the amount by which, if any, transferred Product inventory is less than $6 million, and estimated transaction costs of $600,000); (ii) assume certain liabilities of the Company associated with the Product as specified in the Asset Purchase Agreement; and (iii) make periodic earnout payments (to consist of contingent payments and milestone payments which, if paid, will be treated as additional purchase price) to us based on the "Net Sales" derived from the purchased Product, subject, in each case, to Cardinal Health 414's right to off-set. In no event shall the sum of all earnout payments, as further described below, exceed an aggregate of $230 million. "Net Sales" is defined as gross amounts invoiced to third parties for the Product sold or leased in the Territory for current approved indications by the FDA and similar indications approved by the FDA in the future by Cardinal Health 414, its licensees, sublicensees and affiliates, or in any combination thereof (other than the Company and its sublicensees and affiliates), less the sum of the following actual and customary deductions where applicable and separately listed: cash, trade, or quantity discounts or rebates (as allowed under applicable law); sales tax, use tax, tariff, import/export duties or other excise taxes imposed on particular sales (except for value-added and income taxes imposed on the sales of Product in foreign countries); credits to customers because of rejections or returns, or transfers of Product without charge for charitable, promotional, non-clinical, clinical research or regulatory purposes. For purposes of calculating Net Sales, transfers to Cardinal Health 414's licensees, sublicensees or affiliates (other than the Company and its sublicensees and affiliates) of Product without an invoice for (i) end use (but not resale) by such licensee, sublicensee or affiliate shall be treated as sales by Cardinal Health 414 at Cardinal Health 414's list price for the Product or (ii) resale by such licensee, sublicensee or affiliate shall be treated as sales at the list price of such sublicensee or affiliate.

- during the period commencing on the date of closing of the Asset Sale and ending on the earlier of (i) June 30, 2026 or (ii) such time as $160,000,000 in contingent payments have been earned by the Company (the "Contingent Payment Period"), Cardinal Health 414 will pay to the Company contingent payments in an amount equal to eight percent of the Net Sales for each measuring year, or each fiscal year ending June 30th through and including June 30, 2026; provided that the first measuring year shall be from the closing of the Asset Sale through and including June 30, 2017. In the case of contingent payments to be made with respect to the first three measuring years during the Contingent Payment Period, Cardinal Health 414 will make such payments on a quarterly basis (equal to the greater of (a) eight percent of Net Sales during the applicable fiscal quarter, or (b) $1,675,000) to the Company within 30 days following the end of each fiscal quarter during the applicable measuring year. Notwithstanding the foregoing, with respect to the first measuring year, the minimum contingent payment will be pro rated based on a fraction, the numerator of which equals the number of days elapsed between the closing of the Asset Sale through and including June 30, 2017 and the denominator of which equals 365, and, to the extent such pro ration results in the Company receiving less than the minimum contingent payment for such first measuring period, Cardinal Health 414 will pay the Company a "catch-up contingent payment" in an amount equal to the difference between what the Company received and the minimum contingent payment for such first measuring period within 30 days following the end of the second fiscal quarter of the fourth measuring year. Notwithstanding the foregoing, if the contingent payment in any of the first three measuring years would be less than $6.7 million (as pro rated for the first measuring year) based upon the calculation of Net Sales, then the contingent payment to the Company for the applicable measuring year will be deemed to be $6.7 million (as pro rated for the first measuring year) (each such contingent payment during the first three measuring years and the catch up contingent payment, collectively being the "guaranteed payments"), subject to Cardinal Health 414's right to off-set the difference between $6.7 million and the amount that would have otherwise been payable in the absence of this minimum threshold against any future earnout payments that are not guaranteed. In no event will the sum of all contingent payments exceed $160,000,000 (of which $20,100,000 are guaranteed payments), subject, in each case, to Cardinal Health 414's right to off-set.

- during the Contingent Payment Period, subject to Cardinal Health 414's right to off-set, Cardinal Health 414 will pay to the Company the following additional milestone payments upon the achievement by or on behalf of Cardinal Health 414 of the following milestone events:

  o $10,000,000, payable after the first fiscal year ending June 30th in which annual Net Sales exceed $100,000,000;
  o $15,000,000, payable after the first fiscal year ending June 30th in which annual Net Sales exceed $200,000,000;
  o $20,000,000, payable after the first fiscal year ending June 30th in which annual Net Sales exceed $300,000,000;
  o $25,000,000, payable after the first fiscal year ending June 30th in which annual Net Sales exceed $400,000,000.

  In no event will the aggregate of all such milestone payments exceed $70,000,000, provided, however, that more than one milestone payment can be earned in the same fiscal year.

- As part of the Asset Sale, the parties have agreed that simultaneous with the closing, subject to certain conditions, Cardinal Health 414 will enter into a license-back agreement, a "License Back," with the Company pursuant to which Cardinal Health 414 will grant to the Company a sublicensable (subject to conditions) and royalty-free license to use certain intellectual property rights included in the Acquired Assets and owned by Cardinal Health 414 as of the closing of the Asset Sale to the extent necessary for the Company to (i) on an exclusive basis, subject to certain conditions, develop, manufacture, market, sell and distribute new pharmaceutical and other products that are not Competing Products (as defined below), and (ii) on a non-exclusive basis, develop, manufacture, market, sell and distribute the Product throughout the world other than in the Territory. As used in the License-Back, a "Competing Product" is any pharmaceutical or other product that: (i) accumulates in lymphatic tissue or tumor-draining lymph nodes for the purpose of (a) lymphatic mapping or (b) identifying the existence, location or staging of cancer in a body; (ii) provides for or facilitates any test or procedure that is reasonably substitutable for any test or procedure provided for or facilitated by the Product; or (iii) is marketed for unapproved uses that allow such product to compete with the Product. Subject to the Company's compliance with certain restrictions in the License-Back, the License-Back also restricts Cardinal Health 414 from using the intellectual property rights included in the Acquired Assets to develop, manufacture, market, sell or distribute any product other than the Product or other product that (a) accumulates in lymphatic tissue or tumor-draining lymph nodes for the purpose of (1) lymphatic mapping or (2) identifying the existence, location or staging of cancer in a body, or (b) provides for or facilitates any test or procedure that is reasonably substitutable for any test or procedure provided for or facilitated by the Product. Pursuant to the License-Back and subject to rights under existing agreements, Cardinal Health 414 will be provided with a right of first offer to market, sell and/or market any new products developed from the intellectual property rights licensed by Cardinal Health 414 to the Company by the License-Back.

- Also as part of the Asset Sale, the Company shall grant to Cardinal Health 414 a five (5) year warrant to purchase up to 10 million shares of the Company's Common Stock at an exercise price of $1.50 per share, which warrant is subject to anti-dilution and other customary terms and conditions.

- If all necessary approvals have been obtained or waived, including stockholder approval and any third party consents to the Asset Sale, we expect to complete the Asset Sale shortly after this Special Meeting scheduled for March 2, 2017.

**Parties to the Asset Sale (page 19)**

- *Navidea Biopharmaceuticals, Inc.* is a biopharmaceutical company focused on the development and commercialization of precision immunodiagnostic agents and immunotherapeutics. Navidea is developing multiple precision-targeted products based on our Manocept™ platform to help identify the sites and pathways of undetected disease and enable better diagnostic accuracy, clinical decision-making, targeted treatment and, ultimately, patient care. Navidea's Manocept platform is predicated on the ability to specifically target the CD206 mannose receptor expressed on activated macrophages. The Manocept platform serves as the molecular backbone of the Product (technetium Tc 99m tilmanocept), the first product developed and commercialized by Navidea based on the platform. After consummation of the Asset Sale, Navidea intends to distribute the Product in Europe, where the Product received European approval in imaging and intraoperative detection of sentinel lymph nodes in patients with melanoma, breast cancer or localized squamous cell carcinoma of the oral cavity. Navidea also intends to continue developing its remaining candidates using the Manocept platform.

- *Cardinal Health, 414, LLC* is a wholly-owned subsidiary of Cardinal Health, a global integrated healthcare services and products company providing customized solutions for hospital systems, pharmacies, ambulatory surgery centers, clinical laboratories and physician offices worldwide. Cardinal Health 414 is the exclusive distributor of the Product in the United States.

**Reasons for the Asset Sale (page 24)**

- In arriving at its determination that the Asset Sale is advisable to, and in the best interests of, the Company and our stockholders, our Board of Directors considered various factors, including without limitation, the need to pay off or refinance the Company's outstanding debt obligations to CRG, as discussed below. For the material factors considered by our Board of Directors in reaching its decision to adopt and approve the Asset Sale and the Asset Purchase Agreement, see "The Asset Sale —Reasons for the Asset Sale," beginning on page 24.

**Risk Factors (page 15)**

- In evaluating the Asset Sale and Asset Purchase Agreement, you should carefully read this proxy statement and especially consider the factors discussed in the section entitled "Risk Factors" beginning on page 15 of this proxy statement.

**Interests of Our Directors and Executive Officers in the Asset Sale (page 27)**

- In considering the recommendation of our Board of Directors to vote for the proposal to adopt and approve the Asset Sale, you should be aware that some of our directors and executive officers may have personal interests in the Asset Sale that are, or may be, different from, or in addition to, your interests. See "Interests of Our Directors and Executive Officers in the Asset Sale" beginning on page 27.

- Dr. Michael Goldberg, our President and Chief Executive Officer, previously managed a portfolio of funds for Platinum from May 2007 until December 2013. In 2011, he made an initial investment of $1.5 million in Platinum Partners Value Arbitrage Fund, L.P ("PPVA") as a passive investor. Dr. Goldberg believes his current investment balance is approximately $1.4 million after giving effect to prior redemptions and reinvestments. Dr. Goldberg was not a member of the management of any of the Platinum entities; rather he solely had control over the trading activities of a portfolio of health care investments from funds allocated to him from the Platinum funds. Dr. Goldberg was responsible for all investments made by Platinum in the Company and for the trading in the Company's securities up until he joined the Company's Board of Directors in November 2013, at which time he relinquished all control over the trading of the Company's securities held by all of the Platinum entities. On December 13, 2013, Dr. Goldberg formally separated from Platinum and had no further role in managing their health care portfolio. As part of his separation from Platinum, Dr. Goldberg entered into a settlement agreement, dated March 28, 2014, and amended on June 11, 2015, with PPVA pursuant to which Dr. Goldberg was entitled to receive a beneficial ownership interest in 15% of (1) all securities held by Platinum at the time of his separation from Platinum which included, without limitation, warrants to purchase the Company's common stock, and (2) the drawn amounts from the Platinum debt facility. Dr. Goldberg and Platinum are presently in the process of effectuating the transfer of ownership in such securities to Dr. Goldberg. In furtherance of the foregoing, on October 17, 2016, Platinum transferred warrants to acquire an aggregate of 5,411,850 shares of our common stock to Dr. Goldberg, which warrants were exercised in full by Dr. Goldberg on January 17, 2017 resulting in gross proceeds to the Company of $54,118.50. The Company has been advised that a portion of its outstanding debt to Platinum, amounting to approximately $1.4 million, which accrues interest at an annual rate of 14.125%, compounded monthly, as evidenced by a third amended and restated promissory note, is currently intended to be transferred to

Dr. Goldberg upon consummation of the Asset Sale. That part of the Platinum debt not transferred to Dr. Goldberg will be paid-off by us using proceeds of the Asset Sale as the Asset Purchase Agreement requires that, at closing, all indebtedness of the Company be paid in full out of the initial closing cash payment, which includes debts payable to CRG, Platinum and, if the foregoing debt transfer occurs, Dr. Goldberg. The Company discussed obtaining a waiver of such requirement with respect to any Platinum debt transferred to Dr. Goldberg. Cardinal Health 414 has orally agreed to waive such requirement provided there is no security interest in the assets being transferred to Cardinal Health 414. Dr. Goldberg has agreed to not require repayment by the Company of any debt transferred to him until the original maturity date of September 30, 2021, and has agreed to release any financial covenants and securitization requirements. The Company and Dr. Goldberg intend to finalize the negotiation of the definitive terms of such remaining indebtedness. Currently, the Company and Dr. Goldberg have not entered into a formal written agreement concerning the terms of such repayment. Pursuant to a settlement agreement, dated as of June 16, 2016, among the Company, PPVA, Platinum-Montaur Life Sciences, LLC and others, Platinum agreed to forgive interest owed on its credit facility with the Company in an amount equal to 6%, effective July 1, 2016, making the effective annual interest rate on the Platinum debt 8.125% as of December 31, 2016.

- Jed A. Latkin, our Interim Chief Operating Officer and Chief Financial Officer, was an independent consultant that served as a portfolio manager from 2011 through 2015 for two entities, namely Precious Capital and West Ventures, each of which were during that time owned and controlled, respectively, by PPVA and Platinum Partners Capital Opportunities Fund, L.P. Mr. Latkin was party to a consulting agreement with each of Precious Capital and West Ventures pursuant to which, as of April 2015, an aggregate of approximately $13 million was owed to him, which amount was never paid and Mr. Latkin has no information as to the current value. Mr. Latkin's consulting agreements were terminated upon his ceasing to be an independent consultant in April 2015 with such entities. During his consultancy, Mr. Latkin was granted a .5% ownership interest in each of Precious Capital and West Ventures, however, to his knowledge he no longer owns such interests. In addition, PPVA owes Mr. Latkin $350,000 for unpaid consulting fees earned and expenses accrued in 2015 in respect of multiple consulting roles with them. Except as set forth above, Mr. Latkin has no other past or present affiliations with Platinum.

- Dr. Eric Rowinsky, our director, was recommended for appointment to the Company's Board of Directors by Dr. Goldberg at a time when Dr. Goldberg was affiliated with Platinum and has, since that time, been elected by the Company's stockholders to continue to serve as an independent director. At no time has Dr. Rowinsky been affiliated, or in any way related to, any of the Platinum entities.

6

- the expectation that a portion of the consideration we will receive in connection with the Asset Sale will be subject to certain U.S. federal, state, and local income and other taxes;

- the risk that unforeseen liabilities and expenses may be incurred that may limit the ultimate amount of net proceeds from the Asset Sale; and

- the significant costs involved in consummating the Asset Sale, including legal and accounting and other costs, which we estimate to be approximately $600,000.

After careful and due consideration, our Board of Directors concluded that overall, the risks, uncertainties, restrictions and potentially negative factors associated with the Asset Sale were outweighed by the potential benefits of the Asset Sale, and that many of these risks could be managed or mitigated prior to the consummation of the Asset Sale or were unlikely to have a material adverse effect on our Company.

The foregoing information and factors considered by our Board of Directors are not intended to be exhaustive. In view of the variety of factors and the amount of information considered, our Board of Directors did not find it practicable to, and did not, quantify, rank or otherwise assign relative weights to the specific factors it considered in approving the Asset Sale and the Asset Purchase Agreement. In addition, individual members of our Board of Directors may have given different weights to different factors. Our Board of Directors considered all of these factors as a whole, and overall considered them to be favorable to support its determination.

**Interests of Our Directors and Executive Officers in the Asset Sale**

In considering the recommendation of our Board of Directors to vote for the proposal to adopt and approve the Asset Sale, you should be aware that some of our directors and executive officers may have personal interests in the Asset Sale that are, or may be, different from, or in addition to, your interests.

Dr. Michael Goldberg, our President and Chief Executive Officer, previously managed a portfolio of funds for Platinum from May 2007 until December 2013. In 2011, he made an initial investment of $1.5 million in PPVA as a passive investor. Dr. Goldberg believes his current investment balance is approximately $1.4 million after giving effect to prior redemptions and reinvestments. Dr. Goldberg was not a member of the management of any of the Platinum entities; rather he solely had control over the trading activities of a portfolio of health care investments from funds allocated to him from the Platinum funds. Dr. Goldberg was responsible for all investments made by Platinum in the Company and for the trading in the Company's securities up until he joined the Company's Board of Directors in November 2013, at which time he relinquished all control over the trading of the Company's securities held by all of the Platinum entities. On December 13, 2013, Dr. Goldberg formally separated from Platinum and had no further role in managing their health care portfolio. As part of his separation from Platinum, Dr. Goldberg entered into a settlement agreement, dated March 28, 2014, and amended on June 11, 2015, with PPVA pursuant to which Dr. Goldberg was entitled to receive a beneficial ownership interest in 15% of (1) all securities held by Platinum at the time of his separation from Platinum which included, without limitation, warrants to purchase the Company's common stock, and (2) the drawn amounts from the Platinum debt facility. Dr. Goldberg and Platinum are presently in the process of effectuating the transfer of ownership in such securities to Dr. Goldberg. In furtherance of the foregoing, on October 17, 2016, Platinum transferred warrants to acquire an aggregate of 5,411,850 shares of our common stock to Dr. Goldberg, which warrants were exercised in full by Dr. Goldberg on January 17, 2017 resulting in gross proceeds to the Company of $54,118.50. The Company has been advised that a portion of its outstanding debt to Platinum, amounting to approximately $1.4 million, which accrues interest at an annual rate of 14.125%, compounded monthly, as evidenced by a third amended and restated promissory note, is currently intended to be transferred to Dr. Goldberg upon consummation of the Asset Sale. That part of the Platinum debt not transferred to Dr. Goldberg will be paid-off by us using proceeds of the Asset Sale as the Asset Purchase Agreement requires that, at closing, all indebtedness of the Company be paid in full out of the initial closing cash payment, which includes debts payable to CRG, Platinum and, if the foregoing debt transfer occurs, Dr. Goldberg. The Company discussed obtaining a waiver of such requirement with respect to any Platinum debt transferred to Dr. Goldberg. Cardinal Health 414 has orally agreed to waive such requirement provided there is no security interest in the assets being transferred to Cardinal Health 414. Dr. Goldberg has agreed to not require repayment by the Company of any debt transferred to him until the original maturity date of September 30, 2021, and has agreed to release any financial covenants and securitization requirements. The Company and Dr. Goldberg intend to finalize the negotiation of the definitive terms of such remaining indebtedness. Currently, the Company and Dr. Goldberg have not entered into a formal written agreement concerning the terms of such repayment. Pursuant to a settlement agreement, dated as of June 16, 2016, among the Company, PPVA, Platinum-Montaur Life Sciences, LLC and others, Platinum agreed to forgive interest owed on its credit facility with the Company in an amount equal to 6%, effective July 1, 2016, making the effective annual interest rate on the Platinum debt 8.125% as of December 31, 2016.

Jed A. Latkin, our Interim Chief Operating Officer and Chief Financial Officer, was an independent consultant that served as a portfolio manager from 2011 through 2015 for two entities, namely Precious Capital and West Ventures, each of which were during that time owned and controlled, respectively, by PPVA and Platinum Partners Capital Opportunities Fund, L.P. Mr. Latkin was party to a consulting agreement with each of Precious Capital and West Ventures pursuant to which, as of April 2015, an aggregate of approximately $13 million was owed to him, which amount was never paid and Mr. Latkin has no information as to the current value. Mr. Latkin's consulting agreements were terminated upon his ceasing to be an independent consultant in April 2015 with such entities. During his consultancy, Mr. Latkin was granted a .5% ownership interest in each of Precious Capital and West Ventures, however, to his knowledge he no longer owns such interests. In addition, PPVA owes Mr. Latkin $350,000 for unpaid consulting fees earned and expenses accrued in 2015 in respect of multiple consulting roles with them. Except as set forth above, Mr. Latkin has no other past or present affiliations with Platinum.

Dr. Eric Rowinsky, our director, was recommended for appointment to the Company's Board of Directors by Dr. Goldberg at a time when Dr. Goldberg was affiliated with Platinum and has, since that time, been elected by the Company's stockholders to continue to serve as an independent director. At no time has Dr. Rowinsky been affiliated, or in any way related to, any of the Platinum entities.

27

# Exhibit 14

# Holland & Knight

31 West 52nd Street | New York, NY 10019 | T 212.513.3200 | F 212.385.9010
Holland & Knight LLP | www.hklaw.com

Warren E. Gluck
212-513-3396
warren.gluck@hklaw.com

March 16, 2017

*Via Hand Delivery and E-mail to mgoldberg@montaurcap.com*

Michael Goldberg, M.D.
Montaur Capital Partners, LLC
207 Booth Avenue
Englewood, New Jersey 07631

Re:    **Exercise of Navidea Biopharmaceuticals, Inc. Warrants by Michael Goldberg**

Dear Mr. Goldberg:

This firm represents Matthew Wright and Christopher Kennedy in their capacities as the Joint Official Liquidators (the "**Liquidators**") of Platinum Partners Value Arbitrage Fund L.P. ("**PPVA**"). On October 27, 2016 and December 16, 2016, the Financial Services Division of the Grand Court of the Cayman Islands issued orders directing the official winding up of PPVA (the "**Cayman Liquidation**") and appointing Messrs. Wright and Kennedy as the joint official liquidators thereof. The Bankruptcy Court for the Southern District of New York entered an order recognizing the Cayman Liquidation as a foreign main proceeding and the Liquidators as the foreign representatives of PPVA pursuant to chapter 15 of the Bankruptcy Code on November 22, 2016 (the "**Chapter 15 Order**"). *See In re Platinum Partners Value Arbitrage Fund. L.P. (in Official Liquidation), et al.*, No. 16-12925 (SCC) (Bankr. S.D.N.Y., Dkt. 27). A copy of the Chapter 15 Order is enclosed herewith.

PPVA is the sole member of Montsant Partners LLC ("**Montsant**") and the holder of 99% of the membership interests in Platinum-Montaur Life Sciences LLC ("**Platinum Montaur**").

On or about August 20, 2015, Navidea Biopharmaceuticals, Inc. ("**Navidea**") entered into that certain Securities Exchange Agreement with PPVA and Montsant (the "**Exchange Agreement**"), by which PPVA and Montsant exchanged Series B preferred stock in Navidea that they then held for warrants to purchase Navidea common stock. Among other things, under the terms of the Exchange Agreement, Navidea issued 9,365,280 warrants to Montsant (the "**Montsant Warrants**") and 5,411,850 warrants to PPVA (the "**PPVA Warrants**").

In its February 8, 2017 14A Definitive Proxy Statement (the "**Proxy**"), Navidea disclosed that on October 17, 2016, "Platinum Montaur Life Sciences LLC and its affiliates" transferred 5,411,850 warrants, which appear to correspond exactly to the PPVA Warrants, to Michael

Anchorage | Atlanta | Austin | Boston | Charlotte | Chicago | Dallas | Denver | Fort Lauderdale | Houston | Jacksonville | Lakeland
Los Angeles | Miami | New York | Northern Virginia | Orlando | Portland | San Francisco | Stamford | Tallahassee | Tampa
Washington, D.C. | West Palm Beach

Michael Goldberg, M.D.
March 16, 2017
Page 2

Goldberg, President and Chief Executive Officer of Navidea (the "**Goldberg Transfer**"). The Proxy further indicates that Dr. Goldberg purportedly exercised the warrants he received in connection with the Goldberg Transfer on or about January 17, 2017 (the "**Goldberg Exercise**").

Paragraph 7(b) of the Chapter 15 Order expressly authorizes the Liquidators to "examine witnesses, take evidence, and seek the production of documents within the territorial jurisdiction of the United States concerning the assets, affairs, rights, obligations or liabilities of the [PPVA and PPVA International], [their] affiliates and [their subsidiaries by…[*inter alia*] written request [to] obtain[ ] turnover of any and all documents, records, filings, or other information, however stored, including but not limited to emails that are property of, concern or were made or issued on behalf of the [PPVA and PPVA International], from any person or entity subject to [the] Court's jurisdiction…." Accordingly, the Liquidators request that Goldberg produce copies of the following documents by March 30, within 10 business days of the day hereof:

1. All documents or communications between and among (i) Navidea, its officers, directors, employees, representatives, attorneys, agents and assigns (the "**Navidea Parties**"), and (ii) PPVA, Montsant, Platinum Montaur, Platinum Management (NY) LLC ("**Platinum Manager**"), and any of their respective members, operators, officers, directors, employees, subsidiaries, affiliates, representatives, attorneys, or agents (the "**Platinum Parties**"), concerning the issuance of the PPVA Warrants and the Montsant Warrants;

2. All documents or communications between the Navidea Parties and any of the Platinum Parties concerning the transfer or assignment of the PPVA Warrants or the Montsant Warrants at any time to any other person, including but not limited to Michael Goldberg, his agents, attorneys, representatives, assigns or any other person or entity acting on his behalf (the "**Goldberg Parties**");

3. All documents concerning the purported October 2016 transfer of warrants by Platinum Montaur and its affiliates to Michael Goldberg, as described in the Navidea Proxy.

4. All documents concerning the purported Goldberg Exercise in or about January 2017;

5. All documents or communications between and among the Navidea Parties and the Goldberg Parties concerning the purported transfer any of the PPVA Warrants or Montsant Warrants to Dr. Goldberg or any of the Goldberg Parties;

6. All documents or communications between and among the Navidea Parties and the Goldberg Parties concerning the purported Goldberg Exercise.

7. All documents or communications between the Navidea Parties and any other person or entity concerning the purported Goldberg Transfer or the Goldberg Exercise.

Michael Goldberg, M.D.
March 16, 2017
Page 3


8.    All documents or communications concerning the source of the information contained in the Navidea Proxy regarding the purported Goldberg Transfer and the Goldberg Exercise.

The Liquidators reserve the right to request additional documents and testimony, as well as all of their rights at law and equity.

Please call me if you have any questions regarding the foregoing requests.

Very truly yours,

HOLLAND & KNIGHT LLP

Warren E. Gluck

cc:    Matthew Wright (By E-Mail)
       Christopher Kennedy (By E-Mail)
       Barbra R. Parlin, Esq.  (By E-Mail)
       Mitchell J. Geller, Esq. (By E-Mail)

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Southern
_____    District of  New York
_____

In re  Platinum Partners Value Arbitrage Fund L P  (In Official Liquidation), et al
_____
Debtor

*(Complete if issued in an adversary proceeding)*

_____
Plaintiff

v.

_____
Defendant

Case No.  16-12925 (SCC)
_____

Chapter  15
_____

Adv. Proc. No.  _____

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  Michael Goldberg, Montaur Capital Partners, LLC, 207 Booth Avenue, Englewood, NJ 07631
_____
*(Name of person to whom the subpoena is directed)*

■ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  **See Schedule A**

| PLACE | DATE AND TIME |
|---|---|
| Holland & Knight LLP, 31 West 52nd St., New York, NY 10019 | March 30, 2017 |

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  03/16/2017
_____

CLERK OF COURT

                                                            OR

_____          _____
*Signature of Clerk or Deputy Clerk*                *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
Liquidators of Platinum Partners Value Arbitrage Fund L P  , who issues or requests this subpoena, are:
Warren E. Gluck, Holland & Knight LLP, 31 West 52nd St., New York, NY 10019, (212) 513-3200, warren.gluck@hklaw.com

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

# PROOF OF SERVICE
## (This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

    I declare under penalty of perjury that this information is true and correct.

Date: _____

                                        _____
                                                    *Server's signature*

                                        _____
                                                    *Printed name and title*

                                        _____
                                                    *Server's address*

Additional information concerning attempted service, etc.:

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
　(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
　(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
　　(i) is a party or a party's officer; or
　　(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
　(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
　(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
　(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
　(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
　　(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
　　(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
　(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
　　(i) fails to allow a reasonable time to comply;
　　(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
　　(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
　　(iv) subjects a person to undue burden.
　(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
　　(i) disclosing a trade secret or other confidential research, development, or commercial information; or

　　(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
　(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
　　(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
　　(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
　(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
　(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
　(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
　(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
　(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
　　(i) expressly make the claim; and
　　(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
　(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

# SCHEDULE A

**Instructions:**

1.      Unless otherwise indicated, all document requests below seek responsive documents from the time period of March 14, 2010 to the present.

2.      In answering these document requests, you are requested to furnish all documents available to you regardless of whether this information is possessed directly by you, your agents, representatives, employees, representatives, or investigators, or by any other legal or non-legal entities controlled by and/or in any manner affiliated with you.

3.      These document requests are continuing in nature.  If, at any time after service of the initial answers hereto and prior to the closing of factual discovery in this action, you obtain additional information responsive to these document requests, you are required to supplement or amend your answers.

4.      Where a claim of privilege is asserted in objecting to any document request or part thereof, please follow the requirements set forth in the Local Bankruptcy Rules for the Southern District of New York.

5.      If the responding party elects to specify and produce business records in answer to any document request, the specification shall be in sufficient detail to permit the requesting party to locate and identify, as readily as the responding party can, the business records from which the answer may be ascertained.

6.      If, in answering these document requests, the responding party encounters any ambiguities when construing a question, instruction, or definition, the responding party's answer shall set forth the matter deemed ambiguous and the construction used in answering.

## **Definitions:**

Notwithstanding any definition below, each word, term, or phrase used in these requests for the production of documents is intended to have the broadest meaning permitted under the Federal Rules of Civil Procedure. All capitalized terms not expressly defined in these requests for production of documents shall have the meanings ascribed to them in the cover letter delivered along with this subpoena and Schedule A.

1.   *Account:* The term "account" includes any bank account, brokerage account, checking account, investment account, money market account, securities account, or any other type of account maintained by and through the bank or any of its affiliates, subsidiaries or related companies.

2.   *Wire Transfer:* The term "wire transfer" refers to any electronic transfer of funds. All terms used in connection with the term "wire transfer," such as "originator" and "beneficiary" have the meanings set forth in Article 4A of the Uniform Commercial Code.

3.   *You/Your:*   The terms "you" or "your" include the person(s) to whom these requests are addressed, and all of that person's agents, representatives, and attorneys. The present tense includes the past and future tenses. The singular includes the plural, and the plural includes the singular. "All" means "any and all," "any" means "any and all." "Including" means "including but not limited to," "and" and "or" encompass both "and" and "or." Words in the masculine, feminine, or neutral form shall include each of the other genders.

4.   *Concerning:* The term "concerning" means relating to, referring to, describing, evidencing, or constituting.

5.   *Communication:* The term "communication" means the transmittal of information by any means.

2

6. *Document:* The terms "document" and "documents" are defined to be synonymous in meaning and equal in scope to the usage of the term "documents" and include(s) the term "writing" as well as, but not limited to, books, records, minutes, letters, telegrams, memoranda, diaries, calendars, notes, worksheets, reports, surveys, calculations, cards, invoices, financial statements, accounts, checks, emails, receipts and any other written or printed matters, including computer tapes, discs, records and printouts and drafts of any of the foregoing, in whatever form any of such materials may appear and in whatever language, and all other tangible things on which words, figures, notations or sounds are recorded in writing, or by any other means, and any such material underlying, supporting or used in the preparation of any of the foregoing and all originals, counterparts and copies of the foregoing.

## Requested Documents:

1. All documents or communications from March 14, 2010 to the present between and among (i) Navidea Biopharmaceuticals, Inc., its officers, directors, employees, representatives, attorneys, agents and assigns (the "**Navidea Parties**"), and (ii) PPVA, Montsant, Platinum Montaur, Platinum Management (NY) LLC ("**Platinum Manager**"), and any of their respective members, operators, officers, directors, employees, subsidiaries, affiliates, representatives, attorneys, or agents (the "**Platinum Parties**"), concerning the issuance of the PPVA Warrants and the Montsant Warrants;

2. All documents or communications from March 14, 2010 to the present between the Navidea Parties and any of the Platinum Parties concerning the transfer or assignment of the PPVA Warrants or the Montsant Warrants at any time to any other person, including but not limited to Michael Goldberg, his agents, attorneys, representatives, assigns or any other person or entity acting on his behalf (the "**Goldberg Parties**");

3

3.    All documents from March 14, 2010 to the present concerning the purported October 2016 transfer of warrants by Platinum Montaur and its affiliates to Michael Goldberg, as described in the Navidea Proxy.

4.    All documents from March 14, 2010 to the present concerning the purported Goldberg Exercise in or about January 2017;

5.    All documents or communications from March 14, 2010 to the present between and among the Navidea Parties and the Goldberg Parties concerning the purported transfer any of the PPVA Warrants or Montsant Warrants to Dr. Goldberg or any of the Goldberg Parties;

6.    All documents or communications from March 14, 2010 to the present between and among the Navidea Parties and the Goldberg Parties concerning the purported Goldberg Exercise.

7.    All documents or communications from March 14, 2010 to the present between the Navidea Parties and any other person or entity concerning the purported Goldberg Transfer or the Goldberg Exercise.

8.    All documents or communications from March 14, 2010 to the present concerning the source of the information contained in the Navidea Proxy regarding the purported Goldberg Transfer and the Goldberg Exercise.

4